E
X
H
I
B
I
T

C

# EXHIBIT C

Amy Gabay
October 08, 2020

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

WEST PALM BEACH DIVISION

CASE NO.:  9:20-cv-80279-DMM-DLB

DARLENE DEARY, individially and

as assignee of DWIGHT NORMAN,

        Plaintiff,

 vs.

PROGRESSIVE AMERICAN INSURANCE COMPANY,

        Defendant.

_____/

REMOTE VIDEO TELECONFERENCE DEPOSITION OF

AMY GABAY

DATE TAKEN:          October 8, 2020

TIME:               10:05 a.m. - 1:17 p.m. EDT

WITNESS LOCATION:  Lake Worth, Florida

Reported By:

MARCI PORTER, CER No. 1029

Appearing remotely via video teleconference from

MIAMI-DADE COUNTY, FLORIDA

Amy Gabay
October 08, 2020                                                2

APPEARANCES:


On behalf of Plaintiffs:

   VER PLOEG & MARINO, P.A.

   100 Southeast Second Street, Suite 3300

   Miami, Florida 33131

   mmeiler@vpm-legal.com

   BY:  MICHAL MEILER, ESQUIRE

   APPEARED VIA VIDEO TELECONFERENCE


On behalf of Defendant:

   YOUNG, BILL, BOLES, PALMER, DUKE & THOMPSON, P.A.

   2 South Biscayne Boulevard, Suite 3195

   Miami, Florida 33131

   aduke@flalawyer.net

   BY:  ADAM A. DUKE, ESQUIRE

   APPEARED VIA VIDEO TELECONFERENCE



ALSO PRESENT:

   NADINE GABAY, In-House Counsel for Progressive American

   Insurance Company

   APPEARED VIA VIDEO TELECONFERENCE

Amy Gabay
October 08, 2020                                    3

INDEX

DEPOSITION OF AMY GABAY                                   PAGE

Examination by Ms. Meiler                                 6

Certificate of Oath for Witness                          144

Certificate of Reporter                                  145

Certificate of Transcriptionist                          146

Witness Notification Letter                              147

Errata Sheet                                             148


          PLAINTIFF'S EXHIBITS FOR IDENTIFICATION:


NUMBER        DESCRIPTION                              PAGE

Exhibit 1     Progressive Claim Notes PGR 719-773       28

Exhibit 2     Faxed Letter dated 4-7-17                 37

Exhibit 3     Letter dated 4-7-17 PGR 309               57

Exhibit 4     Letter dated 5-3-17 PGR 781               68

Exhibit 5     Letter dated 7-17-17 PGR 121-276          71

Exhibit 6     Liability Navigator Assessment 8-1-17     91

Exhibit 7     Claim Information Letter dated 8-3-17

              PGR 780                                   108

Exhibit 8     Letter dated 8-7-17 PGR 321              119

Exhibit 9     Letter dated 8-15-17 PGR 829             128

Exhibit 10    Letter dated 9-18-17 PGR 31-34           130

Exhibit 11    Progressive Claims Handling Guidelines

              PCS 1-34                                  137

P R O C E E D I N G S

Deposition taken under oath before MARCI PORTER, CER No. 1029 and Notary Public in and for the State of Florida at Large, in the above cause.

- - - - - - -

THE COURT REPORTER:  So I'll need to see the witness's ID.

THE WITNESS:  Oh, I'll have to get up and get that. Okay?

THE COURT REPORTER:  Okay.

THE WITNESS:  Sorry.  I was not prepared for that one.  I'm going to assume I can just hold it up to this --

THE COURT REPORTER:  The camera.  Thank you.  A little closer.  Let me see if I can read the words. Okay.  Perfect.  Are you in Lake Worth now?

THE WITNESS:  Yes.

THE COURT REPORTER:  Okay.  Thank you.  I'm -- I saw it.

(Witness presented government-issued identification and identity is verified.)

THE COURT REPORTER:   Okay.  So I'm going to do a read-on.  The parties participating in this proceeding acknowledge that I am not physically present in the proceeding room and that I will be reporting this

proceeding remotely.  They further acknowledge that in lieu of an oath administered in person, I will administer an oath remotely.  This arrangement is in pursuant to the Florida Supreme Court Administrative Order No. AOSC-20-23.  The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.  Please indicate your agreement by stating your name and your agreement on the record.

THE WITNESS:  My name is -- oh, sorry.

MS. MEILER:  Michal Meiler on behalf of Darlene Deary, and we agree.

MR. DUKE:  This is Adam Duke on behalf of Progressive.

THE COURT REPORTER:  Do you agree?

THE WITNESS:  My name is Amy --

THE COURT REPORTER:  I'm sorry.  Adam, do you agree for a video [sic] deposition?

MR. DUKE:  Yes.

THE COURT REPORTER:  Okay.  Thank you.  Okay.  So will -- will the witness please raise your right hand? Do you solemnly swear or affirm that the testimony you give in this case will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURT REPORTER:  Thank you.

THEREUPON,

AMY GABAY,

was called as a witness, and after having been first duly sworn, was deposed and testified as follows:

EXAMINATION

BY MS. MEILER:

Q.  Good morning, Ms. Gabay.  My name is Michal Meiler and I represent Darlene Deary in this case.  And we're here relating to Darlene Deary's claim against Progressive's insured, Dwight Norman.  Are you familiar with that claim?

A.  Yes.

Q.  Have you ever been deposed before?

A.  No.

Q.  Okay.  So I'll go through some of the rules.  I'm going to ask you questions about your involvement in this case.  I need you to answer verbally.  So "yes" and "no" instead of "uh-huh" and "huh-uh."  That way the court reporter can take it down.  If I ask you anything that's confusing or that you're -- you don't know what I'm asking, then just let me know so I can rephrase the question.  If you answer my question, I'm going to assume you understood what I asked.  Okay?

A.  Okay.

Q.   If you need to take a break at any point, then let me know.  We can take a break.  Before we got on the record, we discussed the exhibits to this deposition since we are remote.  My understanding is that you don't have the exhibits in front of you.  So I'll be using screen-sharing.  If at any point you want me to zoom in to a document or to -- you know, go to the next page or -- or anything like that, just let me know.  Also, if you want to see the document itself, then let me know, I can email it to you; and we can take a break so that you can review it as well from your computer screen.  Okay?

A.   Okay.

Q.   Ms. Gabay, what is your date of birth?

A.   March 3rd, 1969.

Q.   And where are you employed?

A.   Progressive Insurance.

Q.   What is your -- your address at work?

A.   5311 Tyler Lakes Boulevard -- no -- 5 -- yeah. It's been so long since I've been there with COVID.  5133 Tyler Lakes Boulevard, Suite 200, West Palm Beach, Florida 33407.

Q.   And where do you reside?  What county?

A.   Palm Beach.

Q.   Palm Beach.  Do you have any plans of leaving Palm Beach in the next year?

Amy Gabay
October 08, 2020                                    8

A.   Not that I know of, no.

Q.   Okay.  Now, because of COVID, if we needed to serve you with a subpoena, for example, would we serve you at home?

A.   I would assume yes.

Q.   Okay.  So can you give me your home address as well?

A.   It's 5441 Oakmont O-A-K-M-O-N-T, Village Circle, Lake Worth, Florida 33463.

Q.   Thank you, Ms. Gabay.  Prior to today's deposition, did you review any documents to prepare?

A.   Yes, I did.

Q.   What did you review?

A.   I reviewed the claim itself, and I went over some of the documents in the claim.

Q.   When you say "the claim itself," do you mean the claim file?

A.   Yes.

Q.   Okay.  And the claim file, does that exist -- consist of Progressive's claim notes?

A.   Yes.

Q.   What about the letters exchanged between Progressive and Ms. Deary's counsel?

A.   I reviewed the ones that I personally handled while I was on the claim.

Q.   When you reviewed these documents, did you go into Progressive's claim system yourself to look at what you wanted to see or did somebody provide you with those documents?

A.   So I was provided with some of the documents through Progressive house counsel.

Q.   In-house counsel?

A.   Progressive's house counsel.

Q.   And who is Progressive's house counsel?

A.   Nadine Gabay.

Q.   Did you speak with Ms. Gabay -- Nadine Gabay --

A.   Yes, I did.

Q.   -- relating to this deposition?

A.   Yes, I did.

Q.   Both about the contents of the deposition or just about, like, form, like, what -- you know --

MR. DUKE:  Objection.

BY MS. MEILER:

Q.   -- (Inaudible)?

MR. DUKE:  I'm going to instruct the witness not to answer with regard to any of the substance of any communications with in-house counsel.  She can say that she spoke to her.  That's fine.  But as far as what they talked about, I'm going to assert attorney-client privilege.

MS. MEILER:  Okay.

BY MS. MEILER:

Q.  Ms. Gabay, Nadine Gabay has the same last name as you; right?

A.  Yes.

Q.  Okay.  Are you guys related in any way?

A.  Not that I know of.

Q.  Okay.  Did you speak to Mr. Duke, who is representing Progressive in this matter?

A.  Yes.

Q.  How long did you speak to Mr. Duke for?

A.  Probably about a hour and a half.

Q.  Just once or was that over multiple conversations?

A.  Just once.

Q.  And for how long did you speak to Ms. Gabay relating to this deposition, Ms. Nadine --

A.  The same.  It was all in one conversation.

Q.  Okay.

A.  Combined.

Q.  All right.  Now, Ms. Gabay, you said that you are employed by Progressive right now?

A.  Correct.

Q.  What is your position there?

A.  I am a claims specialist.

Q.  Are you assigned to specific types of claims?

A.  Bodily injury claims.

Q.  And are there different departments for different types of bodily injury claims?  For example, unrepresented versus represented claims?

A.  Exactly.

Q.  Okay.  And which -- which department are you in?

A.  Represented.

Q.  Is there any threshold of injury that you handle?  For example, like, if it's a minor injury, it goes to a different unit; or do you handle all bodily injury for represented claims?

A.  I handle my -- soft tissue mostly.

Q.  All right.  And if it's not a soft tissue claim, like, for example, a death claim, is that something that you handle or does that go to a different department?

A.  I think it would depend upon the circumstances.

Q.  Is there --

A.  (Inaudible) --

Q.  Continue.

A.  I think most claims are going to depend upon the circumstances.

Q.  Is there a separate division other than the one that you're in that handles more serious injury claims?

A.  Yes.

Q.  Okay.  And what is that unit called?

A.  Well, we have a litigation department; and we also have a health department.

Q.  Did you say "health"?

A.  Mm-hmm.  Yes.

Q.  Okay.  And what does "health" stand for?

A.  I don't know what the acronym is.  I'm sorry.

Q.  That's okay.  And what is the name of your division?

A.  Casualty.

Q.  How long have you been a claims specialist in the casualty unit?

A.  Somewhere between six and eight years.

Q.  How long have you been employed by Progressive?

A.  21 years.

Q.  Okay.  So can you take me through your positions starting from when you first went to Progressive until you entered the casualty unit about six to eight years ago?

A.  I -- 1999, I joined Progressive as a property damage liability adjuster.  I worked there up until about six, eight years ago when I decided to join casualty.  Applied for the position; and then I, you know, took my training.  Well, I got the position; and then I took my training, which lasted about two months.  And then I've been in this position ever since; and we do our continuous training.  Every week we have continuous training,

basically.

Q.  All right.  The initial training that you received for about two months, what -- what did that consist of?

A.  So we were taught about different injuries, and we were taught how to use the computer system, and we were taught how to read medical records.

Q.  Which computer system?

A.  Well, we have -- well, we use LNav --

Q.  LNav?

A.  -- half the time.

Q.  Is that Liability Navigator?

A.  Yes.

Q.  And what does LNav do?

A.  Well, it's a tool that helps us.  We do all the work.  It's just -- puts it in a form for us.

Q.  Is that a valuation software that assists you?

A.  Yes.

Q.  Okay.  And that's to value bodily injury claims?

A.  Well, we actually do the value.

Q.  Okay.  So how does LNav help you?

A.  So I put in all the -- I put in all the injury information.  I put what we accept as far as the injuries. I put what we accept as far as the treatment.  I put what we accept as far as what medical records we're going to accept.  I put what we're going to accept as far as the

specials, and then LNav will put it all together for us in a form.

Q. Okay. When you say "what we're going to accept," is that what you as an adjuster have determined were injuries caused by the accident?

A. Yes.

Q. And when you say "specials," what does that mean?

A. So specials are what out-of-pockets there actually are.

Q. Okay. So actual medical expenses?

A. Yes.

Q. Okay. When you say "out-of-pockets," does that include anything that's been paid by PIP or a collateral source?

A. Well, PIP is not something -- PIP is something that's already been paid. So that out-of-pockets would be their deductible or their copayments or any -- or stuff that has not been paid.

Q. Okay. So the specials that you input into LNav are above what's been paid by PIP?

A. Correct.

Q. What about future medical expenses? Do you input that?

A. No.

Q. Where is -- is there a way that you as an adjuster

Amy Gabay
October 08, 2020                                    15

are able to add the future medical expenses to whatever you input into LNav?

A.   So I can put additionals in there if I deem that the file needs additionals.  I have full control over if I need that.

Q.   Okay.  And the additionals, that would be including future medical expenses?

A.   If I see it.

Q.   If the claimant has a permanent injury and is entitled to noneconomic damages like pain and suffering, is there a place to put that into LNav?

A.   Yes.

Q.   What is that place?  Is that also additionals or is there a separate --

A.   Right.

Q.   -- (Inaudible)?

A.   Right.

Q.   Like, it's also (Inaudible) --

A.   So I could put additionals -- it's like if she -- if she has injections, I can put that under "additionals" as well.

Q.   When you say "if she has injections," why doesn't that go into the specials?

A.   Because if we want to add more for the pain and suffering for additionals -- for injections, I would put

that into additionals.

Q.   Okay.  So the cost of the injection, for example, would be in the special section; but the cost of pain and suffering related to the injectables would be in the additional section?

A.   Correct.

Q.   Okay.  And you as the adjuster have discretion as to what to put into the specials or not to put anything into the specials?

A.   Correct.  Well, specials -- actually, specials, I don't -- if there's specials, I owe specials.

Q.   Okay.  So you have to put -- input something in the specials category?

A.   If it's out-of-pocket expenses, they're owed.

Q.   Okay.  And for the additionals -- apologies -- for the additionals, it's up to you as the adjuster whether to add anything to the additionals; is that right?

A.   Correct.

Q.   Okay.  And that would include the noneconomic damages?

A.   Correct.

Q.   And that would include the future medical expenses?

A.   Correct.

Q.   All right.  So back to the training, we just went through a little bit of the LNav.  And -- and we'll later

Amy Gabay
October 08, 2020                        17

actually look at the LNav from this claim.  So we might

talk about it a little bit more.  But, for now, let's go

back to -- you mentioned how to read medical records.

What kind of training did you get initially from

Progressive regarding how to read medical records?

    A.  So we were trained on what certain type of injuries

were, you know, how we accept certain injuries.  And we

just went through trainings on, you know, how to

negotiate, teaching us stuff like that.

    Q.  When you say "training on how to accept certain

injuries," what does that -- what does that mean track

there?  Like, when do you accept certain injuries and when

do you not accept certain injuries?

    A.  Well, we look at -- we look at each person as an

individual.  You know, there's no two claims that are the

same.  So we have to look at it holistically.

    Q.  If the medical records that you received have a

doctor or a medical professional's opinion that the

treatment received was as a result of the accident, then

does Progressive give you training as to whether to accept

that at face value or what -- what do you do you with that

information?

        MR. DUKE:  Object to the form, but you can go ahead

    and answer.

        THE WITNESS:  I'm sorry?

BY MS. MEILER:

Q.  Sure.  Let me rephrase the question.  As an adjuster, when you receive medical records that have a medical professional opining that an injury was caused by the accident or that treatment was -- was rendered as a result of an accident, how do you, as an adjuster, decide whether to accept that injury and treatment or whether to reject that injury and treatment?

A.  I think that we look at the whole file in its totality.  So I think that that's kind of an open-ended question because you have to look at the whole thing in its totality.

Q.  Okay.  Now, when you -- did Progressive give you any training on investigative tools that you can use relating to medical treatment, like, to obtain more records and things like that?

A.  I'm not sure exactly what you're asking for in reference to that.  Are you asking, like, to search something on Google or -- I'm not --

Q.  Sure.  Let me rephrase the question.  Do you know what an ISO report is?

A.  Correct.

Q.  Okay.  What -- what is an ISO report?

A.  An ISO report, you search to see if there's any previous injuries, if there's any previous accidents, you

know, if there's any priors.

Q. Okay. So would you agree with me that an ISO report is a tool that you as an adjuster can use to investigate the damages?

A. We use the ISO tool, but it's not indicative of things that are going -- you know, it gives you an idea.

Q. Okay. Are there any sources of information that Progressive trains you to be familiar with? So, for example, an ISO database. Are there any other sources of information that Progressive trains you to utilize?

A. We use ADD to run a VIN number. I'm not sure what you're looking for.

Q. Do you have nurses or medical professionals in-house at Progressive that you can consult when you're not sure of the nature of an injury or -- or what the medical records are saying?

A. No.

Q. So when you receive medical records, if you're unsure of what an injury is, what do you -- what do you do as an adjuster?

A. I'll go online, and I'll search to see what the injury is.

Q. When you say "online," do you mean like Google or is there an internal source of information at Progressive that you consult?

A.   There's both.  And I also ask other people who may be more aware of the injury than I am.

Q.   What do you have internally at Progressive that you can consult relating to injuries?

A.   So in -- I usually go online, and that's what I use.

Q.   Okay.  And when you say "online," you mean Google or is there a website that you specifically would use?

A.   So I'll -- I'll google.  But, most of the time, the injuries that I see, I don't have have to do that because they usually -- most of the time, they're usually like soft tissue injuries or it's injuries that I've seen before.

Q.   How long was your training on reading medical records specifically during that two-month period?

A.   I really don't remember.

Q.   Did Progressive give you any sort of handout or -- or a training manual that talks about, for example, the definition of a bulge versus a herniation or something like that?

A.   I think everything was online; so I don't really remember having a card copy.

Q.   Okay.

A.   I don't remember.  I don't remember to tell you the truth.  It was six to eight years ago.

Amy Gabay
October 08, 2020                                    21

Q.  So is it fair to say that you don't have any hard-copy policy or manual relating to injuries that you consult on a day-to-day basis?

A.  I do not have anything at my desk.

Q.  After that two-month training that you received at Progressive when you joined the casualty unit, you mentioned that you received training every week; is that right?

A.  Approximately, yes.

Q.  What kind of training do you receive every week?

A.  So every week, approximately, we'll get together as a group; and our supervisor will bring a liability or an injury; and we'll discuss it.  And we'll do a roundtable, and we'll go through the claim, and we'll get additional training on that.

Q.  Is an actual accident -- like, claim arising from an actual accident that is presented to you, or is it a hypothetical situation that's (Inaudible) --

A.  A little bit of both.

Q.  And would that -- that weekly training session, have you gone to that every week since you joined the casualty unit six to eight years ago?

A.  No.

Q.  Okay.  When did that start?

A.  I can't even tell you.

Q.   You were involved in this claim beginning in April of 2017, at least according to my review.  We can go through the details.  Do you know if you were -- if you had those weekly training sessions back in April of 2017?

A.   I can't tell you that.

Q.   Do you know if it -- if those occurred at all in the year of 2017?

A.   I would assume that back in 2017, we had training. I don't remember what the training was, but we do have training. It may have been every other week at that point. I don't know.

Q.   Okay.  Who is your supervisor right now that does the weekly trainings for everybody?

A.   Well, we do it with our manager.

Q.   Okay.  Is there a difference between a supervisor and a manager?

A.   Yes.

Q.   Okay.  What's -- what's a supervisor, and what's a manager?

A.   My supervisor is Greg Chalfant.

Q.   How do you spell that?

A.   Greg, G-R-E-G, C-H-A-L-F-A-N-T.

Q.   C-H-A-L --

A.   -- F-A-N-T.

Q.   Greg Chalfant.  And who is your manager?

Amy Gabay
October 08, 2020                                    23

A.  Charles and last -- Strohson, S-T-R-O-H-S-O-N.  But I may have spelt that incorrectly.

Q.  Okay.  And who is the role of your supervisor and the role of your manager?

A.  So Greg's -- is directly overseeing me, and Chuck oversees quite a few supervisors, and they go to him.

Q.  Okay.  When you were handling Ms. Deary's claim against Mr. Norman, do you know who your supervisor was?

A.  I do not because we've changed supervisors a couple different times, and they just changed.

Q.  Do you know your manager was at the time?

A.  It was Charles.  We call him "Chuck."  So it was Chuck.

Q.  Okay.  So if we talk about Chuck during this deposition, that means Charles Strohson; correct?

A.  Correct.

Q.  Okay.  Do you know who Melissa Matz is?

A.  Yes.  That was probably Melissa at the time.

Q.  Melissa was probably your supervisor?

A.  Correct.

Q.  Okay.  So she would have overseen your day-to-day activities; is that fair?

A.  Correct.

Q.  Do you know if you did those -- actually, strike that.

I just want to make sure that I understand the weekly trainings.  Are those with the supervisor or with the manager?

A.  Usually, it's the whole group at the same time.

Q.  Do you remember have ever having one of those weekly training with Melissa Matz?

A.  So, at the time, it probably would not have been because Melissa was in the Broward office; and I was in the West Palm Beach office.  At the time, we weren't virtual like this.  So it would've been an in-house training.  So the training would've been with the people in the West Palm Beach office, which was where I was.  So my training would've been in-house in West Palm Beach.  So Melissa probably would not have been there, but I would've been with the West Palm Beach office.

Q.  Okay.  And you don't know if that was the weekly training or a different kind of training; right?

A.  I'm sorry.  Was the weekly --

Q.  You don't know if that's the weekly training or a different type of training, like less often (Inaudible)? I just want to be clear that (Inaudible).

A.  I'm not understanding the question because if the -- the training would've been in West Palm Beach that I went to.

Q.  Okay.  But you don't know if that was the weekly

Amy Gabay
October 08, 2020                                25

roundtable that you were having or if that was less often,
like a month?

MR. DUKE:  Object to the form.

A.  Right.  Right.

BY MS. MEILER:

Q.  Okay.  When you joined the casualty unit six to
eight years ago, did you receive any training on good
faith duties in Florida?

A.  Yes.

Q.  Okay.  Do you remember what that training consisted
of?

A.  So I did not receive it as I entered the casualty
department, but I've received it at Progressive --

Q.  Okay.  But --

A.  -- previously and since.

Q.  Okay.  That was going to be my next question.  How
often do you receive training on the good faith duties in
Florida?

A.  I don't know.

Q.  Do you know when the last time you received a
training on that was?

A.  I don't -- I don't know.

Q.  Do you know if it was before or after April of
2017?

A.  I couldn't tell you for sure.

Amy Gabay
October 08, 2020                              26

Q.  Okay.  And are those trainings typically given by an attorney or another claims professional?

A.  I want to say last time we had it, it was by an attorney but I'm not a hundred percent certain.

Q.  Do you remember if that was somebody -- an attorney from outside of Progressive or in-house the way that Ms. Gabay is an in-house attorney, as Nadine Gabay?

A.  I think it was in-house.

Q.  Do you know if you ever received any trainings from Todd Parnell?

A.  I think although I'm not a hundred percent sure.

Q.  What about Robert (Inaudible)?

A.  You know what?  I can't say.

Q.  Do you have any other computer system that you use to value injuries other than the LNav system?

A.  To value the claim?

MR. DUKE:  Object to the from.  Are you -- are you asking about during the time frame that we're --

MS. MEILER:  Yeah.

MR. DUKE:  -- talking about in this case?

MS. MEILER:  Yeah.  Let me rephrase the question.

BY MS. MEILER:

Q.  Back during 2017 and 2018 when you were involved in this claim, did you use any other software system to assist you valuing injuries other than the LNav system?

A.  Not to my recollection.

Q.  Okay.  All right.  Do you have any independent recollection of your involvement in Ms. Deary's claim against Mr. Norman?

A.  I -- I've reviewed the claim.  I remember some of it.

Q.  All right.  So did you -- you mentioned earlier that you received the documents that you were involved in; correct?

A.  Correct.

Q.  Okay.  Do you remember what the earliest involvement you had in the claim was?

A.  Like you said, I reviewed it; and I think it was April 14th was when it was assigned to me.

Q.  All right.  Do you know who Jose Pantoja is?

A.  I think he works for Progressive, but I don't know him personally.

Q.  Okay.  Now, he was -- at least in the claim notes, he had notes early on from the date that the -- the claim was reported to Progressive.  Do you know if you spoke to Mr. Pantoja when you took over the claim or was assigned the claim in -- on April 14th of 2017?

A.  I do not know.  I do not think so, but I do not know.

Q.  Okay.  Do you know Adina Johnson is?

A.  She works for Progressive as well, but I do not know her personally.

Q.  Do you know if you discussed this claim with Adina Johnson when you took over on April 14th, 2018 -- 2017?

A.  I do not think so.

MS. MEILER:  All right.  I'm going to (Inaudible) okay.  I'm going to screen-share, and we can -- we can mark as Exhibit 1 to this deposition Progressive's claim notes, which are PGR 7190773.  Madam Court Reporter, are you able to -- to mark that document?

THE COURT REPORTER:  Yes.

(Plaintiff's Exhibit No. 1 was marked for identification.)

MS. MEILER:  And I am going to screen-share so we can both take a look at that, if I can figure out how to -- can you enable screen-sharing, Madam Court Reporter?

THE COURT REPORTER:  I -- I don't think I am -- you want me to bring it up or do you want me to enable it? Am I the -- am I the host?

MS. MEILER:  Oh, I found it.  Never mind.

THE COURT REPORTER:  Okay.

MS. MEILER:  Sorry about that.  And I think we have the wrong screen.  Sorry about that.  Here.  Let me pull this over here.  Now you see what I get to look at

Amy Gabay
October 08, 2020                              29

during the day.  All right.  Can we all see the -- the document in front of us, the claim notes?

THE WITNESS:  Okay.

BY MS. MEILER:

Q.  You can see the claim notes.  Okay.  So I'm going to scroll down the claim notes to --

MR. DUKE:  Michal?

MS. MEILER:  Yeah.

MR. DUKE:  A moment ago the claim notes were taking up pretty much the whole screen; but, now, most of the screen is being occupied with the list of the documents.  So I don't know.

MS. MEILER:  Oh, that was the right screen.  Okay.  I apologize.  (Inaudible).  Sorry.  I -- I have two screens here, and I'm not the best at technology.

MR. DUKE:  Yeah, the way you had it the first time looked pretty good.  I don't know if you can get it back that way.

MS. MEILER:  I will try.  Why is this not working now? Here we go.  Okay.

MR. DUKE:  There you go.

MS. MEILER:  Okay.  Now -- okay -- we're both on the same -- we're literally on the same page.  Okay.

BY MS. MEILER:

Q.  All right.  So these are Progressive's claim notes.

Amy Gabay
October 08, 2020                              30

Ms. Gabay, did you review these claim notes starting at the first page, PGR 719, when the claim was reported on March 18th, 2017?

A.   I would assume I did.

Q.   Okay.  If we -- if we take a look at PGR 20, which is the second page of the claim notes, do you see this -- this note that's entitled "Liability" on March 18th, 2017, at 12:00 o'clock p.m.  Can you read that?

A.   Yes.

Q.   Okay.  Do you see where it says "what I did" and then "recording line unavailable"?

A.   I'm sorry.  Are you looking at liability?  Okay.

Q.   Okay.  I just highlighted --

A.   Yes.

Q.   -- with my cursor.  Do you see that note that was at noon?

A.   Yes.

Q.   Okay:  And do you see where it says "what I did: Recording line unavailable"?

A.   Yes.

Q.   Do you know why the recording line was unavailable in March of 2017?

MR. DUKE:  Object to the form.

BY MS. MEILER:

Q.   When your attorney makes objections, unless he

instructs you not to answer, you still have to answer the question.

    A.   Okay.

    Q.   If you forget what my question was, just let me know; and we could either have the court reporter read it back or I'll re-ask it.

    A.   I didn't know.  I can't answer that.

    Q.   You can't answer it because you don't know; is that fair?

    A.   Because I don't know.  I don't know the answer.

    Q.   Did you take any subsequent recorded statements from Mr. Norman?

    A.   I would have to look through the notes to see.

    Q.   Okay.  When you took over in -- on April 14th, 2017, did you review all of the claim notes that came prior to you being assigned to the claim?

    A.   Yes.

    Q.   Okay.  Do you typically, in your practice, speak to the prior adjusters when you are assigned a claim?

    A.   It depends upon the situation.

    Q.   In what situation would you speak to the adjusters and in what situations you would not?

    A.   It depends upon if there's something going on with the claim that I don't understand or if it's something -- yeah, something going on I don't understand.  If it's a

rear-end accident where it seems liability's in line.

Q.  When you took over this claim, Ms. Deary's claim against Mr. Norman, was there anything that stood out to you that you didn't understand that would warrant speaking to the prior adjusters?

MR. DUKE:  Object to the form, but you can answer.

A.  I -- I don't have an answer for you.  I would assume no if I did not speak -- reach out to him.

BY MS. MEILER:

Q.  If you had reached out to Mr. Pantoja, would you have noted that in the claim note system?

A.  I would've put it -- probably put it under "file review" and I would -- or "contact" -- and I would've said "spoke to A11051 and blah, blah, blah, blah."

Q.  Got it.  Okay.  So that's how we know whether you would have -- whether you did or did not speak to the prior adjuster; is that fair?

A.  Correct.

Q.  Okay.  If we look at PGR 724, there's a note on the same date, March 18th, 2017, when this claim was reported to Progressive at 1:22 p.m.  I just highlighted it with my cursor.  Do you see that note?

A.  Correct.  Yes.

Q.  Entitled "Liability Complete Resolution Summary." Do you see that?

Amy Gabay
October 08, 2020                    33

A.  Yes.

Q.  Is it fair to say that on the same day that this claim was reported to Progressive, that Progressive had determined that Mr. Norman was 100 percent liable for the accident?

A.  I'm reading it.

Q.  Sure.

A.  It's fair to say that Jose did find him at fault.

Q.  Did you have to do a new liability review when you took over the claim on April 14th or did you adopt the liability that somebody (Inaudible) before your involvement?

A.  I reviewed -- I would have to review the claim.

Q.  Did you have to do a new investigation into liability, or did you accept this initial liability resolution?

A.  I have to look to see what I did.

Q.  Okay.  So let's go to the first note that you authored, which was on page 733 on April 14th.  Let me scroll to that note.  Okay.  Do you see the note at the top of this page on April 14th, 2017?

A.  Yes.

Q.  Okay.  And that says:  "Sent change of adjusting letter to attorney for Deary."

A.  Okay.  Yes.

Q.   Do you know if you were involved prior to this note?

A.   I think that that was my first note from what I remember.

Q.   Okay.  I'm going to scroll to the page before that, PGR 732.  Do you see where on April 14th, 2017, at 9:07 a.m., there's a note that says:  "RBI exposure open for Darlene Deary"?

A.   Yes.

Q.   Okay.  Who is Ryan Derosier?

A.   I do not know.

Q.   Do you know why a bodily injury claim for Darlene Deary was not opened prior to April 14th of 2017?

A.   I cannot say.  I do not know.

Q.   Do you know what you did initially when you got this claim assigned to you on April 14th, 2017?

A.   The first thing I would've done is read through the notes.

Q.   The prior notes?

A.   Yes.

Q.   Okay.

A.   And then I would've looked -- actually, I was going to say I would've looked to see if there was any documents in the claim; but, back then, we didn't have documents in the claim.  So I take that back.

Q.   What do you mean "documents in the claim"?

A.   Our computer system's different now.  So it doesn't have documents in there, so.

Q.   Do you mean that the -- any documents related to the claim were not scanned electronically into the claim note system back in April of 2017?

A.   So, now, I would've -- now, we look to see if, like, there's a letter of rep in the claim that I would have to respond to.  Back then, I don't think that we had that electronic folder where the letter of rep would've been in the file.  So --

Q.   Where -- sorry.  Continue.

A.   Back then, they would have came in a paper format.  Now, a lot of them come electronically.  So now, we look to see -- electronically.  I was getting confused between now and back then.

Q.   Okay.  And so, back then, where would the -- where would a note be, for example -- a letter be, a letter of representation be?  Would there be a paper file that you could consult?

A.   Correct.

Q.   And when you were assigned this claim on April 14th, 2017, did you receive the paper file?

A.   I don't know.

Q.   Prior to April 14th, 2017, there wasn't a bodily

injury claim opened or exposure opened in this claim; correct?  Progressive hadn't opened a bodily injury claim for Darlene Deary?

          MR. DUKE:  Object to the form.

     A.  Correct.

BY MS. MEILER:

     Q.  All right.  So if there were documents relating to this accident, would those be copied into a new folder for Ms. Deary's bodily injury claim or how does that work?

     A.  So I keep my own bodily injury file.  There might have been a property damage where they would keep things like an estimate or a police report; but I would've had a bodily injury file, which is where you probably have most of these documents from.

     Q.  Right.  Now, the police report and estimates, those might actually be pertinent to your evaluation of bodily injury claim; correct?

     A.  And the police report, it would've been easy enough to get.  And the estimate probably would've been in the -- I would've been able to get from the computer.

     Q.  Okay.  Were those scanned in somewhere else other than the claim file?

     A.  And, forgive me, because I don't know -- my phone's ringing on the other end as well.  Forgive me, because I'm not sure when our electronic file started, but the

estimates were probably in the computer at that time.  So I could just pull the estimate from the computer.

        MS. MEILER:  Got it.  All right.  I'm going to pull up what we can mark as Exhibit Number 2.  It is an April 7th, 2017, fax from Yolanda McGee to Progressive.

        (Plaintiff's Exhibit No. 2 was marked for identification.)

BY MS. MEILER:

    Q.  All right.  Are you able to see this document?

    A.  Yes.

    Q.  Okay.  And it's dated April 7th, 2017.  Do you see that?

    A.  Correct.

    Q.  And then there's a fax on top that indicates it was faxed on April 11th, 2017.

    A.  Okay.

    Q.  Do you see that?

    A.  Yes.

    Q.  Do you know if this document was received via fax by Progressive?

    A.  Okay.

    Q.  Do you know if it was received via fax by Progressive based on that it's -- the banner on top of this letter?

    A.  I would assume it was.

Q.   Okay.  And what's this fax number, the 561-214-8050?

A.   That was not Progressive's fax number.  That might have been been Gordon & Doner's phone number -- fax number.

Q.   Okay.  Thank you.  Outgoing.  Do you know what Progressive's fax number was in April of 2017?

A.   I really don't remember, to tell you the truth.

Q.   Okay.  Do you see here it says -- there's a handwritten note that says:  "WPBCAS Amy Gabay"?

A.   Yes.

Q.   All right.  Do you know who wrote that?

A.   No, because what it looks like happened is it looks like it was faxed to a different office, and then it had to be sent to my office.

Q.   When you say "a different office," which office -- this Tampa address, which office is that?

A.   That looks like it is Tampa, and I'm in the West Palm Beach office.

Q.   Right.  But does the Tampa office handle different elements of the claim?  For example, the property damage portion of this claim?

A.   I usually know Tampa for handling personal injury protection.  I don't know what else they handle there.

Q.   Okay.  In this -- and this fax number 813-371-4049,

do you know where that -- that goes when a document is faxed there?

A. I'm not -- I'm not in the Tampa office. I don't know exactly where it goes.

Q. Now, it says: "Super Tonya Lovely." Was that your supervisor back in April of 2017?

A. So -- she was one of the supervisors in my office. So it could have been my supervisor at the time. I'm not sure if it was Melissa or Tonya.

Q. Did you have certain claims that were supervised by Melissa and certain claims that were supervised by Tonya simultaneously or was it one supervisor that supervised all of your claims?

A. It was one supervisor.

Q. Okay. So do you remember a time when you were supervised by Tonya Lovely?

A. Yes.

Q. Do you know when you would've switched over to Melissa Matz?

A. I do not remember.

Q. Do you know why you switched supervisors or why that -- that shift occurred?

A. No, they just -- sometimes, we get a new supervisor in the office. So they just switch people around. There's no rhyme or reason. I don't know. Well, there

Amy Gabay
October 08, 2020                          40

probably is, and I just don't know.

Q.   Okay.  Do you see there's a stamp that says:
"Received April 13, 2017, CPU-JSO0030"?

A.   Yes.

Q.   What is that stamp from?

A.   I would assume that was from -- I -- and I could be
wrong.  I would think that was from -- actually, I don't
know.

Q.   Okay.  And do you see another stamp that says
"Received April 20th, 2017, Patricia Sellars"?

A.   Yes.

Q.   Who is Patricia Sellars?

A.   She is in the West Palm Beach office.

Q.   And what is her position there?

A.   She is a claims processor.

Q.   Is that like an administrative-assistant-type role?

A.   Correct.

Q.   Is she the one that would direct documents to the
appropriate adjuster?

A.   She was the one who would have given it to my
supervisor,

Q.   Okay.  And there's other stamp that says "Tonya
Lovely, claims supervisor, April 20th, 2017, reviewed."
Do you see that?  It's a little bit light.  It's towards
the top of the document.

A.   Okay.  I could barely see it.  So I can't tell what it says, but --

Q.   Does that help you now that I have zoomed?

A.   I can see a little bit.

Q.   Okay.  Did you have a stamp similar to the ones that you see on this document by Patricia Sellars and a CPU number as well as Ms. Lovely?

A.   No.

Q.   Why do the documents go first to the supervisor not the adjuster?  Do you know?

A.   They review -- at that time, they review all attorney mail.

Q.   Is -- has there been a change in that policy?

A.   Recently.

Q.   When was that change?

A.   Shortly after COVID.

Q.   And, now, do the attorney letters go directly to the adjuster before the supervisor?

A.   We get to see the -- it goes directly to the adjusters.

Q.   Okay.  Now, you mentioned that back in April of 2017, things were not scanned electronically.  So would this -- this letter be passed around like in hard copy to the supervisor and then to you?

A.   I'm sorry.  Can you -- I didn't hear the first part

of that question.

Q.  Sure.  You mentioned that back in April 2017, documents were not scanned electronically into the claim note system; is that right?

A.  Correct.

Q.  And so this letter that's dated April 7th, 2017, and faxed on April 11, 2017, would it be passed around the office in hard copy?

A.  Correct.

Q.  Okay.  And so would there just be one copy that goes to your supervisor; and then once your supervisor views it, that hard copy's then given to you?

A.  Correct.

Q.  Were you in the same physical office as Tonya Lovely?

A.  Yes.

Q.  And Melissa Matz as well?

A.  No, Melissa Matz was in the Broward office.

Q.  All right.  So when Melissa Matz was supervising you, how would a document go from her office in Broward to your desk in West Palm Beach?

A.  Most of the mail still came to the West Palm Beach office, even though Melissa was in Broward.

Q.  So then how would it get to Melissa in Broward?

A.  Most of the mail didn't go to the Broward office.

It still came to the West Palm Beach office.

Q.   How would Melissa Matz then view a hard copy document?

A.   So most of the mail would still go to the supervisors in the West Palm Beach office for review.

Q.   Even if that supervisor was not supervising you?

A.   Correct.

Q.   Do you remember reviewing this April 7th, 2017, letter of representation?

A.   I know I did it.  Do I remember this in particular? No, but I know I did it.

Q.   Okay.  When -- do you know if when you received this letter whether you reviewed the claim file to see if there was any prior mention of an injury claim being presented by Darlene Deary?

A.   I'm sorry.  Can you repeat that?

Q.   When you received this letter, did you look in the claim note system to see if there was any prior mention of an injury claim being presented by Darlene Deary?

A.   No, because I already knew that there was an injury claim.

Q.   When --

A.   I got this letter after the claim was assigned to me.  So if the claim was assigned to me, there was already an injury involved.

Amy Gabay
October 08, 2020                                    44

Q.  All right.  So let me ask you this:  When the claim was assigned to you on April 14th of 2017, did you look in the claim note system to see if there was any prior mention of a bodily injury claim (Inaudible) by Darlene Deary?

A.  As I said before, when I got the claim, I reviewed all the prior notes.

Q.  All right.  Let's go back to the claim notes, which were Exhibit 1.  I want to go back to PGR 727, which was prior to your first note and your assignment to the claim. All right.  Do you see this note on March 21st, 2017, at 4:13 p.m. by Adina Johnson?

A.  Yes.

Q.  Do you know if you would've reviewed this note when you took over the file?

A.  Yes.

Q.  All right.  This note -- do you see where it says "daughter has pancreatic disease and is -- and now is in pain."

A.  I do see that.

Q.  Okay.  Do you think that Progressive should've opened up a bodily injury exposure on April 21st, 2017, when it received information from Elizabeth Diente, Ms. Deary's mother, that her daughter was now in pain?

MR. DUKE:  Object to the form.

BY MS. MEILER:

Q.   You can answer.

A.   I wasn't on that call.  So I don't know what transpired.

Q.   Okay.  But do you think reviewing the -- the notes that Progressive should've assigned this claim to you earlier than April 14th?

A.   I don't --

MR. DUKE:  Objection.  Yeah, object to -- I'm going to instruct the witness not to answer about her present mental impressions today about something that she wasn't involved in and didn't know about seven years ago.  You're asking for her opinions today.  That's work product.

MS. MEILER:  Okay.  So you're objecting on the basis of work product and instructing the adjuster not to answer?

MR. DUKE:  That's correct.

BY MS. MEILER:

Q.   Ms. Gabay -- Amy Gabay, not Nadine Gabay, are you an attorney?

A.   No.

Q.   Are you involved in the -- actually, let me -- let me go a step back.  Do you know if Progressive has a separate extra-contractual file related to this claim now

Amy Gabay
October 08, 2020                                   46

that -- that a lawsuit has been filed?

A.  I'm sorry.  You cut out.  Can you say that again?

Q.  I apologize.  Do you know if Progressive has a separate extra-contractual claim file now that -- being that a lawsuit has been filed?

A.  I don't know what happened with this claim after it was taken -- after it went to somebody else.

Q.  Okay.  So is it fair to say that you're not involved in the handling or adjusting of the bad faith claim that's been brought against Progressive?

A.  That is correct.

Q.  All right.  I'm going to scroll to PGR 731 also on Exhibit 1.  There's a note at -- on April 11th, 2017, at 1:33 p.m. by Adina Johnson.  Do you see that at the bottom of the page?

A.  Yes.

Q.  Do you see that the -- there's a note by Ms. Johnson that says:  "Advised the BI was settled successfully"?

A.  Yes.

Q.  Do you know what Ms. Johnson was referring to in that note?

A.  I think that Ms. Johnson had settled one of the injury claims.

Q.  And whose injury claim was that?

A.   It was sent -- Elizabeth -- there was Elizabeth and there was another person involved and I don't know the --

Q.   Do you know if Elizabeth is Ms. Darlene Deary's mother?

A.   I do not know.

Q.   Okay.  Was Elizabeth -- and her last name according to claim notes is Diente -- do you know if she was in the same vehicle as Darlene?

A.   I think she was.

Q.   All right.  I'm going to go back to PGR 733 which is the page that has your involvement -- your first involvement in this claim.  And I want to take you to the note that you input on April 17th, 2017, at 10:45 a.m.  Do you see that note?

A.   Yes.

Q.   Okay.  And it says "called NI and advised of attorney rep BI."  Do you see that?

A.   Yes.

Q.   "NI," is that the named insured?

A.   Correct.

Q.   Would that be Dwight Norman?

A.   Correct.

Q.   Okay.  Do you know which phone number you called him at?

A.   I do not know offhand.

Amy Gabay
October 08, 2020                               48

Q.  All right.  Where would you have obtained his phone number in the claim note system?

A.  It would've been in the computer system.

Q.  And would his email address be in the same place that his phone number would be?

A.  If he had an email address at the time.  I do not know.

Q.  Okay.  And what about his mailing address?  Would that be on the same section of the claim system?

A.  Probably, yes.

Q.  Okay.  What is -- do you know if there's a specific name for that section of the electronic claim system?  Like, is there a tab that's called "contact information".

A.  I -- I would -- I would assume it would need to be "contact" or "personal."  You know what?  I -- I don't -- I don't look at it to tell you the truth, the name of it.  I go in the computer, and I do what I have to.

Q.  Sure.  In that contact section in the computer, do you know if it -- it records when information is updated?  For example, if there's one phone number in there and then you, as the adjuster, call the insured and he says, "Hey, I have a new phone number," and you input the new one, does it show that you input a new phone number and the date that you did that?

A.  I -- if you put -- I think it's "personal

information," and I think if you put a new phone number in the personal information, I don't think it shows a time date stamp.  I don't think, but I'm not a hundred percent sure on that.

Q.  Okay.  And just as a matter of procedure, every time you speak to the insured, do you verify their contact information?

A.  No, I do not.

Q.  All right.  When you spoke to Mr. Norman on April 17th of 2017, do you remember that conversation?

A.  I do not personally remember it, the conversation from three years ago, no.

Q.  Okay.  So are you relying just on your claim notes?

A.  Correct.

Q.  Do you remember any of the phone conversations that you had with Mr. Norman throughout your involvement in this claim?

A.  None of them stand out.

Q.  Okay.  This note says:  "Advised of process."  Do you know what the contents of that communication is?

A.  Yes.

Q.  And what --

A.  I do.  So when I write "advised of process," I would've advised him of -- that there was a bodily injury claim submitted, and I would've told him that -- what the

policy limits are.  I would've told that we're sending him

a letter to tell him what his policy limits are and that

we're sending him a letter asking him if he has any other

insurance and if he was in the course or scope of

employment at the time of the accident.  I also would've

explained that the claim -- how long the claim goes on and

that once the claim -- you know, during the whole process

of the claim, I normally don't call him because normally

it makes him nervous; but, if we need something, I will

call him and he should feel free to call me at any time.

        I told him, normally, you know, these things go on

for approximately a year, sometimes, you know, more;

sometimes less, depending upon what the person is

claiming.  We would do the demand.  And once we get the

demand in, I will give him a call; and I will send him a

copy of the demand letter and that we will evaluate the

claim based upon what the doctors say.  I will -- like I

said, I'll call him once we get the demand in.  Every time

that we get an offer to the attorney, I will copy him so

that he is aware of what's going on on the claim.  So I

would've taken him through the whole process of the claim.

    Q.  Now, that process that you just explained, is

there, like, a checklist that you have that you refer to

or are you testifying regarding what you typically do in

every claim?

Amy Gabay
October 08, 2020                                51

A.   That's what I typically do.

Q.   Okay.  So you don't have an independent recollection of -- of this conversation but this is -- but what you just testified to is what you typically advise the insured; is that fair?

A.   That is what I typically do with all, yes.

Q.   Do you know if Mr. Norman asked you any questions in response to that explanation?

A.   No, I do not.

Q.   All right.  On the same page, if -- if you look, there's a note right below the note that we just read on April 17th, 2017, at 10:49 a.m.  Do you see that?

A.   Yes.

Q.   And it -- it starts with "ISO on CGP."  Do you see that?

A.   Yes.

Q.   What does that mean?

A.   Like we spoke about before, ISO.

Q.   Is it --

A.   And "claimant guest passenger."

Q.   "Claimant guest passenger."  Does that refer to Darlene Deary?

A.   Yes.

Q.   And but "claimant driver," would that have been Elizabeth?

A.   Correct.

Q.   The claim that was already settled; correct?

A.   Yes.

Q.   And it says here "6/17/02 neck."  Do you see that?

A.   Yes.

Q.   What does that refer to?

A.   That means that on June 17th of 2002, she had a injury with her neck.

Q.   On the ISO report, does it show anything relating to the treatment or specifics of the -- the 2002 claim?

A.   Sometimes it does; sometimes it doesn't.  It depends upon how old the claim is, how much information was given by the provider.  It depends.

Q.   Back in April of 2017, would you have printed that ISO report and placed it in the physical claim file?

A.   I do not know.

Q.   If there were pertinent specific details included on that ISO report, would you have input it in a note such as this April 17th, 10:49  a.m. note?

A.   What kind of -- what kind of details?

Q.   Sure.  So if, for example, the '02 neck injury specified which vertebrae was affected, what treatment was received, or what amount the claim was settled at, would that have gone into this claim note system?

A.   Possibly.

Q.   Okay.   When you say "possibly," why would or wouldn't it have gone?

A.   I would like to say yes, but anything can happen, and I don't know.

Q.   Okay.   And why do you run this ISO report?   Or why did you run it in this case?

A.   Well, because we like to see if there's any priors going on to see if anything -- you know, if there's any previous injuries that we should know about.

Q.   Okay.   Now, what was your understanding as of April 17th, 2017, of what Ms. Deary's injuries were as a result of this accident?

A.   I think it was -- she was claiming neck and back, from what I remember.

Q.   It says -- on the same ISO note that we were reading at 10:49 a.m., there's another accident 6/9/00 and then "COLL."   Do you see that?

A.   Yes.

Q.   What is "COLL"?

A.   It was a collision claim.

Q.   Okay.   Meaning just property damage?

A.   Correct.

Q.   All right.   Was there any indication on the ISO report of any back injury?

A.   Not from those notes.

Q.  Okay.  If someone has a prior injury which is made worse by an accident, is that called an "aggravation claim"?

A.  I can't say.  It depends upon what the notes are.

Q.  Okay.  What -- well, why don't you tell me:  What is your understanding of what an aggravation claim is?

MR. DUKE:  Object to the form, but go ahead.

A.  Well, I think -- I think each individual case is different.  You know, it's not -- you can't say, "Well, it's" -- you can't say a definitive answer because each piece -- person is an individual, and you can't clump it together.  So you have to look at each record and you have to look at the totality of the claim to see what's really going on.

So it would be like saying I have migraines, and I'm in an accident.  So, therefore, it must have aggravated it.  Well, no, because I'm not having any headaches from this accident.  So how did it aggravate it?  So you have to look at the totality of the claim and see exactly what's going on.  And even if the doctor says -- the doctor may not even say that it was an aggravation.  So if the doctor's not saying it's an aggravation, how do you know?

BY MS. MEILER:

Q.  Okay.  Just as a general matter, can an insured be

Amy Gabay
October 08, 2020                                    55

liable for an aggravation of a pre-existing injury?

A.   Yes.

Q.   All right.  I'm going to scroll to the next page of these claim notes.  And, earlier, I mentioned that if at any point you want me to send you these claim notes or you want to see a different note that I haven't moved into or drawn your attention to, please let me know.

A.   Okay.

Q.   Okay.  So I'm going to scroll to the next page which is PGR 733.  And I'm going to take you to -- there's a note on April 25th, 2017, at 11:59 a.m.  Do you see that?

A.   Yes.

Q.   All right.  And that's authored by you?

A.   Yes.

Q.   It says "L/M for Debra at attorney to speak about preservation of evidence."

A.   Okay.

Q.   Do you see that?

A.   Yes.

Q.   Who is Debra?

A.   She is somebody who works for the attorney's office.

Q.   Do you know if you had ever spoken to Debra at Gordon & Doner?

A.   I don't know.  If I ever spoke to her before or after?

Q.   Yeah, unrelated to this claim.

A.   I do not remember.

Q.   And let's actually talk about your -- your familiarity.  Have you ever -- prior to this claim, had you ever adjusted a claim that was brought by someone represented by Gordon & Doner?

A.   Yes.

Q.   And -- and did you have any opinions prior to handling this claim relating to that law firm?

A.   I don't think so.

Q.   Had you ever worked with Yolanda McGee at Gordon & Partners prior to this claim?

A.   Probably.

Q.   Did you have a general impression of your experience with Ms. McGee?  Like, did you have a good working relationship?  A bad one?  A neutral one?

A.   I really don't know before this.

Q.   What about now?

A.   I don't -- now, I really don't know.  I --

Q.   All right.  Let me -- let me actually pull up another exhibit.  One moment.  Okay.  We can mark this as Exhibit Number 3.  It's a March -- sorry -- an April 17th, 2017, letter.  It's PGR 309.  Do you see this letter, Ms.

--

A.  Yes.

(Plaintiff's Exhibit No. 3 was marked for identification.)

Q.  -- Ms. Gabay?  Did you send this letter to Mr. Norman?

A.  I had one of our CPs, claims processors, send it.

Q.  Is Patricia Sellars a claims processor or she has a different role?

A.  She is one of our claims processors.

Q.  Okay.  Do you see on the top, it says:  "Dwight Norman, 955 Egret Circle, 408B, Delray Beach, Florida 33444"?

A.  Yes.

Q.  Is that an address that you would have advised the claims processor to send the letter to, or is that something that the claims processor does?

A.  That was address that was in the computer.  So that's the address that we would have used.

Q.  Okay.  Do you know if, prior to April 17th of 2017, whether you confirmed Mr. Norman's address at the address that's on this letter?

A.  I do not know.

Q.  Is this a form letter?

A.  Well, yes and no.  So it is a form letter, but it

isn't because everybody has different limits.

Q.   Okay.  Other than specifying the actual limits under the policy, is there any other -- are there any other changes that you can make to this letter?

A.   So I would say no.  It's just tailored to their limits.  But, otherwise, yes, it is a form letter.

Q.   If you wanted to provide the insured with specific details relating to the actual claim that you're handling against them, could -- how would you do that?  Would you have to populate a completely separate additional letter, or could you include those details onto this letter?

A.   I would've populated a different letter.

Q.   Okay.  If you look at this letter and it says -- if you look at the second sentence:  "Unfortunately, the value of those damages may be more than are covered by your policy."  Do you see that?

A.   Yes.

Q.   Okay.  What damages are you referring to in this letter?

A.   Well, we would be referring to the injury claim.

Q.   If there was an open property damage claim, could you be referring to that as well?

A.   Sure.

Q.   Okay.  So in other words, in -- any damages sought against the insured would be encompassed by this second

sentence; correct?

A.   Correct.

Q.   Did you have any specific information as of April 17, 2017, that would indicate that the value of Ms. Deary's claim against Mr. Norman would exceed the bodily injury limit of $25,000?

A.   No.

Q.   So why would you send this letter that says the value of those damages may be more than covered by your policy?

A.   Because we just like to give the insured a heads-up to say, "Hey, these are your policy limits; and we're just giving you a heads-up."

Q.   Okay.   So this isn't necessarily sent only where damages are likely to exceed the policy limits; is that fair?

A.   I send them out -- I usually send them out to a lot of people letting them know what their policy limits are because people should be aware of what their policy limits are.

Q.   Okay.   So this letter is not specific to any -- any severity level of injury claimed?   Let me rephrase that question.

Is it fair to say that you send this letter to all of your insureds when a claim's made against them?

MR. DUKE:  Object to the form.

A.  No.  No, I do not.

BY MS. MEILER:

Q.  Okay.  When do you decide to send this, and when do you decide not to send this?

A.  When -- when they have certain limits on the policy, I send them.

Q.  Why did you send this letter to Mr. Norman?

A.  Because they have $25,000 policy limits per person. And I just like to give -- I like to let them know what their limits are.

Q.  Do you think that $25,000 per person limits are relatively low policy limits?

MR. DUKE:  Object to the form.

A.  I think $25,000 limits are fine.  It's what people could afford, and it's their option.  But they should still be aware that those are their limits.

BY MS. MEILER:

Q.  Hypothetically, in this case, if Mr. Norman had $1 million limits, would you still send him this letter?

A.  If he had $1 million limit --

MR. DUKE:  Object to the form.

A.  If he had $1 million limits, probably not.

BY MS. MEILER:

Q.  Why?

Amy Gabay
October 08, 2020                                     61

MR. DUKE:  Object to the form.

A.  Because -- because most -- a lot of claims do not reach that threshold.

BY MS. MEILER:

Q.  Let me take you back to the claim notes.  And if we go to -- sorry.  One moment.  If we go back to PGR 734 and we look at your note on April 27th, 2017, at 10:05 a.m.  I just highlighted it with my cursor.  Do you see that note?

A.  Yes.

Q.  And it says:  "Received appendix and excess letter to named insured back in the mail."  Do you see that?

A.  Yes.

Q.  Okay.  What is "appendix"?

A.  That was the letter that I was telling you about where we ask them if they have any other insurance and if they were in the course or scope of employment.

Q.  And what is the "excess letter"?

A.  That's the letter that we were just talking about where it tells them what the policy limits are.

Q.  Okay.  And it says that you received it back from the named insured, "Back -- back in the mail."  Do you see that?

A.  Yes.

Q.  Okay.  So that -- does that indicate that the letter was returned to you for some reason?

A.   That's what it appears to, yes.

Q.   Okay.  So -- and it says "unable to forward excess reg and cert."  Do you see that?

A.   Yes.

Q.   What does that mean "unable to forward"?

A.   When it came back, that's what the mail said, that they were unable to forward it regular and certified because it was a certified letter because I sent it regular and certified.  So the Certified Mail, they were unable to forward it.

Q.   Okay.  So that means that the post office didn't have, like, a forwarding address, for example, on file?

A.   Correct.

Q.   All right.  Did you -- did you call Mr. Norman to find out if he had a new address?

A.   I do not know.

Q.   If you had --

A.   But --

Q.   Sorry.

A.    -- I had spoken to him, and I had told him about this.  So he was aware of it.

Q.   When you say that you had spoken to Mr. Norman and you told him about this, that would be the conversation on 733 that we discussed; is that fair?

A.   That you just passed on 4/17, you just passed it

where I told him about the process.

Q.   Okay.  And you advised him of the limits; right?

A.   Mm-hmm, yes.

Q.   Did you advise him during that phone call that the injuries could exceed his policy limits?

A.   I advised him of what his policy limits were.

Q.   And so this letter that you sent, the excess letter, it has additional -- would you agree with me that it has additional in it other than what you discussed with Mr. Norman?

MR. DUKE:  Object to the form.

A.   I'd have to read the letter, but probably.

BY MS. MEILER:

Q.   (Inaudible).  Okay.  I pulled up the letter again. Do you know if you discussed everything that was in this letter with Mr. Norman or did you just advise him what his policy limits are?

A.   I can't say that I did.

Q.   Okay.  And so after you received this April 17, 2017, letter back from the post office on April 27th, did you speak to Mr. Norman again to find out what his new forwarding address was?

A.   I do not know.

Q.   Do you think you should have called him to find out what his new forwarding address was?

Amy Gabay
October 08, 2020                                    64

MR. DUKE:  Object to the form.

A.  I do not know.

BY MS. MEILER:

Q.  Do you know at the time -- April 27th of 2017 -- whether you had Mr. Norman's email address?

A.  I do not know.

Q.  If you had his email address, did you have the ability to forward a copy of this letter to him via email?

A.  No.

Q.  Why not?

A.  Because our computers were not -- did not have that capability at that time.

Q.  Did you have a scanner available to you at Progressive back on April 27th, 2017?

A.  I did not have -- I personally did not have a scanner.

Q.  Could you have asked your -- your assistant, Ms. Sellars to scan this letter and email it?

A.  I'm not sure to tell you the truth at that point.

Q.  All right.  Let's go back to your claim notes.

MR. DUKE:  We've been going for about an hour and a half.  I don't know if you want to take a quick break or -- I mean, I'm assuming this thing isn't going to be done any time in the near future, so.

MS. MEILER:  It's not.  I mean, I'd like to --

well, I shouldn't say it's not.  I mean, Ms. Gabay, again, I have, like -- you know, she wasn't involved for the entire duration of the claim.  But I do need to take like a half-an-hour break around 12:30.  So I'm wondering if we wanted to -- we could take, like, a five-minute break now and then a longer break around then.  Does that work?

MR. DUKE:  Yeah, that's perfectly fine.  The other deposition's set for 1:00 o'clock.  Do you think that you're going to be done with Ms. Gabay by 12:30 and then we'll start the other one at 1:00?

MS. MEILER:  (Inaudible) from now.  So I think I will be done by then.

MR. DUKE:  Okay.  Great.  Can we just take a very quick five-minute break then, and then we'll come back?

MS. MEILER:  No problem.

MR. DUKE:  Okay.  Great.  Thanks.

(Recess taken.)

BY MS. MEILER:

Q.   Okay.  I'm going to share my screen again.  Okay. So we're still on PGR 734, which is the second page of claim notes in which you are involved.  And do you see that you -- you have a note here on April 27, 2017, at 10:44 a.m. that you called Yolanda at attorney to find out if she needs preservation of evidence.  Do you see that?

A.   Correct.  Yes.

Q.   Do you have an independent recollection of that conversation?

A.   You know, I did not.  But reading through the notes, I kind of do remember that.

Q.   What do you remember?

A.   I remember I was trying to call and get that preservation of evidence because I know I have to get it in writing.  So I remember calling her and say "hey, I need to get this" because I just can't ignore it because it was on the letter of rep.

Q.   Got it.  Do you know if you discussed anything other than the preservation of evidence during this call?

A.   During the -- no, I do not.

Q.   Okay.  Did you discuss anything about Ms. Deary's injuries?

A.   At that time, I do not know.

Q.   All right.  And then do you see two notes below where it says "contact information" -- sorry.  At 1:37 p.m., it says:  "Call Yolanda at attorney for Deary, she will waive the preservation of evidence.  Sent letter to confirm."

A.   Yes.

       THE WITNESS:  I'm sorry.  Does somebody have, like, a noise in the background?

MS. MEILER:  I don't think so.  Mr. Duke, do you hear anything in the background?

MR. DUKE:  Faintly.  But I'm not sure what it is. I don't know.  It's not on my end because I'm on mute. So I'm not sure.

THE WITNESS:  Okay.

MS. MEILER:  Yeah, I don't -- I don't hear anything here in my office.

MR. DUKE:  Michal, it almost sort of sounds like a sort of -- it's faint, but maybe a scratchy sound when you're talking, almost like a feedback or something. But I don't -- I don't know.

MS. MEILER:  Hmm.  (Inaudible).  I'm not sure.  I'm only using my computer audio, so.

BY MS. MEILER:

Q.  Okay.  Well, Ms. Gabay, if you can't hear something -- and same thing, Ms. -- Madam Court Reporter -- if you can't hear something that I'm saying, just let me know so that we can -- I can repeat it.  Okay?

A.  Okay.

Q.  Okay.  I'm going to pull up what we'll mark as -- I think it's Exhibit 4.  Sorry.  Not that letter.  I apologize.  What we'll mark as Exhibit 4, it's a May 3rd, 2017, letter.  It's PGR 781.  Now, this letter, do you remember if you reviewed this letter?

Amy Gabay
October 08, 2020                              68

(Plaintiff's Exhibit No. 4 was marked for identification.)

A.  I wrote it.  So, yes.

Q.  Okay.  And it confirms that the preservation of evidence will be waived; correct?

A.  Yes.

Q.  And that's consistent with your note on the same date.  Do you see that?

A.  Yes.

Q.  All right.  Now, you didn't ask for any injury information on May 3rd, 2017; is that right?

A.  Correct, I would assume.

Q.  You would assume because it's not in your notes and it's not in that letter; correct?

A.  Correct.

Q.  Is it fair to say that between April 27, 2017, and May 3rd, 2017, that you took no action on the claim?  And I'll pull up your claim notes again.

A.  Between April 27th and May 3rd.  So one week?

Q.  Yes.

A.  Sure.

Q.  Okay.  And I'm going to scroll to the next page of your claim notes, which is PGR 735.  And, actually, before I do so, who's Cindy Blood?

A.  I have no idea.

Amy Gabay
October 08, 2020                                         69

Q.   Okay.  Do you know why she would have input this note that says "federal Medicare research completed"?

A.   No, I do not.

Q.   What is this "Global Process Administration Team"?

A.   I do not know.

Q.   Do you know if this was -- this was research that you requested that be done on this claim?

A.   No, it was not.

Q.   All right.  So let's go to the following page of your claim notes, which is PGR 735.  Do you know who Taryn Fonticiella is?

A.   Yes.

Q.   Who is that?

A.   She's somebody who works for Progressive, and I don't know if -- at the time, I would assume that she was a supervisor or superintendent at Progressive.

Q.   When you say "superintendent," what is that -- what is that position?  Is that --

A.   It's at the same thing as a supervisor.

Q.   Okay.  And the manager would still be above that role; correct?

A.   Correct.

Q.   Do you know who the manager above Tonya Lovely was back in April of 2017?

A.   Chuck.

Q.  Okay.  And -- all right.  And we'll -- we'll go on. Do you see a note on July 19th, 2017, by Maria Ramos at 2:26 p.m.?

A.  Yes.

Q.  Okay.  Who is Maria Ramos?

A.  She's a claims processor.

Q.  Okay.  Same as Patricia Sellars?

A.  Correct.

Q.  Do you know why she would have sent a cover letter and copy of demand to NOD via registered -- regular and Certified Mail?

A.  Yes, because we have to inform the insured and send them a copy of the demand letter letting them know that we've received the demand.

Q.  Okay.  Did you instruct Ms. Ramos to do that or did she do that automatically on her own?

A.  My -- Tonya would've -- sorry.  Taryn would have given it to her to send it out.

Q.  Okay.  Do you know if you had even seen a copy of the demand letter prior to Ms. Ramos sending it off to the insured?

A.  I do not know.

Q.  All right.  I'm going to pull up a letter that we can mark as -- I believe this is Exhibit 5.

MS. MEILER:  Is that right Ms. -- Madam Court

Reporter?

THE COURT REPORTER:  Yes, 5.

(Plaintiff's Exhibit No. 5 was marked for
identification.)

BY MS. MEILER:

Q.  And this is a --

THE WITNESS:  Can I interrupt for one second?  I'm
just going to take a medication because that noise is
literally driving me insane.

MS. MEILER:  Oh, I apologize.

THE WITNESS:  And I wasn't joking when I said I get
terrible migraines, so.

MS. MEILER:  Is my voice really loud?  I'm
wondering if I can lower the volume, if that would
help?

MR. DUKE:  I wonder if it's feedback from your --
you have that -- you have your microphone headset on
and that microphone might be picking up the speaker.
Is -- is there sound coming out of your computer as
well or is it just coming out of your headset?

THE WITNESS:  It just seemed to go down, though.
The noise just seemed to get better if you did
something.

MS. MEILER:  I didn't do anything.

THE WITNESS:  Nope.

MR. DUKE:  Yeah.  Hopefully it gets better.

MS. MEILER:  Let me try putting down my volume and maybe that'll help.

THE WITNESS:  It's almost like a fan on the computer or something.

MS. MEILER:  It actually might be the fan on my computer.  I do hear that in my office, but it's really low here.  It's probably, like, picking up more because the microphone is attached to the computer.

BY MS. MEILER:

Q.  Okay.  Ms. Gabay, let me know when you're ready to proceed.

A.  I'm doing a double.  I'm taking a cocktail right now.  Sorry.

Q.  No worries.  I apologize for the feedback.  I don't know how to fix it.

A.  Okay.

Q.  Okay.  Let's go to Exhibit Number 5, was it --
Exhibit Number 5 which is the July 17, 2017, letter.  It's PGR 121 through 276.  Do you see that?

A.  Yeah, PGR 121, yes.

Q.  Okay.  Do you know if this is the document that we were just discussing in the claim notes that was forwarded to the insured?

A.  That's a part of it.

Amy Gabay
October 08, 2020                                73

Q.  Okay.  And I'll scroll down.  It's actually a pretty lengthy document. Do you have access to this document from what you reviewed prior to today's deposition?

A.  I'm sure I have access to it.  It wasn't sent to me by your court -- by your court person, but I'm sure I have access to it.

Q.  Okay.  If at any point while -- during my questioning you want the full document, let me know; and I can email it to you.

A.  Okay.

Q.  Okay.  Now, do you know if this is what we were -- what you were referring to in the claim notes as a "demand"?

A.  Correct.

Q.  Now, this -- this document, do you see there's a -- a stamp here that says "Taryn Wachter claims superintendent July 18th, 2017."

A.  Same person as Taryn -- Taryn, same person.

Q.  Okay.  So just different last name on the stamp in the --

A.  She got married, yes.

Q.  And then there's a another stamp by Patricia Sellars on the same date?

A.  Yes.

Q.   Okay.  Do you know why there were two of these administrative assistants involved in this?

A.   Taryn's not an administrative assistant.  Taryn's a supervisor.

Q.   But I mean Patricia Sellars versus Maria Ramos who forwarded the documents?

A.   It could have been that it went to -- there's two West Palm Beach offices.  One is off of Tyler Lakes; the other is off of Center Park.  And it could've been that it went to one office and then it had to be transferred to the other West Palm Beach office.

Q.   Okay.

A.   That's what I would assume.

Q.   Now, if we look back at your claim notes on PGR 735, do you see that there's a note on 7/21/17 at 5:18 p.m. by you?

A.   Yep.  Yes.

Q.   Okay.  And this note has more details regarding treatments received and injuries; correct?

A.   Yes.

Q.   Okay.  Do you know if this July 21st, 2017 -- do you know if that was the first date that you reviewed the -- the demand letter?

A.   I would say it would be if that's my first note from the demand.

Amy Gabay
October 08, 2020                                      75

Q.   Do you know why you didn't review it on July 18th, 2017 when it was stamped by Taryn Wachter and Patricia Sellars?

A.   Could it have been a weekend involved?

Q.   I don't have a calendar up, but it might be a Friday to a Monday.

A.   It might be a Friday to Monday.  So that could've been the reason.

Q.   Okay.  And there's a handwritten note here that says "TLD."  What does that stand for?

A.   Time limit demand.

Q.   And it says "8/17."  Do you see that --

A.   It says -- it looks like 8 --

Q.   (Inaudible) --

A.   -- 7.

Q.   Yeah, 8/7.  And that --

A.   Which means --

Q.   I'm sorry.

A.   Which means that's the date that it's due and 25,000, and I think that means that's what the demand is for.

Q.   Who wrote this handwritten note?

A.   I don't know.

Q.   Did you write it?  Do you know?

A.   No.  No.

Amy Gabay
October 08, 2020                              76

Q.   It's not your handwriting; correct?

A.   No.

Q.   And let's go to the second page of this letter which is PGR 122.  Do you see that?

A.   Yes.

Q.   Okay.  So is it fair to say that Ms. Deary was making a settlement offer for $25,000 to settle her claim against Mr. Norman?

A.   Yes.

Q.   And $25,000 was the policy limits; correct?

A.   Correct.

Q.   Now, this letter enclosed 154 pages of medical records and bills; correct?

A.   From my recollection, yes.

Q.   Did you review all of those records and bills on -- on the 21st?

A.   Yes.

Q.   And, now, this outline, is this something that you authored, which is on PGR 735 of your claim notes?

A.   I'm sorry.  Did you say it's something that I offered?  Oh, authored.  Yes.

Q.   Okay.  And that note goes into 736.  Do you see that?

A.   You mean page number 736?

Q.   Yes.

A.   Oh, 735.  Yes.

Q.   Okay.  If you look at the note on PGR 736 where it says "threshold," do you see that?

A.   Yes.

Q.   What does "threshold" mean?

A.   Basically, there's no (Inaudible), loss.  There's no dermatones.  It doesn't pierce -- we don't see a permanency at this point.

Q.   Okay.  What are "dermatones"?

A.   Strength, reflexes, sensory -- oh, my God.  Sensory -- I'm having a brain freeze.  I'm sorry.  I'm having a brain freeze.  Strength, sensory, motor, reflexes.  I can't think of the other one.  I'm having a brain freeze right now.

Q.   The last inclusion that says "most dermatones are normal" is that an analysis that you as the adjuster performed based on the records?

A.   Yes.

Q.   So this wasn't something that a medical professional advised you of?

A.   No, but if you look at the notes right above it, it says:  "Motor, 5/5" -- five out of five -- "from ER medical, strength is equal, motor's 5/5, sensory's intact."  And it says "paresthesia in left hand."  And then right underneath, it says "Spine and Brain, no

radicular, numbness, or tingling or arm weakness.  Motor 5/5."  And then it says "sensation intact, reflexes three-plus."  So there is your only issue.  So it's saying that everything else is normal.  So that's actually coming from the doctors that there's -- you know, mostly it's normal.

Q.  And that is just the one record from the emergency room at Delray Medical; correct?

A.  And that's also coming from Spine and Brain, right underneath it.  Go down.

Q.  Yeah.

A.  You have -- where was that?  ER Delray Medical.  So that's that line right underneath -- and right underneath that, you have Spine and Brain.

Q.  Okay.  And now, your conclusion is that most dermatones are normal.

A.  Right.

Q.  Does that mean that some were not normal?

A.  Well, because it said reflexes three-plus.

Q.  Okay.  So that means that she did have some dermatones that -- that indicated an ongoing injury; is that fair?

A.  Right.

Q.  And so if she had some dermatones that were not normal based on the medical records you reviewed, then why

did you conclude that there was no threshold pierced?

A. Based upon the totality of the claim, I didn't see anything. She has the treatment. She went to the ER once. She then didn't treat for 14 days, and then she went back to the doctor, and then she didn't treat again for 14 days. So if somebody is really hurt, they're not going to stop and have treatment like that. They're going to continuously go. And she had inconsistent treatment. And based upon everything that we received, it didn't look like she had a threshold that was pierced.

Q. All right. So based on the 14-day gap after her initial emergency room visit, is that what you based your threshold determination on?

A. She had two 14-day gaps.

Q. Okay. With soft tissue injuries, do you normally see a delay in, for example, treatment as well as an MRI to -- related to those types of injuries?

A. So most people get MRIs.

Q. Mm-hmm.

A. Most people -- most people don't have delays. But, you know, like I said, everybody's different.

Q. Okay. So it's not -- a delay in seeking treatment is not determinative that the person does not have injuries; is that fair to say?

A. That is correct.

Amy Gabay
October 08, 2020                                         80

Q.   And I want to take you to some of these records.
If we can go to -- sorry.  What was it called?  Just give
me one moment.  All right.  I apologize for the delay.  If
we look at PGR 173, do you see this record?

A.   Yes.

Q.   And this is a progress note on June 16th of 2017.
Do you see that?

A.   Yes.

Q.   Okay.  Do you see that the indications for the
procedure says the "patient has suffered from neck pain
after a car accident"?

A.   Yes.

Q.   Okay.  And that the "pain had a tremendous negative
impact on the quality of life, physical activities,
function status, and has been unresponsive to the
conservative measures in the past."  Do you see that?

A.   Yes.

Q.   Now, "conservative measures," does that -- do you
know if that refers to chiropractic treatments?

A.   I would assume that's what the doctor is talking
about, but I can't read his mind, but that's what I would
assume.

Q.   Okay.  And the records that you received did
indicate that Ms. Deary had received numerous chiropractic
treatments as a -- after this accident; correct?

A.  I would assume, yes.

Q.  Now, do you see that this record talks about cervical facet joint injections?

A.  Correct.

Q.  Okay.  And it says it's "indicated to reduce pain and improve the quality of life."  Do you see that?

A.  Yes.

Q.  Okay.  Would -- do you typically see patients or claimants undergo injections for pain prior to undergoing a surgery?

A.  I can't -- sometimes; sometimes not.  I don't think -- I can't answer that.

Q.  Okay.  Let's go to PGR 175.  And that's a note on June 28th, 2017.  Do you see that?

A.  Mm-hmm, yes.

Q.  Yes.  Okay.  So do you see where the note starts: "At this time, Darlene Deary has reached maximum medical improvement."  Do you see that?

A.  Yes.

Q.  What is maximum medical improvement?

A.  That means they don't think that she's going to get any better, that they think this is the best she's going to get.

Q.  Does that indicate a permanent injury to you?

A.  Yes.

Amy Gabay
October 08, 2020                                    82

Q.   And it says:  "Final diagnosis is neck pain and these injuries related to the motor vehicle accident sustained on 3/17/17."  Do you see that?

A.   Yes.

Q.   Okay.  So is it fair to say that Dr. Sheth from Spine and Brain Surgery opined that Ms. Deary had a permanent injury as a result of this motor vehicle accident?

A.   Yes.

Q.   Do you see that the next line says:  "It is my opinion that all of the treatment that Darlene has received from the day of the accident to president -- present which has included chiropractic treatment, physical therapy, pain medications, cervical spine steroid injections is directly related to her involvement in the accident on 3/17/17."  Do you see that?

A.   Yes.

Q.   And then it has "within a reasonable degree of medical probability, patient has sustained 7 percent disability to the body as a whole."  Do you see that?

A.   Yes.

Q.   Okay.  The 7 percent disability or impairment rating, what does that -- what does that mean in layman's terms?

A.   That means that she has a 7 percent disability.  I

don't know how -- but, you know, the chiropractor also said that she has a disability of -- I think it was, like, 13 to 15 percent.  So there's a huge disparity there.  So somebody's off.

Q.  All right.  The chiropractor impairment rating of 13 percent, did that happen before Ms. Deary underwent the steroid injections?

A.  I'm not sure.

Q.  Okay.  So if the conservative -- the most conservative treatment, which is the chiropractic treatment, resulted in a 13 percent impairment rating; but then the patient underwent more treatment that was more aggressive like steroid injections and her impairment rating went down.  Is that inconsistent or does that just show that the more aggressive treatment was working for her?

MR. DUKE:  Object to the form.

A.  I'm not the doctor.  So I don't know.

BY MS. MEILER:

Q.  Okay.  Do you see towards the bottom of the third -- sorry, the fourth paragraph that starts with:  "If there's worsening or recurrent symptoms or neurological deficits fails, then definitive surgical intervention may be warranted."  Do you see that?

A.  Yes.

Q.  Okay.  Does that indicate that if -- if Ms. Deary's pain is not resolved with these injections, that she would need surgery?

A.  It says if it worsens.

Q.  If it worsens.  Okay.

A.  If it worsens.

Q.  Is it fair to say that Progressive was on notice that Ms. Deary's treating physician was considering surgery as an option for her?

A.  So I would say we see that verbiage a lot where I would says "if it worsens."  And that's what we take it as.  If it worsens.  It didn't say that she needs definitive surgery; it says if it worsens.

Q.  And so if a patient -- if a claimant then schedules surgery, does that indicate to you that their pain has worsened and they are now undergoing surgery?

A.  Sometimes.

Q.  Do you see where it says the approximate global cost of the two-level ACDF surgical spine surgery is 80,000 to 100,000?

A.  Yes.

Q.  And then in addition, it will require at least two days of hospitalization?

A.  Yes.

Q.  Okay.  So that two days of hospitalization, would

that indicate that the surgery would actually potentially cost more than the 80,000 to 100,000 because there are additional costs?

A.  I would assume.

Q.  All right.  Now, I want to take you to the PGR 177. Do you see that on your screen?

A.  Yes.

Q.  Okay.  And this note actually predates the last one.  You see that?

A.  Sure.

Q.  Okay.  And that's on 5/1/2017.

A.  Okay.

Q.  Okay.  Now, do you see under "notes" it says:  "I went over the findings of the MRI scan of the cervical spine"?

A.  Yes.

Q.  Okay.  And it says:  "She still has persistent neck pain."  Do you see that?

A.  Yes.

Q.  And "I talked to her about the option of injection to the cervical spine"?

A.  Okay.

Q.  Do you see there that it says "I made it very clear that is only for pain relief."

A.  Yes.

Amy Gabay
October 08, 2020                    86

Q.  Okay.  And that "we talked about the surgical option which she should think about seriously since there is evidence of spinal cord compression due to disc herniation."  Do you see that?

A.  Yes.

Q.  And "she'll think about this option, and let me know if she wants to proceed with the cervical spine injections."  Do you see that?

A.  Yep.  Yes.

Q.  Doctor went over the risks of both the injection and the surgery?

A.  Yes.

Q.  Now, as the adjuster, did this note advise you or put you on notice that, even as of May 2017, Ms. Deary was discussing both injections and surgery with her doctor?

MR. DUKE:  Object to the form.

A.  Yes.  But also if you look at the MRI, the MRI does show that lots of it is degenerative disc disease as well which degenerative disc disease we know is not related to this.  That is something that's degenerative within your body.

BY MS. MEILER:

Q.  Now, the C4-6-5 [sic] right-sided disc herniation with annular tear compressing the spinal cord on the right side, do you know if that was degenerative or if the

Amy Gabay
October 08, 2020                              87

treating physicians opined that that was a result of this accident?

A.  I don't have the MRI in front of me.  I just remember that there was degenerative disc disease on her back.

Q.  Okay.

A.  Which she had pre-existing which would account for the 14 days' lapse in treatment because, usually, if you're that hurt, you're not going to have those continuous gaps.

Q.  You mean 14 days is a continuous gap?

A.  Well, she had 14 days when the accident first happened.  And then she had another 14 days, where if you're that hurt, you're not going to have two back-to-back gaps.

Q.  Is it your conclusion that there would never be an injury caused by an accident if there are two 14-day gaps in treatment?

A.  No.

MR. DUKE:  Object to the form.

BY MS. MEILER:

Q.  All right.  Let's go back to your analysis on PGR 735.  Okay.  Do you see your note where it says "not accepting hip or shoulder as known mechanism" do you --

A.  Yes.

Amy Gabay
October 08, 2020                                    88

Q.   And then it says:  "Will accept C/T/L and left shoulder.  However, T/L are questionable."

A.   Yes.

Q.   Do you see that?  What is "C/T/L"?

A.   Cervical, thoracic, and lumbar.

Q.   Okay.  And then what is "T/L"?

A.   Thoracic and lumbar.

Q.   Okay.  So does that indicate that you were accepting the cervical spine injury without question but you had questions as to the thoracic and lumbar?

A.   Yes, but I am still accepting them.

Q.   You're still accepting them, but you still have some question as to the thoracic and lumbar; correct?

A.   Correct.

Q.   And there's no question that the cervical injury was as a result of this accident; is that fair?

A.   As far as the soft tissue, yes.

Q.   Now, when you say that you still were accepting the thoracic and lumbar injury, if you were still -- if you were accepting that injury, does that mean that you acknowledge that the insured would be liable for those injuries as a result of this accident?

A.   As far as soft tissue, I will accept it as far as my evaluation.

Q.   Had you accepted the permanency rating of 7 percent

Amy Gabay
October 08, 2020                                    89

by Dr. Sheth, would you have to pierce a -- would a
threshold be pierced?  Are those two things related?
    A.  I'm not sure I'm completely getting the question.
    Q.  Sure.  Now, I know you had some questions about the
permanency rating of 7 percent by Dr. Sheth; is that fair
to say?
    A.  Yes.
    Q.  Okay.
    A.  About both doctors.
    Q.  About both doctors.  Now, if you had no questions
about the 7 percent permanency rating by Dr. Sheth, and
you -- you agreed with that hypothetically, would you then
have to conclude that a threshold was pierced?
        MR. DUKE:  Object to the form.
    A.  I think I would have to relook at the entire demand
because I haven't looked at -- you know, I haven't
evaluated it in three years.  So I would have to look at
the entire demand again.
BY MS. MEILER:
    Q.  Okay.  Do you want to take a break and look at it,
or -- because I want to make sure that I'm giving you an
opportunity to fully answer my questions.
        MR. DUKE:  You're asking her a hypothetical if she
    thought something different than what she actually
    thinks.  So I don't think her looking at the document's

not going to help her answer that.

BY MS. MEILER:

Q. All right. Let me ask you a different question then that maybe you can answer. If we go back to PGR 736, under that threshold that we saw where it says "threshold based on the above no wage loss, moderate impact, most dermatones are normal, doesn't pierce a threshold." Do you see that note?

A. Yes.

Q. Does that indicate that you discounted completely Dr. Sheth's permanency rating of 7 percent?

A. I didn't --

MR. DUKE: Object to the form.

A. I didn't discount anything. I'm just putting a sentence -- I'm just putting a thought in there. I didn't discount anything.

BY MS. MEILER:

Q. Okay. Did you -- based on the records that you received, including the 7 percent permanency regards from Dr. Sheth and the 13 percent rating from the chiropractor, did you conclude that Ms. Deary had a permanent injury or that she did not have a permanent injury?

A. I -- yeah, I did -- I made an evaluation based upon all of the medical records that I received, and I gave her additional based upon everything that I received. I don't

Amy Gabay
October 08, 2020                                     91

know if I actually made an evaluation whether or not there was a permanency because usually, we want to see more for a permanency, so.

Q.  Let me see if I can pull up -- okay.  Sorry.  One moment.  Let me just find the Navigator screen. (Inaudible).  Okay.  Would you need to determine permanency before you could assess noneconomic damages like pain and suffering?

A.  I would do it at the same time.

Q.  All right.  I'm going to pull up a new document that we will mark as Exhibit 6.  It's the Liability Navigator, assessment date August 1st, 2017.  Do you see that document on your screen?

A.  Yes.

(Plaintiff's Exhibit No. 6 was marked for identification.)

Q.  Okay.  And that starts at PGR 280 through PGR 283. Okay.  Okay.  It says:  "Adjuster name:  Gabay, Amy."  Do you see that?

A.  Yes.

Q.  Does that indicate that you were the one that input the information into the Liability Navigator?

A.  Usually, yes.

Q.  Okay.  And that was done on August 1st, 2017?

A.  Okay.  Yes.

Q.   Yes?  Okay.  The original note that you had in your claim notes was July 17, 2017.  Do you see that?

A.   Yes.

Q.   Okay.  Do you know why you wrote the note evaluating all of the records on July 21st, but you didn't input the information into the Navigator until August 1st?

A.   Because I was waiting on the PIP log.

Q.   Okay.  And so once you received the PIP log -- is that when you input all the information into Liability Navigator?

A.   I think that's what my note says, that I received the PIP log on August 1st.

Q.   Okay.  Now, the PIP log, you called Yolanda on August 27, 2017, at Ms. Deary's attorney's office and requested that PIP log; correct?

A.   I think I called before the 27th because it looks like Jen received it on the 24th.

Q.   Okay.  So on the 24th, the attorney --

A.   Actually, I left message -- on the day of the eval, I left a message for her.

Q.   Okay.  So on 7/21, you left a message asking for the PIP log; correct?

A.   Yes.

Q.   And then the PIP log was sent on 7/24 to your office; correct?

A.   Yes.

Q.   Okay.  So let's go to Liability Navigator.  And I'm on PGR 281.  Do you see that?

A.   Yes.

Q.   Okay.  "General damages," it says:  "2,255 to 4,100."  Do you see that?

A.   Yes.

Q.   Do you know where that number came from?

A.   That is a number that once I put in all of the medical dates of service and all the doctor's visits --

THE COURT REPORTER:  Oh, no.  I froze.

MS. MEILER:  Madam Court Reporter, are we unfrozen now?

THE COURT REPORTER:  Yeah.  Did you hear me?  I lost you.  I heard "all of the doctor's visits" and then I -- then I froze.

MS. MEILER:  I think that was the end of the testimony.  We took a break when we heard you say it was frozen.

THE COURT REPORTER:  Okay.  Thank you.

BY MS. MEILER:

Q.   Okay.  All right.  So if we take a look at this, what does "general damages" mean?

A.   That's when it's giving additional over and above what the specials are for all the doctors' visits and for

the treatments.

Q.  So does that take into consideration anything paid by PIP or any other collateral source?

A.  No.

Q.  It doesn't.  Okay.  So this is not out-of-pocket; this is total amounts of medicals?

A.  That's just the doctor -- give me one second.  I'm just turning off my -- I don't need to have my email up for this; right?  I was just turning off my email because it kept sending things in.  I was turning it off because the beeping was driving me nuts.  Okay.  So it's just from putting in the doctor visits and the doctors itself.  It had nothing to do with what monies were actually paid by PIP.

Q.  Okay.  So if I totaled all of the medical records and bills, and they totaled to $27,000 not to 2,255 through 4,100 --

A.  Medical -- it has nothing to do with any dollar amount whatsoever.

Q.  Okay.  So why don't you explain that to me?

A.  I thought I did.

Q.  Yeah.  I'm confused as to if you're putting in all the bills and they total a certain amount --

A.  I'm not -- I'm not putting in bills yet.

Q.  Oh, okay.

A.   Generals have nothing to do with bills.

Q.   So what do they have to do with?

A.   Doctors' visits, the actual visit itself.  So it's how many times the person -- I put in, like, how many times a person -- how many times I'm accepting a person goes to the doctor, how many doctors I'm accepting.  So the actual treatment activity.

Q.   Not what the doctors are charging for that treatment?

A.   Right.  That's not what generals are about.  It's just treatment itself.

Q.   Okay.  And why is there a range?

A.   Because it gives you a range because we work with rangers -- ranges.  We don't give just a lump sum.  We give a range.

Q.   Is this past doctor's visits or future doctor's visits?

A.   Past.

Q.   Okay.  So these are all --

A.   Actual.

Q.   -- the actually --

A.   They actually happened.

Q.   Okay.  Actually happened.  Okay.  So if they actually happened, then shouldn't there be a set amount and not a range?  That's what I'm confused about.

A.   No, because when we evaluate a claim and we negotiate a claim, we work with ranges.

Q.   Okay.  And here, it says "additional damages 7,000."  Do you see that?

A.   Yes.

Q.   What were those additional damages?

A.   Because I wanted to give a higher offer to the attorney for the injections.

Q.   Okay.  Where in this plan does it account for the actual billed amounts from the treatment providers?

A.   So we take what PIP paid out, and we actually owe 20 percent of what PIP paid out per state statute.  And I think that PIP paid out about $6,400 if I'm not mistaken.  So there was PIP left over.  So there was still money that Personal Injury Protection would've had left.  So if PIP paid out $6,400, if -- which would've been $1,601 to Progressive, which is under medical.  And that's the amount that Progressive would've been responsible for based on the actual amount that PIP allowed.

Q.   What about if there were additional bills that were not paid by PIP?  Who's responsible for those?

A.   Well, they would need to go to PIP because PIP has money left over.

Q.   PIP is capped at $10,000; correct?

A.   Correct.  If there was money over and above -- if

PIP had exhausted, then they would come to Progressive.

Q.  Okay.  So where in this screen does it account for the bills above the $10,000 PIP cap?

A.  At the point that I did this evaluation, PIP did not exhaust.

Q.  I understand that PIP did not exhaust.  But if there were additional bills that were above and beyond $10,000, where would that be in this screen?

A.  If a PIP -- if a PIP had exhausted at that point, it would've been with the medical records of 1,601.  It would've been included with that 1,601.  We would've just -- say PIP exhausted.  Then that number would've been $2,500 instead of 1,601 and then anything over and above that.

Q.  Okay.  So do you wait for PIP to exhaust to input bills that go above and beyond the $10,000 PIP limit?

MR. DUKE:  Object to the form.

A.  So if PIP had exhausted and I had a PIP log that showed that they only paid out $6,400 but PIP had not paid those bills, I would have figured out what we owed on that; and I would've put it in that spot.

BY MS. MEILER:

Q.  All right.  So then it has here "total net damages 3,856 to 12,701."  Do you see that?

A.  Yes.

Amy Gabay
October 08, 2020                                98

Q.   Okay.  So is that all of these -- these plan numbers combined?

A.   Correct.

Q.   How did you come up with that $7,000 number?

A.   Based on experience.

Q.   So there's no formula that you use?  It's just what you, in your experience, thought the additional damages might be?

A.   Correct.

Q.   Does that indicate that you were acknowledging that Ms. Deary was entitled to noneconomic pain and suffering damages?

A.   That was acknowledging that she had two injections and that she deserved additional money because of the two injections.

Q.   Would that be additional money for pain and suffering or for something else?

A.   That would be additional money for the injections and the pain and suffering for the injections.

Q.   What about future medical expenses?  Where is that in this worksheet?

A.   There was not.

Q.   Is there a reason why you omitted future medical expenses in this worksheet?

A.   Because, at that point, we did not put in future

medicals.

Q.   Could you have put the future medicals into the additional damages section?

A.   I do not know.

Q.   Once you have this range of 3,856 to 12,701 dollars, do you have the ability to still offer more than that, for example, if you think there's going to be future medical expenses?

A.   More than the 12,000?

Q.   Yes.

A.   No.

Q.   So how do you -- all right.  So you testified just now that future medical expenses don't go into this worksheet because you weren't putting them in at that time.  If you thought that Ms. Deary was entitled to future medical expenses, how would you have that reflect in the offer that you were making her?

A.   I did not say that she deserved future medicals.

Q.   Okay.  So is it your position that on April -- I'm sorry -- August 1st of 2017, you did not believe that Ms. Deary was entitled to any future medical expenses?

A.   At this point, we were not to that level.

Q.   All right.  On page PGR 282, do you see that?

A.   Yes.

Q.   Okay.  And these dates, March 17th, 2017, "medical

code, CMS code," what does that mean?

A.   That's the codes for a cervical and thoracic and lumbar when you enter into -- you know, that you're accepting those injuries.

Q.   Okay.  So that indicates that you were acknowledging that Mr. Norman would be responsible for these three types of injuries as a result of the accident?

A.   I was accepting those three levels.

Q.   Okay.  And then the treatment dates, do you see that?

A.   Yes.

Q.   Okay.  So, for example, if you look on this line, April 17, 2017, and it says "chiropractic treatment, spine for ten visits."  Do you see that?

A.   Correct.

Q.   And above that, it says "chiropractic treatment of cervical spine for 18 visits."

A.   Okay.

Q.   And there's an ER visit for pain for three visits. Do you see that?

A.   Okay.  Yes.

Q.   Why is there just one date and not, you know, each 18 visits, each of the 10 visits, each of the 3 visits?

A.   Because over here it says that I'm accepting it for 18 visits.  Over here, it says I'm accepting 10 visits.

So it's actually saying how many visits I'm accepting. You don't put each individual one.  You put it in for how many you're accepting.

Q.  Okay.  And then this Navigator -- Liability Navigator system accounts for each of those visits that you're accepting; is that accurate?

A.  Correct.

Q.  And each of these visits that you list, those are visits that Progressive was not questioning were treatment related to this accident; is that accurate?

A.  Right.

Q.  Okay.  All right.  Let's go back to your claim notes on page PGR 736.  There's a note on 7/24/17 by you that says "called Yolanda at attorney office."  Do you see that?

A.  Yes.

Q.  Okay.  Do you have an independent recollection of this conversation with Ms. McGee?

A.  No.

Q.  Okay.  Do you see that Ms. McGee advised you that she was having difficulty getting medical records?

A.  Yes.

Q.  Do you have any reason to question that Ms. McGee provided Progressive with all of the records that her office had in its possession?

MR. DUKE:  Object to the form.

A.  Sure.

BY MS. MEILER:

Q.  You do have --

A.  Sure.

Q.  -- reason to question that?  What's the reason?

A.  I'm sorry.  Say that again.

Q.  Do you have any reason to -- let me rephrase it.

Based on this note, do you believe that Ms. McGee provided Progressive with all of the medical records that she had in her possession as of 7/24/17?

MR. DUKE:  Object to the form.

A.  I guess.

BY MS. MEILER:

Q.  All right.  I'm going to take you to PGR 737. There's a -- a note on 8/1/17, same day as the Navigator screen that we looked at, by you.  Do you see that?

A.  Yes.

Q.  At 10:18 a.m.  All right.  Do you see it says "BI negotiation range for Darlene Deary"?

A.  Yes.

Q.  "And requested authorization for amount 12,701." Do you see that?

A.  Correct.

Q.  Okay.  That's the high end of that range on that

Liability Navigator screen; right?

A.   Yes.

Q.   Now, earlier, you mentioned that Liability Navigator is just to assist you; correct?

A.   Correct.  Yes.

Q.   So if it's just to assist you, then why did you only ask for authority in the exact amount of the high end of the range that it determined?

MR. DUKE:  Object to the form.

A.   Because I'm the one who put -- I wasn't asking for -- I wasn't asking for authorization for the high end.  I was asking for authority for the additional $7,000 for the injections.

BY MS. MEILER:

Q.   Prior to this note, what authority did you have?

A.   I had authority for the claim itself and for the value.  Any time we ask for additionals, we need authority for the additionals.

Q.   When you say you had authority for the value of the claim, what was that prior to August 1st, 2017?

A.   My value?  I -- I have value up to $15,000.

Q.   So if you had a value up to $15,000, then why did you need authority for the 12,701?

A.   Like I just said, any time we put additionals on a claim, we need authority for additionals.

Amy Gabay
October 08, 2020                            104

Q.  Why did you already have authority for up to $15,000?

A.  Because my authority level is $15,000.

Q.  Is that on every claim?

A.  Yes.

Q.  Okay.  All right.  And then you say:  "Additionals for cervical facet injection in Palm Beach, two injection dates 5/12, C4-C5, C5-C6; and 6/16 for C6-7."  Do you see that?

A.  Correct.  Yes.

Q.  So that indicates that the -- the additional amount was for the cervical injections; right?

A.  Correct.

Q.  Okay.  And who does that request go to?

A.  Melissa Matz.

Q.  She was your supervisor at the time; correct?

A.  Correct.

Q.  Now, Ms. Matz has a note on August 3rd of 2017 at 4:25.  Do you see that?

A.  Yes.

Q.  And it says "reviewed evaluation and agree with additional damages for facet block injections"?

A.  Yes.

Q.  Did you discuss this claim with Ms. Matz?

A.  To tell you the truth, I don't remember.

Amy Gabay
October 08, 2020                                    105

Q.   Did you typically discuss all of the claims in which you were requesting authorization with Ms. Matz?

A.   Sometimes.  Not all the time.

Q.   When would you and when would you not?

A.   If there's anything, you know, blaring at you, something going on.

Q.   Is it fair to say that your request for authorization did not include any damages for potential surgeries?

A.   Correct.

Q.   All right.  Now, there's -- there's another note by Ms. Matz right below it at 4:26.  It says "manual CVQ added."  Do you see that?

A.   Yes.

Q.   Do you know what that means?

A.   Yes.  "CVQ" stands for coverage -- coverage -- so, let me think about how to say this.  When we -- there's a (Inaudible) screen when we clear things, and we weren't putting additionals correctly when we were doing it.  So in order for us to remember to put in the additionals, we put a "CVQ."  So that way it reminds us to code it correctly when we're settling a claim.  And that's all it's doing is -- we're putting something there that when we settle a claim, that we put it correctly.

Q.   Okay.  As of August 1st, 2017, did you think that

Amy Gabay
October 08, 2020                                106

Ms. Deary's claim or that Ms. Deary was entitled to up to $12,701?

A.   Yes.

Q.   Okay.  And that was without any surgery; correct?

A.   Correct.

Q.   And without any future medical expenses as well; correct?

A.   Correct.

Q.   All right.  So let's look at your note -- actually, unrelated to your -- your question --

MS. MEILER:  Mr. Duke, sorry.  I know I said that I'd be done by 12:30.  It looks like I'm running later than that.  Do you want to call Ms. Allums and see if she wants to start a little bit later so we can take our lunch break at 1:00 o'clock?

MR. DUKE:  Right.  So then you think we'll be done with Ms. Gabay at 1:00, we'll take a lunch break, and then we'll come back for Mr. Allums?

MS. MEILER:  Let me just take a look at my notes.  Yes.  So maybe we'll come back at 2:00 o'clock for Ms. Allums instead of 1:00 o'clock?

MR. DUKE:  It's Mr.; but, yes, that's fine.

MS. MEILER:  (Inaudible).

MR. DUKE:  We'll try to get in touch with him, and I don't think that would be a problem.  Do you have any

Amy Gabay
October 08, 2020                    107

estimate as to how long his deposition's going to take?

     MS. MEILER:  Shorter than this one.

     MR. DUKE:  Right.  Okay.

     MS. MEILER:  I would say maybe two hours, 2:00 to 4:00.

     MR. DUKE:  So -- okay.

     MS. MEILER:  But maybe less.

     MR. DUKE:  Okay.  If we started at 2:00, I mean, it'll be three hours to 5:00.  I have a commitment this evening.  I don't think we can go past 5:00.  I hope you can get it done by then if that's possible.

     MS. MEILER:  Yeah.

     MR. DUKE:  Great.  Sounds good.  Thanks.

BY MS. MEILER:

Q.  All right.  So back to this deposition, Ms. Gabay, if you look at PGR 738, there's a note on August 3rd, 2017.  Do you see that?

A.  I see a couple of notes.  Which one?

Q.  Sorry.  5:28 p.m. that says "injury evaluation."

A.  Okay.

Q.  And do you see "offer amount, $8,500"?

A.  Correct.

Q.  Okay.  And here, it says "L/M for attorney to give offer."  Do you see that?

A.  Yes.

Q.  Okay.  What does "L/M" mean?

A.  Left message.

Q.  Okay.  So that's a voicemail message, like a telephone message?

A.  Correct.

Q.  Okay.  And then you followed up with a letter; is that fair?

A.  I faxed it, and I mailed it.

Q.  Okay.  So let me pull up that letter, which we'll mark as Exhibit 7.

A.  And I also copied it to our insured.

(Plaintiff's Exhibit No. 7 was marked for identification.)

BY MS. MEILER:

Q.  All right.  If you take a look at -- actually, let's go back to that.  You mentioned that you copied it to your insureds.  Earlier we saw that the -- that the excess letter to the insured came back as undeliverable. Do you remember that?

A.  Yes.

Q.  Do you know if between then and when you received -- when you sent the demand to the insured, whether you called him to find out what his correct address was?

A.  I'm not sure.

Q.  Okay.  All right.  So let's go to this letter on

August 3rd of 2017, which is PGR 780.  Do you see that?

A.  Yep.

Q.  Okay.

A.  Yes.

Q.  Is this your response to Ms. Deary's settlement offer for $25,000?

A.  I'm sorry, 85.

Q.  Right.  Is your response -- she made a settlement offer for 25,000; correct?

A.  Yes.

Q.  And this is your response to that offer; correct?

A.  Yes.

Q.  And your offering 8,500?

A.  Yes.

Q.  Okay.  Why not offer $12,701?

A.  Because we give a range.

Q.  Why do you give a range?

A.  Because we don't always give our -- we never give our highest offer because that ensures that you are going to go to suit because when we give our highest offer, the attorney always comes back and they says -- well, they say, "well, we'll" -- most attorneys will negotiate.  And they'll say "okay.  Well, I can come down to this.  So what can you do?"  And then I have no place to go.  And that ensures that we'll go to suit.

Q.  All right.  Now --

A.  So we have to give an offer and negotiate it.  So by giving an offer, then we try and resolve the claim.  And it's not that we're trying to save money or anything.  It's trying to resolve it and trying to protect our insured.

Q.  Now, Ms. Deary's mother, Elizabeth, she had already settled her claim with Progressive; correct?

A.  Yes.

Q.  Do you know how much she settled her bodily injury claim with Progressive for?

A.  No.

Q.  Do you know if she negotiated from Progressive's first offer?

A.  No.

Q.  Had Ms. Deary accepted this $8,500 offer, that would be essentially a windfall of $4,000 to Progressive; is that right?

MR. DUKE:  Object to the form.

A.  (Inaudible).  There would be a windfall of what?

BY MS. MEILER:

Q.  About $4,000 to Progressive.

A.  I didn't look at it that way.  It has -- we know that the attorney's not going to accept our first offer.

Q.  Would you agree with me that Progressive had a duty

to settle Ms. Deary's claim against Mr. Norman within his policy limits and obtain a release of him?

A.   That's what our purpose is.  That's what we try to do.

Q.   All right.  Let me go back to your claim notes on page 748.  There is a note here on August 3rd of 2017 that says:  "Left message for named insured to advise of demand."  Do you see that?

A.   Yes.

Q.   Do you know if you ever got ahold of Mr. Norman on August 31st?

A.   On August 3rd, I do not know.

Q.   (Inaudible).

A.   I'm sorry?

Q.   Yeah, I meant August 3rd.  I apologize.

A.   Okay.  I do not know.

Q.   Okay.  Do you know if prior to sending the $8,500 offer to Ms. Deary whether you had explained to Mr. Norman that there was a settlement offer for $25,000 and that you were offering $8,500 in response?

A.   I do not know.

Q.   Do you know if you ever advised Mr. Norman that you internally valued Ms. Deary's claim at up to $12,701 but that you only offered 8,500?

A.   I know that I spoke to Ms. -- Mr. Norman, and I

explained to him the process, and I told him that it was
negotiations.

Q.  Was that that initial phone call that we already
discussed today?

A.  Probably so, but I know that I did speak to him
within the course of the claim, and I did explain to him
the process.

Q.  Did you ever advise Mr. Norman that, as of August
1st, 2017, you internally valued Ms. Deary's claim at up
to $12,701?

A.  I don't know.

Q.  If it's not in your claims note, does that indicate
that you did not advise him of that?

     MR. DUKE:  Object to the form.

A.  No, that does not mean that.

BY MS. MEILER:

Q.  Okay.  Would you have had a conversation with him
and not put that conversation into the claims notes?

A.  I do not know.  It's -- is it possible?  Yes, that
could be possible.

Q.  Are you supposed to log every conversation that you
have with the insured?

A.  Yes.

Q.  And that --

A.  So --

Q.   -- because in cases like this, for example, where we're years out, it helps you refresh your recollection; right?

A.   Yes.

Q.   And that's also because, at the time that you're adjusting the claim, your supervisor can or any other employee at Progressive can log in and see that you had this conversation with the insured; right?

A.   Correct.

MR. DUKE:   Object to the form.

BY MS. MEILER:

Q.   Okay.   If we look on page PGR 738, there is a file review note by Angela [sic] Camacho-Spivey on 8/7/17 at 2:42 p.m.   Do you see that?

A.   Yes.

Q.   Who is Angela Camacho-Spivey?

A.   Another representative, claims adjuster.

Q.   Do you know why she was involved in this claim on August 7, '17?

A.   I would assume because I was on vacation.

Q.   Okay.   So let's go back to the -- the letter that you sent on August 3rd of 2017.   Okay.   And then back to your claims notes, it looks like on August 4th of 2017, the day after you faxed the counteroffer, you received a voicemail from Yolanda.   Do you see that?

A.   Yes.

Q.   Do you have a recording of that voicemail?

A.   No.

Q.   I know some computer systems, when a voicemail is received, it's transcribed into your email.  Do you know if Progressive had that -- that system in August of 2017?

A.   I do not know.

Q.   Has Progressive ever had a system like that?

A.   I do not know of any system that they have voicemails held back.  I don't know.

Q.   I mean, transcribed, so that you can have, like a record of it in your email.

A.   I've never seen them.  I don't know.

Q.   Does the voicemail recording go to your email at all, or does it stay just on your phone system?

A.   After I listen to a voicemail, I delete it.  I don't know if it's held someplace else.  I -- I don't know -- I don't know how else to answer that question.

Q.   Okay.  So this -- this note that says "received voicemail from Yolanda at attorney's office and she will not accept anything less than the limits."  Do you see that?

A.   Yes.

Q.   Do you have any independent recollection of that voicemail?

A.   No.

Q.   The next note at 1:31 p.m., it says "advised offer is 8,500; and Yolanda said that's ridiculous and hung up." Do you see that?

A.   Yes.

Q.   Who called who?  Do you know?

A.   I would assume I called her.

Q.   Okay.  And --

A.   (Inaudible) -- go ahead.

Q.   Continue.

A.   Go ahead.

Q.   The note about this conversation and the note regarding the voicemail, is that the same time?  They're both at 1:31 p.m.  Do you see that?

A.   Yes.

Q.   So how is it that she left a voicemail and you had a conversation with her at the same time?

A.   So I would assume that she left the voicemail and I called her right back because she had left the voicemail. And since she was saying "I'm still demanding the limits." I called her back to address that.

Q.   Okay.  And when you called her back, did you increase your offer from 8,500?

A.   Apparently not.

Q.   But you had authority to do so up to 12,701;

correct?

A.   Correct.

Q.   And, in fact, you had authority to settle any of her claims up to $15,000 without any manager approval; correct?

A.   I had authority -- on this claim, my authority was up to 12,000 and change.  I can't go up -- over my -- my evaluation.

Q.   You have to ask for permission when you want to?

A.   No, but my evaluation -- we don't go over our evaluation.  That's why we evaluate the claim because the claim is worth that much to us.  So we don't go over our evaluation.

Q.   Did you ever, as of August 4th of 2017, ask for authority to settle up to the policy limits of $25,000?

A.   No.

Q.   Okay.  Then there's a note here at 2:42 p.m. on August 7th by Gregory Zitkiewicz.  Do you see that?

A.   Yes.

Q.   Who is that?

A.   That's another superintendent.

Q.   Okay.  And do you know why he was involved in this claim on August 7, 2017?

A.   Probably because somebody gave him the time limit demand and he logged it.

Amy Gabay
October 08, 2020                                    117

Q.  Okay.  The same demand that you had already responded to on August 3rd?

A.  So it probably came in paper form.  So he still had to log it.

Q.  Do you mean a second copy of it would have come in paper form?

A.  If that's how they sent it.  I can't control what the attorney sends in.

Q.  Okay.  Is there any indication on this claim -- on the claim notes that that's what happened as opposed to a supervisor just going into the file and seeing that a time limit demand was expiring on that date?

MR. DUKE:  Object to the form.

A.  So there's no reason for him to go into a claim and log something when he has no idea that something's going on.  He would've received a paper form.

BY MS. MEILER:

Q.  When you first received the -- or when Progressive first received the demand that expired on August 7th of 2017, is there a place where you log the expiration date to make you complied with -- with that deadline?

A.  Yes.

Q.  Okay.  And do you clear that deadline in any way once you respond?

A.  I'm sorry?

Amy Gabay
October 08, 2020                             118

Q.   Can you clear the deadline once you respond to the time limit demand?

A.   So I go in there, and I put the deadline, and then we have diaries that we work by.

Q.   Okay.  So, in this case, there was a time limit demand expiring on August 7th of 2017 for $25,000; correct?

A.   Yes.

Q.   You responded on August 3rd of 2017 with a counteroffer for 8,500; correct?

A.   I'm sorry.  I'm getting the dates -- I'm getting confused here.

Q.   The first demand that was sent expired on August 7th of 2017.

A.   Do you mind if I write this down?  Because I'm a visual person.

Q.   Sure.  No problem.  And I can show you the letter as well.

A.   Okay.

Q.   All right.  Okay.  The first demand was that received dated July 17, 2017, do you see that it expires on August 7th of 2017?

A.   Okay.

Q.   Do you see that; correct?

A.   Okay.

Q.   Now, you responded on August 3rd of 2017; correct?

A.   Yes.

Q.   And you made a counteroffer for 8,500.  Do you see that?

A.   Okay.

Q.   Now, the deadline of August 7th, was that cleared or was that still ticking somewhere in Progressive's claims system?

A.   That was cleared.

Q.   Okay.  So do you know why on the exact due date of August 7, 2017, a superintendent would go into the file and make a note regarding the -- a demand?

A.   Because TLD 25,000 expires on 8/14.  Because that one -- that one was August 7th.  It wasn't July 7th.  That was August 7th.  That was a new demand.

Q.   Okay.  So let's -- let's talk about that, actually.  On -- and I'm going to pull up a letter that we can mark as Exhibit 7.  Sorry.  Exhibit 8.  It's August 7, 2017 letter.  Do you see that Exhibit 8?

(Plaintiff's Exhibit No. 8 was marked for identification.)

A.   Yes.

Q.   Okay.  And do you see that at the bottom of this letter on PGR 321, it says:  "Ms. Deary's ready and willing to accept your insurance policy limits of $25,000

through Monday August 14th, 2017"?

A.  Yes.

Q.  Okay.  So do you think that this is what the superintendent was logging?

A.  Yes.

Q.  Okay.  And were you out of the office?  Is that why there was a different adjuster and superintendent involved?

A.  Yes.  I -- well, it has nothing to do with the superintendent; but because it was a different adjuster, yes.

Q.  Okay.  Now, do you see Angelica Comacho-Spivey's note on August 17th of '17 at 2:45 p.m.?

A.  Yes.

Q.  Okay.  And do you see where it says "discussed with MXM."

A.  Yes.

Q.  Do you know if that's Melissa Matz?

A.  Yes.

Q.  When you -- do you know when you came back to the office?

A.  I do not know the exact date when I came back to the office, no.

Q.  When you would've come back to the office, would you ever read the notes input by Ms. Camacho-Spivey and

Mr. Zitkiewicz?

A.  I did, actually.

Q.  Do you remember if you spoke to them?

A.  I did.  And if you look in the notes after that, actually, I put in notes in there that I actually looked at the demand and reviewed it to make sure that there was no additional medical records.

Q.  Okay.  The demand meaning this -- this new letter on August 7, 2017?

A.  Correct.

Q.  All right.  And, in response, I'm going to pull up an August 11th, 2017, letter.  Do you see this letter?

A.  Yes.

Q.  Okay.  And it says that you "have re-reviewed your client's claim and will re-extend the $8,500 offer."  Do you see that?

A.  Yes.

Q.  Okay.  Why didn't you increase the offer from 8,500?

A.  I think that was written by Angie when I was on vacation because Yolanda wouldn't give her an extension.

Q.  An extension past August 14th?

A.  Yes.  I think in the notes, Angie asked for an extension.

Q.  Okay.

Amy Gabay
October 08, 2020                                           122

A.   And she was told that she couldn't have one.  So they reiterated the last offer.

Q.   Okay.  Now the -- the second demand that you noted was due on August 14th; correct?

A.   Correct.

Q.   And this letter is offered August 11th; right?

A.   Correct.

Q.   Okay.  So Progressive didn't use the additional three days that it already had?

A.   Correct.

Q.   Do you know why Angie was asking for more time?

A.   I don't know.

Q.   Do you know how much extension she was asking for?

A.   I don't know.

Q.   Now, on August 14th of 2017, if you look at PGR 739, do you see that there's a note that you offered on that date?

A.   Yes.

Q.   Okay.  So you were already back in the office the day that -- the day that the demand was expired; correct?

A.   Correct.

Q.   And it says "received certified letter demand letter to named insured back in the mail unclaimed."  Do you see that?

A.   Yes.

Amy Gabay
October 08, 2020                                    123

Q.  Okay.  So --

A.  It looks like we received the certified letter, but it doesn't look like we received the regular mail letter.

Q.  So what does that mean?

A.  Maybe regular mail was getting to him, and he just wasn't coming to pick up the Certified Mail.

Q.  Do you know if you sent this letter to the same address that the excess letter you sent to him --

A.  No.

Q.  You don't know if it's the same address?

A.  Well, I'm assuming that the -- I don't know.  I don't know.

Q.  All right.  Do you see this note on August 7th -- August 15th, 2017, at 12:08 p.m., "received a call from Yolanda"?

A.  Yes.

Q.  Okay.  Do you -- do you have any independent recollection of this phone call?

A.  So it's really funny that you should ask me that because when I started reading this letter -- claim -- I recognized the name and I started reading this claim and I read that note.  And I'm like, "Oh, my God, I remember this."  Because I actually do remember that.

Q.  Why do you remember this?

A.  Because I remember hearing -- I remember -- I

remember -- in my mind, I remember a claim where an attorney said to me "who in their right mind would have a surgery with only 25 limits and no UM?"  And I remember it being somebody who was just not so nice on the phone.  And it just -- it jogged my memory.  And it was just one of those things because it's not something that you hear often.  And it was just one of those moments that you're like "Oh, my God.  I remember that" because it was just something that I couldn't get out of my mind.

Q.  Why did you ask Ms. McGee if Ms. Deary was going to proceed with her surgery?

A.  I'm sorry?

Q.  Why did you ask Ms. McGee if Ms. Deary was going to proceed with her surgery?

A.  Because I was going to ask her for the recordings, the preop records.

Q.  Would Ms. Deary be required to undergo surgery to be entitled to damages that would cover a (Inaudible) surgery?

A.  I would have asked her for the preop records and see if we could have done something about that.

Q.  That's not my question.  Is a claimant required to undergo surgery to be entitled to damages for that surgery?

MR. DUKE:  (Inaudible).

A.  She she's not required to do anything.

BY MS. MEILER:

Q.  Okay.

A.  I can't require her to do anything.

Q.  Is Progressive responsible for -- well, actually, strike that.

Is the insured responsible for damages that would cover a surgery if the claimant had not yet undergone the surgery?

MR. DUKE:  Object to the form.

A.  I would assume if it's related to the accident.

BY MS. MEILER:

Q.  Then yes?

A.  If it's related to the accident.

Q.  All right.  And so, in this note, you noted that you said "I guess it depends on how much pain she is in, and I don't know her financial situation.  So I cannot answer.  Again -- advise again, I can negotiate.  And then Yolanda advised me to tell the named insured that attorney will file."  Do you see that note?

A.  Yes.

Q.  Okay.  Now, you advised that you would negotiate according to this note.  Do you see that?

A.  Yes.

Q.  Did you, in fact, during this phone call negotiate

Amy Gabay
October 08, 2020                                      126

above your $8,500 offer?

A. No, because she was not willing to.

Q. Okay. But did you increase your offer?

A. She was not willing to.

MR. DUKE: Object to the form.

MS. MEILER: I'm not asking what she did.

BY MS. MEILER:

Q. Did you increase your offer from $8,500?

A. She was not willing to -- she was not willing to hear me out. She wasn't willing to take a offer. She wasn't willing to negotiate.

Q. How do you know that she wouldn't have considered an often for $12,701 had you made it?

A. Because she just told me she's going to file. She said she's not willing to negotiate.

Q. Does your duty to settle a claim against insured end because somebody, an assistant at an attorney's office says "I want the policy limits and not less"?

MR. DUKE: Object to the form.

A. I tried to negotiate with her. If somebody's not willing to negotiate with me, I can't go there and twist her arm. She told me she is not willing to negotiate with me.

BY MS. MEILER:

Q. Okay. So I'd like to talk to you about how you

Amy Gabay
October 08, 2020                            127

tried to negotiate.  Did you offer above $8,500 during this phone call with Ms. McGee?

A.  I can't say I did or didn't.  I tried calling her. I sent her letters.  I spoke to her.  I told her multiple times I would like to negotiate with her.  She kept telling me "I'm not willing to do so."

Q.  Okay.  So let's talk about what you tried to do to settle this claim after this conversation.  You said you sent letters; correct?

A.  Yes.

Q.  Okay.  So let's -- I'm going to pull up another document, which is a September 7, 2017, letter.  It's PGR 779.  Do you see that?

A.  Yes.

Q.  Okay.  So on September 7th, 2017, you September a letter; correct?

A.  Yes.

Q.  And was this the first letter that you sent after that conversation with Ms. McGee?  In other words, do you know if you sent her any other letters in between?

A.  I'm not sure.  I'm not in the data -- I'm not in the database.  So I would assume if that's the one that you're showing me.

Q.  Okay.  Now, this letter on September 7th, 2017, offers $8,500.  Do you see that?

A.   Mm-hmm.

Q.   Yes?

A.   Yes.

Q.   So is it fair to say that following the conversation that you had with Ms. McGee, you did not offer more than $8,500?

A.   No.

Q.   It's fair to say that or it's not?

A.   Yes.

Q.   All right.  Now, Ms. McGee, in that conversation, according to your notes, said to tell the named insured that they were going to pursue the suit.  Do you recall seeing that in your claim note?

A.   I'm sorry.  Say that again.

Q.   In your claim note, you wrote that Ms. McGee advised you to tell the insured that the attorneys were going to file suit against them.  Remember that?

A.   Yes.

Q.   Okay.  So I'm going to pull up another letter which we'll mark as Exhibit 9.  It's a August 15, 2017, letter to Mr. Norman.  Do you see that?

        (Plaintiff's Exhibit No. 9 was marked for
    identification.)

A.   Yes.

BY MS. MEILER:

Amy Gabay
October 08, 2020                                    129

Q.  And it's PGR 829.  Do you see that "the purpose of this letter is to apprise you that should you receive any type of legal paperwork, it's imperative that you contact me immediately."

A.  Yes.

Q.  And it says:  "I have been notified that a lawsuit has or may be filed against you."  Do you see that?

A.  Yes.

Q.  Okay.  As of August 15, 2017, (Inaudible) suit had been filed against Mr. Norman?

A.  No.

Q.  And had you spoken to Mr. Norman about the $25,000 settlement offer and your response of $8,500?

A.  I don't know.

Q.  If it's not in your claims notes, would that --

A.  Then probably not.

MR. DUKE:  Object to the form.

BY MS. MEILER:

Q.  I'm sorry.  Could you repeat your answer, Ms. Gabay?

A.  I said if it's not in the claim notes, then probably not.

Q.  All right.  If you look at your claims notes again on PGR 739, there's a note on September 5th, 2017, at 5:26 p.m.  Do you see that?

A.  Yes, I do.

Q.  And it says:  "Received copy of offer to named insured back in the mail, unable to forward."  Do you see that?

A.  Yes, I do.

Q.  Do you know if you called Mr. Norman to find out what his updated address was?

A.  I do not.

Q.  Okay.  And then if you look at the following page, on August -- sorry, PGR 740, August 25th, 2017, it says "received possible suit letter to named insured back in the mail unclaimed."  Do you see that?

A.  I do.

Q.  Okay.  Do you see any indication that you spoke to Mr. Norman regarding the -- the fact that you hadn't settled this claim against him?

A.  No.

Q.  All right.  Now, I'm going to pull up a letter which we'll mark as Exhibit 10.  It's a September 18th, 2017, letter, PGR 31 through PGR 34.  Okay.  Do you see this letter?

        (Plaintiff's Exhibit No. 10 was marked for

    identification.)

A.  Yes.

BY MS. MEILER:

Q.   Okay.  And would you agree with me that this letter advises you that Ms. Deary's scheduled for surgery?

A.   Yes.

Q.   Okay.  And it has additional medical records enclosed.  Do you see that?

A.   No.

Q.   No?

A.   Oh, yeah.  There she is.

Q.   Okay.  Do you see this record that's PGR 44?  It's on August 25th, 2017, record of treatment from Dr. Sheth.

A.   Yes.

Q.   Okay.  And it talks about how the doctor -- sorry -- that Ms. Deary (Inaudible) -- strike that.

Do you see that this record advises that Ms. Deary wants to go ahead with the surgery and will obtain preoperative blood work and clearance?

A.   Yes.

Q.   All right.  Now, on September 26th, 2017, do you see this note at 3:47 p.m.?

A.   Yes.

Q.   Okay.  And it -- it notes that you spoke to Yolanda again at the attorney's office.  Do you see that?

A.   Yes.

Q.   Do you know who called who?

A.   At -- it says "called Yolanda."  So I called her.

Q.  Okay.  So why did you call her on September 26th, 2017?

A.  Because I was calling to follow up in reference to the offer and try to resolve the claim.

Q.  Okay.  Between the date that you -- that you received this or that Progressive received this September 18th, 2017, letter advising that surgery would be scheduled on September 21st, 2017, and this call on the 25th, did you make any additional offers to settle Ms. Deary's claim?

A.  I'm sorry.  I'm starting to zone out a little bit.

Q.  Okay.  Between the letter advising that Ms. Deary would have surgery and this phone call on September 25th, 2017, did you make any additional offers to Ms. Deary?

A.  When was that letter?

Q.  September 18th, 2017.

A.  18th.  Oh, I was calling -- okay.  So on the 18th, I was calling to see if she was actually going for the surgery because of the demand letter.

Q.  You mean on the 26th?

A.  Yes.

Q.  Okay.  Who is --

A.  I'm sorry.

Q.  -- Garfield Birch?

A.  He's a supervisor in the Fort Lauderdale office.

Q.   Do you know why he input a note on September 18th, 2017?

A.   I assume he left message for attorney because he received the letter from the attorney.  They sent it to the wrong office.

Q.   Who is David Siver?

A.   David Siver works in the Fort Lauderdale office.

Q.   Okay.  Do you know if on September 18th, 20 -- 2017 either of those claims professionals tells you or let you know that they received a letter on one of your cases?

A.   I do not know.

Q.   When you spoke to Yolanda on September 26th, 2017, she advised you that Ms. Deary had not undergone the surgery because of an issue with her blood work; correct?

A.   Yes.

Q.   Do you have an independent recollection of that conversation?

A.   Not really.

Q.   Okay.  Do you know if you offered any more than $8,500 to settle Ms. Deary's claim during that conversation?

A.   I don't think we spoke about the demand.

Q.   Did you bring up settlement negotiations during that phone call?

A.   I don't remember.

Amy Gabay
October 08, 2020                        134

Q.  Did you still have a duty to settle Ms. Deary's claim against Mr. Norman on September 26th, 2017?

MR. DUKE:  Object to the form.

A.  Yes.

BY MS. MEILER:

Q.  Is that "yes"?

A.  Mm-hmm.

Q.  Is that "yes," just for the court reporter?

A.  Yes.

Q.  All right.  And after September 26, 2017, it looks like the next note that you input are on October 4th of 2017.  Do you see that?

A.  Yes.

Q.  Okay.  And it looks like you called Yolanda on October 4th, 2017.  Do you see that?

A.  Yes.

Q.  Okay.  Do you remember that phone conversation?

A.  No.

Q.  Your note, it says that she -- Ms. McGee was in the process of filing suit.  Do you see that?

A.  Yes.

Q.  And that surgery still had not occurred; right?

A.  Correct.

Q.  Do you know if you extended any additional offers to settle Ms. Deary's claim at that time?

A.   No.

Q.   You did not; correct?

A.   No, I don't remember; but I would assume not.

Q.   Okay.  And then it looks like, on the same day, that you searched Palm Beach County courts for a lawsuit?

A.   Correct.

Q.   All right.  And now on November 6th of 2017, it says "left message for Yolanda to follow up on offer and case status."  Do you see that?

A.   Yes.

Q.   What prompted you to do that on August -- sorry -- on November 6th, 2017?

A.   Because I have a duty to follow up, and I followed up with her.

Q.   Okay.  Had suit been filed against the insured as of November 6th, 2017?

A.   No.

Q.   So, at that point, did you extend anymore offers in writing to settle Ms. Deary's claim above the $8,500 that you previously offered?

A.   No, because I was trying to get her on the phone to discuss it.

Q.   Okay.  But you didn't send any letters; right?

A.   No.

Q.   All right.  Now, it looks like on August 28th of

2017, you performed another search of the Palm Beach courts.  Do you see that?

A.  Yes.

Q.  And you found a lawsuit; correct?

A.  Correct.

Q.  At that point, was that the last involvement that you had on this claim?

A.  Yes.  When I gave the hard file, yes.

Q.  Okay.  What did you -- what does that mean, you gave the hard file?

A.  I sent the file that I have.  I sent it to the next representative.

Q.  Who is the next representative?  Do you know?

A.  It looks like Jen (Inaudible).

Q.  Is that Jennifer Peterson or somebody else?

A.  Yes.  Yeah.  She got married.

Q.  Did you speak to her at all?

A.  I don't remember.  I may have.  I don't remember.

Q.  Other than the initial conversation or -- or -- sorry.  Other than the initial review that Ms. Matz did of your evaluation, do you know if you had any other conversations with one of your supervisors regarding this claim?

A.  I do not remember.

Q.  If you had, would you have put it in the claim note

Amy Gabay
October 08, 2020                               137

system?

A.  Probably.

Q.  All right.  Do you recall ever having trouble getting in touch with Mr. Norman on the phone?

A.  I don't remember.

Q.  Okay.  Who is Evan Jarvis?

A.  Evan Jarvis was the supervisor in Jen Peterson's office, in her department.

Q.  Okay.  So he did not supervise you; correct?

A.  No.

Q.  All right.  I am just going to really quickly pull up one more exhibit, which is Progressive's claims handling guidelines, which we'll mark as Exhibit 11.  And that is PCS 1 through 34.  Are you familiar with these claims standards?

     (Plaintiff's Exhibit No. 11 was marked for identification.)

A.  Yes.

Q.  Did you have them available to you at any time while you were adjusting Ms. Deary's claim against Ms. Norman -- Mr. Norman?

A.  I'm sure they were available, yes.

Q.  If we take a look at PCS 3, and I will zoom (Inaudible).  Do you see under "Claims Standard Tenets of Progressive's Claims Handling", there's a menu that says:

Amy Gabay
October 08, 2020                        138

"Good Faith, Compliance With Law and Regulations, Choice,

Communication, Technology, Vendors"?

   A.   Yes.

   Q.   Do you know if these are hyperlinks?

   A.   I think they are.

   Q.   Okay.  Did the hyperlink just take you to this

section in this document or is there additional material

that it would take you to?

   A.   It's just -- no, it takes you exactly to where you

are right now.

   Q.   Okay.

   A.   So it shows that they -- that's exactly where it

takes you.

   Q.   Okay.  And now the good faith section where it

says:  "The imperative of Progressive's claim handling is

to protect the interests of its insured and to discharge

contractual obligations on all claims in accordance with

applicable laws or regulations in a good faith manner."

Do you see that?

   A.   Yes.

   Q.   As an adjuster for Progressive, were you bound by

this -- imperative that's in the claim standards?

   A.   Yes.

   Q.   Okay.  And do you see the last sentence under "Good

Faith" that says:  "Progressive Claims people should not

place the interests of Progressive above that of its

insureds in the handling of any claims."

     A.   Yes.

     Q.   Do you agree with that statement?

     A.   Yes.

     Q.   And did Progressive train you on how to discharge

those good faith duties?

     A.   Yes.

     Q.   Do those duties include advising the insured of all

settlement offers?

     A.   Yes.

     Q.   And do those good faith duties require you to

accept all settlement offers that are not unreasonable

under the circumstances?

     A.   Can you rephrase that?

     Q.   Sure.  Are you required to accept all settlement

offers within the policy limits that are reasonable?

          MR. DUKE:  Object to the form.  Calls for legal

     conclusion.

          THE WITNESS:  So am I to answer that?

          MR. DUKE:  You can answer that if you can.  I'm

     making an objection for the record.  I object to the

     form of that question, but go ahead.

     A.   I was going to say that are reasonable.

BY MS. MEILER:

Q.   Yes.  So you would agree with that statement; correct?

A.   I'm -- I'm -- I mean, I'm saying if it's a reasonable demand.

Q.   Okay.  Are you required to advise the insured of steps you can take to avoid an excess judgment?

MR. DUKE:  Object to the form.

A.   Such as?

BY MS. MEILER:

Q.   Such as contributing his own money if it's a reasonable step he can take or any other reasonable steps?

A.   Sure.

Q.   Are you required to advise the insured of the probability of an excess -- sorry -- the possibility of an excess judgment?

A.   Yes.

Q.   What about the probable outcome of litigation?

A.   I don't know the possible outcome of litigation.  I -- I advised him that that could happen.

Q.   Do you advise him what the probable outcome of litigation could be?

A.   I don't know what the outcome of litigation could be.  I'm not a litigation adjuster.

Q.   All right.  And I'm going to take you to -- all right.  I'm going to take you to PCS 17 of these claims

standards.  Do you see under excessive -- do you see the section that's entitled "Excess Disclosures to an Insured"?

A.  Yes.

Q.  And do you see where it says:  "Each organization should have a process which includes a timely advisement to the insured in writing and a notification to an appropriate claim manager"?

A.  Yes.

Q.  When you were adjusting this claim, what -- what was the process that you were using to notify an appropriate claim manager when there's an excess exposure to the insured?

A.  At the time, there was no surgery.  I did not -- I thought that our offer and my evaluation was in line.

Q.  What about when you received the records advising you that surgery was scheduled?

A.  There was no surgery.  She did not have a surgery. There was two months that she still did not have her surgery.  I spoke to Yolanda, and Yolanda even said to me "who -- who in their right mind would have a surgery when there's no UM available?"  So based upon what the attorney said to me, based upon the fact that there was no surgery two months after the fact, there was no surgery.

Q.  Do you have --

A.   So --

Q.   Continue.  Sorry.

A.   So based upon all of that, Yolanda said to me she wasn't having surgery.  So at that point, there was no reason to believe that there was a surgery.

Q.   What about Ms. McGee providing you with records after that conversation that showed that Ms. Deary told Dr. Sheth that she was going to proceed with surgery?

A.   And then how -- and then two months later, she still didn't have to surgery.

Q.   Do you remember that there was an issue with her blood work on her scheduled surgery date?

MR. DUKE:  Object to the form.

A.   Yes.

BY MS. MEILER:

Q.   Do you find your note regarding Ms. McGee's statement that "who in their right mind would have the surgery" inconsistent with Ms. Deary going to have preoperative blood work on the day of her scheduled surgery?

MR. DUKE:  Objection to the form.

A.   No, I don't.

BY MS. MEILER:

Q.   Okay.  So is it fair to say that you never notified the appropriate claim manager that an excess exposure --

that there was an excess exposure to the insured?

A.  I did not believe that there was an excess exposure at that point.

Q.  And "at that point" means your entire involvement in the handling of this claim; correct?

A.  For which I -- yes, for which I was involved in.

Q.  Okay.  Okay.  I have no further questions.

MR. DUKE:  I don't have any follow-up.  Ms. Gabay, you have the opportunity to either read your deposition to see if there's any errors in the transcription by the court reporter and potentially correct them, or you can waive that right.  I would -- it's up to you.  I would recommend to you that you'd read, but you get to make the decision.

THE WITNESS:  Sure.  I'll read it.

MR. DUKE:  All right.  It can be sent to our office, and we'll go over with you, Ms. Court Reporter.

(Remote video teleconference deposition concluded at 1:17 p.m. EDT)

(Reading and signing of the deposition transcript was requested by the witness and all parties.)

CERTIFICATE OF OATH FOR WITNESS


STATE OF FLORIDA

COUNTY OF PALM BEACH


        I, MARCI PORTER, CER No. 1029, Notary Public, State

of Florida, certify that AMY GABAY appeared before me via

video teleconference and was duly sworn on October 8,

2020.


                        Signed this 12th day of October, 2020.

                        _____

                        MARCI PORTER, CER No. 1029

                        Notary Public, State of Florida

                        Commission No.:  GG 164910

                        Commission Expires:  Dec. 3, 2021

CERTIFICATE OF REPORTER


STATE OF FLORIDA

COUNTY OF MIAMI-DADE


        I, MARCI PORTER, CER No. 1029, do hereby certify
that I was authorized to and did electronically report the
remote deposition of AMY GABAY via video teleconference;
that a review of the transcript was requested; and that
the foregoing transcript is a true and accurate electronic
recording of the proceedings.


        I FURTHER CERTIFY that I am not a relative,
employee, or attorney, or counsel of any of the parties,
nor am I a relative or employee of any of the parties'
attorney or counsel connected with the action, nor am I
financially interested in the action.


                    DATED this 12th day of October, 2020.

                    _____

                    MARCI PORTER, CER No. 1029

CERTIFICATE OF TRANSCRIPTIONIST


     I, ANGIE JACKSON, do hereby certify that I transcribed the electronic recording produced by MARCI PORTER, CER No. 1029, of the deposition of AMY GABAY; and that the foregoing transcript is a true transcript of said electronic recording.


     I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.




                         DATED this 12th day of October, 2020.

                         _____

                         ANGIE JACKSON

WITNESS NOTIFICATION LETTER

Date:  October 12, 2020
ATTN:  AMY GABAY
c/o ADAM A. DUKE, ESQUIRE
YOUNG, BILL, BOLES, PALMER, DUKE & THOMPSON, P.A.
2 South Biscayne Boulevard, Suite 3195
Miami, Florida 33131
RE:  DARLENE DEARY, individially and
as assignee of DWIGHT NORMAN vs. PROGRESSIVE AMERICAN
INSURANCE COMPANY
Deposition Date:  October 8, 2020
U.S. Legal Support Reference Job:  2265404


Dear Sir/Madam:

The transcript of the above proceeding is now available for witness review, and the following applies:

_____The witness is requested to contact our office to make an appointment for review purposes.

__X___Counsel above ordered the transcript and is requested to facilitate the witness's review from their copy.

_____Other:_____

We respectfully request that the review be completed within 30 days. The completed errata sheet may be returned to our office at the address listed below for distribution.


Sincerely,
Production Department
U.S. Legal Support, Inc.
700 East Dania Beach Boulevard, First Floor
Dania Beach, FL 33004
Phone:  954-780-8114
Email:  southeastproduction@uslegalsupport.com

Letter CC via Transcript/Mail:
Michal Meiler, Esq., Esquire