E
X
H
I
B
I
T

D

**EXHIBIT D**

Douglas McIntosh
October 14, 2020

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO.: 9:20-cv-80279-DMM-DLB

DARLENE DEARY, individually and

as assignee of DWIGHT NORMAN,

        Plaintiff,

v.

PROGRESSIVE AMERICAN INSURANCE

COMPANY,

        Defendant.

_____/

ZOOM DEPOSITION

OF

DOUGLAS M. MCINTOSH

Zoom Deposition Teleconference

October 14, 2020

10:01 a.m. - 12:55 p.m.

Douglas McIntosh
October 14, 2020                                    2

APPEARANCES:


For the Plaintiff:

          MICHAL MEILER, ESQUIRE

          STEPHANIE ALICE WEEKS, ESQUIRE

          Ver Ploeg & Marino, P.A.

          100 Southeast Second Street, Suite 3300

          Miami, Florida 33131

          305-577-3996

          mmeiler@vpm-legal.com

          sweeks@vpm-legal.com


For the Defendant:

          CHRISTOPHER R. MACHADO, ESQUIRE

          Young, Bill, Boles, Palmer & Duke, P.A.

          2 South Biscayne Boulevard, Suite 3195

          Miami, Florida 33131

          305-222-7720

          cmachado@flalawyer.net

Douglas McIntosh
October 14, 2020                                        3

INDEX

| Witness | Direct | Cross | Redirect |
|---|---|---|---|
| DOUGLAS M. MCINTOSH | | | |
| By Ms. Meiler: | 5 | | 107 |
| By Mr. Machado: | | 101 | |

EXHIBIT INDEX

| Defendant's | Description | Page |
|---|---|---|
| 1 | Letter | 41 |
| 2 | Liability Navigator | 55 |
| 3 | Letter | 78 |

(Exhibits retained by Ms. Meiler.)

Douglas McIntosh
October 14, 2020                                        4

THEREUPON:

THE COURT REPORTER:  The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.

They further acknowledge that, in lieu of an oath administered in person, I will administer the oath remotely.  This arrangement is pursuant to the Florida Supreme Court Administrative Order No. AOSC-20-16.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Will counsel please indicate your agreement by stating your name and your agreement on the record?

MS. MEILER:  Michal Meiler on behalf of Darlene Deary and we agree.

MR. MACHADO:  Chris Machado on behalf of Progressive and we agree.

DOUGLAS M. MCINTOSH

a witness named in the notice heretofore filed, having been first duly sworn, deposes and says as follows:

DIRECT EXAMINATION

BY MS. MEILER:

Douglas McIntosh
October 14, 2020                              5

Q.    All right.  Good morning, Mr. McIntosh.

A.    Good morning.

Q.    My understanding is that you have been hired by Progressive to serve as an expert witness in this case?

A.    Yes.

Q.    Okay.  And how are you currently employed, Mr. McIntosh?

A.    I am a shareholder in the Law Firm of Segal, McCambridge, Singer, & Mahoney.

Q.    All right.  And you -- I deposed you before and you understand the rules of deposition; right?

A.    Yes.

Q.    Okay.  And, so, you are an attorney at -- is there a short form for your firm's name?

A.    You can just call it Segal, McCambridge.

Q.    Okay.  At Segal, McCambridge?  And how long have you been there for?

A.    We joined our firm with them in February 2020.

Q.    Do you focus your practice in a specific area of law?

A.    Yes.

Q.    And what is that area of law?

A.    I basically defend civil litigation, as well as prosecute claims in civil litigation.  And I also

Douglas McIntosh
October 14, 2020                                    6

have a practice in insurance coverage and bad-faith

work.

    Q.    Do you represent policyholders or insurance

companies?

    A.    Both.

    Q.    What percentage would you say you represent

policyholders versus insurance companies?

    A.    For my present caseload?

    Q.    Yes.

    A.    Probably 5 percent policyholder, 95 percent

insurers.

    Q.    The policyholders that you represent, are they

corporate policyholders, or individuals?

    A.    Both.

    Q.    And of the 5 percent, what is the breakdown

for corporate and individual, would you say?

    A.    I don't know; maybe 50/50.

    Q.    Okay.  And in that practice, is there -- do

you ever represent policyholders in bodily injury claims

against their insurance companies, whether for coverage,

determinations, or bad faith?

    A.    I have.  Yes.

    Q.    Okay.  And when was the last time that you

represented a policyholder in either a coverage or bad-

faith action against their insurance company?

Douglas McIntosh
October 14, 2020                          7

A.   I don't recall.

Q.   All right.  Prior to when your -- you said you had a law firm of your own; correct?

A.   Yes.

Q.   Okay.  And what was the name of that law firm?

A.   That firm was known as McIntosh, Soren, and Kirktia, P.A.

Q.   Okay.  And how long did you work with that firm?

A.   I founded the firm in 1989 and worked there until we joined the practice with Segal, McCambridge in February of 2020.

Q.   Was your practice at McIntosh -- I don't know how to pronounce the second part of it.  But was your practice at your own firm the same as your practice at Segal, McCambridge?

A.   Yes.

Q.   What percentage of your work is expert-witness work?

A.   I don't know exactly what the percentage is at present.  So, I can't fairly answer that.  I haven't looked at the numbers.

Q.   Do you do more expert-witness work, now, than when you were -- when you had your own firm, or the same amount?

Douglas McIntosh
October 14, 2020                                    8

A.   You know, it is cyclical.  It runs about the same as before.  Sometimes I had more expert cases than others.  So, you know, I think the pace is relatively the same.

Q.   Have you ever been retained as an expert witness on behalf of a policyholder in bad-faith actions?

A.   Yes.

Q.   Okay.  And when was that?

A.   I would really have to look at a case list, Michal, but within the past year.

Q.   Do you know which case that was?

A.   I was consulted by lawyers in two different cases where they were representing the policyholder.  And I don't recall the names of the cases.

And I am not sure that I was disclosed as other than a consulting expert.

Q.   Did you have an opinion that the insurance company did not act in conformity with its good-faith duties in those two cases for which you were consulted?

A.   I'm sorry.  I would have to get clarification.  Are we talking about cases where I was assisting in representing the policyholder in a claim against an insurer?

Q.   Yes.

A.    Okay.  And your question, I'm sorry, is?

Q.    When you were consulted in those two cases, on behalf of the policyholder against the insurance company in a bad-faith action, did you have the opinion during that consultation, that the insurance company did not comply with their good-faith duties?

A.    I think it was one of each.

Q.    Okay.  So, the one where you were consulted and you thought that the insurance company did comply with its good-faith duty, I would imagine you were not retained to provide that opinion; right?

A.    That would be accurate.

Q.    Okay.  And, in the other one where you thought the insurance company did something wrong, were you actually retained in that case?

A.    I can't remember if I became co-counsel. We're talking about not retained as an expert.  We're talking about working --

Q.    Let me ask this.  I need both scenarios, either whether as an actual attorney representing the policyholder, or as an expert witness.

A.    Okay.  I believe that I was retained as co-counsel in the case where I felt that the carrier had committed an error in their claims handling.

And, of course, in the one where I didn't believe I

could assist them, I wasn't retained.

I have other cases where I was consulted as a potential expert.

I was construing your question earlier to mean working as counsel with a lawyer for the policyholder. So, I apologize if I misunderstood.

Q.   When you say that you practiced in insurance coverage in bad faith, do you mean that you -- have you ever represented an insurance company in a bad-faith action the way that Mr. Machado and his firm represents Progressive in this action?

A.   Yes.

Q.   Okay.  And do you currently represent any insurance companies in that capacity?

A.   Yes.

Q.   Which insurance companies do you represent currently in that capacity?

A.   I want to be careful, here.  Some of them are not of record; some are.  So, I presume the ones that are, are fair game, right?

Q.   Yes.  The ones that are not of record, I understand could be protected by attorney-client privilege, or work product.

A.   Okay.

Q.   So, I won't ask you about those.

A.    The predominant one that comes to mind would be Zurich American Insurance Company.

Q.    Okay.  Have you ever represented Progressive in a bad-faith action, the way that Mr. Machado and his firm are representing Progressive?

A.    No, ma'am.

Q.    Have you ever represented Progressive in a coverage action?

A.    No.

Q.    Of the times that you have been hired by Progressive, has it always been as an expert witness?

A.    I don't think I have ever been hired by Progressive in that context.

I've been retained by counsel representing Progressive.  And, yes, as an expert witness; that is correct.

Q.    Okay.  And was that regarding other insurance companies, for example, Geico?

A.    Yes.  I lost the last part of that.

Q.    Were you retained by the law firm that represents Progressive, here, to opine on the conduct of other insurance companies, like Geico, on a thesis?

A.    Oh, have I done other work for the Young, Bill Firm?

Q.    Yes.

Douglas McIntosh
October 14, 2020                                    12

A.    Yes, ma'am.

Q.    Okay.  But have you done any other work for Progressive, other than this case?

A.    Yes.

Q.    Right.  As an expert witness?

A.    Yes.

Q.    Okay.  The CV that you provided us in response to the notice of deposition, today, is that your most current curriculum vitae?

A.    If it has -- it should be.  Does it have October 2020, on Page 8 of 8?

Q.    Let me -- hold on.

A.    All right.  I'm sorry.  That was my testimony on the history.  It would be on Page 4 of 4, October 2020.

Q.    Yes.  And so that is dated October 2020?

A.    Yes.

Q.    Okay.  You know, so, I don't want to go through your entire CV and your entire case list since you provided it to us.

So, I just wanted to confirm that there are no updates to the document that you provided us, either with respect to your vitae or your testimony of history.

A.    No.  They are current as of -- I last looked at it on last Friday.

Douglas McIntosh
October 14, 2020                          13

Q.   Okay.  Do you have your expert witness report in front of you?

A.   Yes.

Q.   Okay.  Now, I noticed on the documents that you reviewed in the expert-witness disclosure you did not have certain depositions in front of you.

Like, for example, the deposition of Marion Arums (phonetic) and Ms. Gabay (phonetic), the two adjusters.  Have you since reviewed those depositions?

A.   Yes.  I have received Ms. Gabay's and Mr. -- who is it?

Q.   Marion Arums.

A.   Marion Arums, yes.

Q.   What about the depositions of Yolanda McGee (phonetic), Daniel Williams, and Darlene Deary?

A.   I have read all three of those.

Q.   Okay.  After reading all of those depositions, are there any changes or additional opinions that you would like to render on this case?

A.   There are no changes or additional opinions after reviewing those.

Q.   Okay.  If we look at your expert-witness report, on Page 2 it says that you have been asked based on your professional experience, to provide an analysis, expert opinion as to whether the conduct of Progressive

and its claims professionals complied with insurance

standards as established by Florida Law.

And by Claims Handling Standards in place in

Florida, or otherwise that are good-faith obligations of

Progressive to its insureds under Florida law.  Do you

see that?

A.   Yes.

Q.   Okay.  So -- and, then, it goes on to say that

you have also been asked to provide an opinion on

whether any of the actions of Progressive or its claims

handlers contributed to or caused any of the damages

alleged to have been incurred by Dwight Norman.

A.   Yes.  That is correct.

Q.   Okay.  So, those two issues that you have been

asked to opine on, do those accurately describe the

scope of your expert witness opinion in this case?

A.   I believe so.

Q.   Okay.  Now, with respect to the first topic,

whether Progressive complied with the insurance claims

handling standard, it says in your expert witness report

that your opinion is based on your extensive experience

with insurance claims analysis standard and insurance

claims handling in Florida.

What -- is all of that experience dealing with

claims analysis standards and insurance claims

Douglas McIntosh
October 14, 2020                    15

handlings?  Is that all in your capacity as an attorney?

A.   Yes, ma'am.

Q.   Okay.  And, prior to 1989, when you founded your firm, were you practicing as an attorney?

A.   Yes.

Q.   Okay.  And where were you practicing?

A.   I was practicing at the firm that was then known in 1989 as Dickson, Dickson, Nicholas, Vali (phonetic), and McIntosh in Miami, Florida.

Q.   And what area of law did you focus on at that time?

A.   Basically, the same.  Defense of civil litigation, as well as representation of others in civil litigation.

Q    Did you do any insurance coverage or bad-faith work back then?

A.   Yes.

Q.   Okay.  As a large percentage?  Or what kind of percentage was your practice back then if you remember?

A.   It was a smaller percentage in the first eight years of my practice than it has been in the last 31.

Q.   Okay.  So, in the last 31 years of your practice, have you ever worked in-house -- or, actually, for your entire practice, have you ever worked in-house for an insurance company?

Douglas McIntosh
October 14, 2020                                    16

A.    No.

Q.    When you've represented parties in bad-faith actions, has it ever been in bad-faith actions stemming from personal injury claims?  Like car-accident claims?

Or, has it been property claims?  What types of bad-faith action claims have you been involved in?

A.    In both.

Q.    In both?  Okay.  What is the majority, currently?

A.    I don't know.  I haven't looked at my caseload to break it down between property versus bodily injury.

Q.    Okay.  Have you ever been an insurance adjustor?

A.    No, ma'am.

Q.    Have you every gotten a license to adjust claims?

A.    No, ma'am.

Q.    So, what is your -- strike that.  Have you ever adjusted an insurance claim?

A.    Yes, ma'am.

Q.    What type?

A.    All types.

Q.    Have you ever adjusted a bodily-injury claim arising from a car accident?

A.    Yes.

Q.   Did you have to value the claim in terms of whether -- what the value was based on the injuries?

A.   Yes.

Q.   And how did you do that?

A.   You do it in a number of ways.  Predominantly, with gaining access to medical records, as well as other indications of economic loss, both past and present and future.

And you look at the pain and suffering issue and component to the claim.  So, it is both a noneconomic and an economic analysis.

Q.   What is your educational background with respect to medical records?  Did you receive any, like, formal training on that?

A.   I have taken courses on medical records a number of times over the years, as well as taught them to a variety of sources.

Let me just think to the scope of your question -- as well as, of course, during my 38-1/2 years of practice, I have read medical records since I became a first-year lawyer in 1981.

Q.   When you say you taught courses on reading medical records, which courses, specifically?

A.   Those are in-house courses, either at my firm or sometimes at insurance carriers.

Douglas McIntosh
October 14, 2020                                           18

Helping adjusters understand medical records, as well as helping my paralegals and other junior lawyers in my firm learn how to deal with medical records.

Q.   Which insurance companies have you done these in-house trainings at?

A.   That is going back many years.  I know that I have done it for Ace, which is now Chub (phonetic).

In years' past, I have done it for -- going way back, INA, which is, now, Chub.  I can't remember any others right offhand.

Q.   Have you ever given any in-house training to Progressive?

A.   No, ma'am.

Q.   Have you ever assisted Progressive in terms of updating its claims-handling manuals or training materials?

A.   No, ma'am.

Q.   Is it fair to say that the claims analysis standards in insurance claims handling in Florida, those standards that you are using to provide your expert witness opinion in this case, are based on Florida law?

A.   They are based, in part, on Florida law.  Yes, ma'am.

Q.   When you say they are based in part, what else are they based on?

Douglas McIntosh
October 14, 2020                    19

A.    Custom and practice in the industry.

Q.    What do you mean by custom and practice in the industry?

A.    Well, in the development of claims handling standards in Florida, the case law has developed over the past three or four decades.

And, then, it is implemented through custom usage and practice in the industry for what you might term as a best-practices approach to the handling of claims in Florida.

Q.    Do you have any manual or guideline that you use for those best practices?

A.    No, ma'am.

Q.    All right.  The second part of your opinion, or the second topic that you have been asked to opine on is whether Progressive contributed to, or caused, any of the damages.

A.    Yes.

Q.    Isn't that a legal opinion?

A.    No.  It is factual.

Q.    Okay.  When you say it is factual, what does that mean?

A.    It means that when I analyze the claims-handling activity, often, which is documented as it is here in the claims file and claims notes of the claims

Douglas McIntosh
October 14, 2020                                    20

professionals that handle the case.

I can assess, based on my experience, background, training and knowledge, whether anything that the claims handler did or should have done might have caused an exposure to its insured that, otherwise, could have been prevented.

Q.   Is that based on your analysis of the facts?

A.   It is based upon my analysis of all the facts that are made available to me, combined with my in-depth experience handling claims of this type over the past 38 years.  Yes, ma'am.

Q.   Are there any standards or guidelines that you were using to apply to that opinion?

A.   There are a certain number of pronouncements under Florida Law that I would use as a guide.  Yes, ma'am.

Q.   What would be the pronouncements, as to causation, that you were using to apply?

A.   The causation pronouncements have to do with whether -- if there was an instance, for example, that a claims handler did something, perhaps, wrong, mistaken, or not in accord with usual handling procedures.

Whether, in my opinion, that caused the insured to ultimately suffer an exposure that he or she should not have.

Douglas McIntosh
October 14, 2020                          21

Then, I would utilize that in my opinion.  Yes.  It is contained within the jury instruction in Florida on bad faith, too, I believe, the causation problem.

Q.   All right.  So, other than the jury instruction on causation, is there any other standards that you are applying?

You know, from, perhaps, case law or some sort of guideline or practices or procedures, or something that you are applying, today, if somebody does this, that constitutes causation?

And if somebody doesn't do this, that is not causation?

In other words, other than just applying the -- you know, interpreting the facts as you understand them and rendering an opinion as to whether you think they caused it or not, what is the actual guidelines that you are applying?  The standards?

MR. MACHADO:  Objection.  Form.

THE WITNESS: The guideline that I would apply stems from the seminal concept of proximate causation in Tort Law, as it has evolved over the course of my career.

And what I try to do when I am retained in these cases is to fairly look at all of the activities, both by the claimant and/or their

Douglas McIntosh
October 14, 2020                                    22

representatives, and the insured and/or its, or her and his representatives.

And see if ultimately if there is an excess verdict or an excess judgment that is incurred, was it caused because of, or proximately caused by, any particular activity of the defendant who is being accused of the bad faith.

If I conclude that it was, then causation exists.  If I conclude that it wasn't or that there was nothing that was done with respect to the claims-handling practices that could have caused any exposure, then I conclude in that manner.

BY MS. MEILER:

Q.   Are you familiar with the Florida Supreme Court CNN (phonetic) versus Dego (phonetic)?

A.   I am.

Q.   Do you remember in that opinion where the Court does address causation and talks about the fact that even if an insured contributes to the excess judgment, that doesn't alleviate the liability of the insurance company?

A.   Well, you're taking it -- a generalization out of what I recall is about a 38-page opinion.  And I am not sure I would agree with your generalization.

Yes.  I remember the Court discussing causation in

that case.  I remember the Court specifically discussing the lack in that case of two jury instructions not being given on causation.

And, I believe, it is in Footnote 3 that the Court discusses exactly what the standard is in Florida, relative to causation.

Q.   So, what is it from -- or, do you use anything from the Harvey case to apply or to reach your opinion on causation?

A.   Yes.  I think Harvey has -- certainly, it reiterated the law from the seminal case of Boston O'Connolly (phonetic) versus Gutierrez (phonetic).

And, so, yes, in response to your question, I would utilize the reasoning in Harvey in any case that I attempt to provide expert opinion and analysis in.

Q.   So, what does Harvey say about causation?

A.   Harvey says that it is -- it reiterates the principle that it is the acts of the company that are an issue in a case, and not, necessarily, the acts of the insured.

But it also states, in the footnote that I mentioned, that the two instructions on causation can be given when requested.

And in the totality of the circumstances test that is found in bad-faith law in Florida, the jury or the

Douglas McIntosh
October 14, 2020                                    24

factfinder is allowed to consider as part of the totality of the circumstances, the actions and handling of the claim from the other side of the equation, from the policyholder side and/or his or her representatives.

Q.   What methodology did you use to reach that -- your opinion on that first issue, whether Progressive complied with the insurance claims handling standards as established under Florida Law?

A.   The methodology that I used is the one that I use, I think, in every case where I serve as an expert and try to assist the factfinder with their charge in a case like this.

Which is to look at all of the objective evidence that can be provided to me.  To read the exchanges, both by way of correspondence, emails, or otherwise, between the parties involved.

To read the claims file of the company that is being charged with bad faith.  As well as to look at the totality of the circumstances, including all other objective information that is available.

And that would include, of course, when taking depositions, sworn testimony of people involved in the proceedings.

Q.   When you said objective evidence, do you consider the activity log or claims notes of the

insurance company as objective evidence?

A.    I consider it objective.  Yes, ma'am.

Q.    What if there are injuries which are disputed, factually disputed?

A.    Then that is up to somebody, a factfinder to decide where the dispute lies and which is the more credible side of the equation.

Q.    All right.  But does that affect your opinion as to whether those notes are objective versus subjective?

A.    Well, the notes are objective in the sense -- maybe I should have clarified my answer.

The notes are objective in the sense that they are contemporaneously written with the discussions that are being codified or written down.

Are they subjective?  Sure.  One person is trying to recall what was said in, many times, a two-way conversation.

So, yes, you have to weigh it that way, of course. Yes.

Q.    All right.  Let's go to your summary of facts and opinions in your expert report.

A.    Okay.

Q.    Okay.  Now, the numbered paragraphs here that have specific dates and a recitation or a summary of the

facts as you understand them.  Is that based on the discovery adduced in this case?

A.   In this report it is based on what I had at hand as of the date of the report, which was June 5, 2020.

Q.   All right.  Now, since then, you have been able to review the deposition transcripts.

Has your review of those deposition transcripts changed any of the opinions or the statements that you have recited, here, in the summary of facts in this?

A.   I'm trying to understand what your meaning is by is there a change.

Q.   Yes.

A.   It has enhanced my opinions.  So, if that is a change, the answer is, yes.

Q.   All right.  So, let me give you an example.  You know, just talking about Plaintiff's medicals, for example.

Let me -- Do you remember a claim note stating that Ms. McGee from Gordon and Donner had said to the adjuster, who in their right mind would get surgery with these policies limits?  Or, something to that effect?

A.   Yes.  I remember something to that effect appearing in the claims notes.  Yes, ma'am.

Q.   All right.  And do you recall that in

Ms. McGee's deposition she stated that she absolutely did not say that?

A.   I remember her denying that she said it.  I don't know about, absolutely.  I remember her denying that she said it.  Yes, ma'am.

Q.   Okay.  So, that presents somewhat of a factual dispute; would you agree with me?

MR. MACHADO:  Objection.  Form.

THE WITNESS:  It is a factual dispute by Ms. McGee over what the claims handler recalls the conversation to have consisted of.  Yes, ma'am.

BY MS. MEILER:

Q.   All right.  And, so, did you take into consideration the claims note in rendering your opinion in this case?

A.   That particular note?

Q.   Yes.

A.   That note was not really material to my opinion.  No, ma'am.

Q.   Do you have an opinion as to which one is accurate, the claim note, versus Ms. McGee's testimony?

A.   I have not formed a judgment over whether one is more accurate than the other.  No, ma'am.

Q.   All right.  Let's talk about the first, it looks like, three notes relating to Elizabeth Deary.

The first three paragraphs that you have in your report relating to Elizabeth Deary.

A.   Okay.

Q.   Did you see any evidence of Progressive advising the insured, Mr. Norman, that Elizabeth Deary had been -- made a claim against him?

A.   I am not sure that I saw anything to that effect; nor, am I sure that there was such a claim.

Q.   Do you recall that Progressive actually settled Elizabeth Deary's claim with her?

A.   I would have to look back at the file to -- I don't recall it, sitting here, today.  No, ma'am.

Q.   Okay.  Is there a reason why you talk about her claim, or that she was experiencing some neck pain after the accident, but don't include anything relating to the settlement of Elizabeth Deary's claim?

A.   Just a moment.  I'm sorry.  Could you repeat your question?

Q.   Sure.  In the first three paragraphs of your opinion, you start to talk about -- it is really just in paragraph two and three it looks like -- the neck pain that Elizabeth Deary was experiencing.

Is there a reason why you included those details in your expert report, but not the settlement of Elizabeth Deary's claim?

Douglas McIntosh
October 14, 2020                                        29

A.    Just a moment.  I'm sorry.  Could you repeat your question?

Q.    Sure.  In the first three paragraphs of your opinion, you start to talk about -- it is really Paragraph 2 and Paragraph 3 it looks like -- the neck pain that Elizabeth Deary was experiencing.

Is there a reason why you included those details in your expert report but the settlement of Elizabeth Deary's claim?

A.    No.  And I do see that on March 24th, they did settle with Elizabeth Deary.  So, I had forgotten that.  But, yes, I see that.

Q.    Okay.  And how much did Progressive settle with Elizabeth Deary's claim?

A.    I believe it is $5,115.66.

Q.    Was that the property damage?

A.    Looks like it was on the Nissan.  Yes, ma'am.

Q.    And what about her bodily injury claim?

A.    I don't see anything in my summary right now relative to that; nor, do I recall a settlement for a PI claim.

Q.    Okay.  Would a settlement with Elizabeth Deary affect or influence your expert opinion in this case?

A.    It might affect it only in the sense that it shows that the Progressive claims professionals were

Douglas McIntosh
October 14, 2020                                    30

handling as many potential claims as could have been

brought as a result of the accident.

     And discharging their obligations owed to

Mr. Norman under the policy that was sold to him.

     Q.   All right.  Now, is it fair to say that you

did not consider Progressive's conduct with respect to

Elizabeth Deary, at all, in rendering your opinion in

this case?

     A.   Other than what I have noted as far as the

chronology of the claims notes, that would be accurate.

     Q.   Okay.  Do you recall Progressive including any

valuation of Elizabeth Deary's claim?

     A.   Did you say evaluation?

     Q.   Valuation, meaning what it was valued at.

     A.   Valued at.  I don't recall, sitting here,

today, if there was anything in the claim file relative

to valuation of -- you're talking Elizabeth Deary's

claim?

     Q.   Yes.

     A.   No, ma'am.  I don't recall.

     Q.   Okay.  And Elizabeth Deary is Darlene Deary's

mother; correct?

     A.   Yes, ma'am, as I understand it.

     Q.   All right.  Why did you include in Paragraph 4

a reference to the adjustment of the property damage

claim brought by Elizabeth Deary?

A.    Because under the totality of the circumstance's test, I like to look at, is the totality of the claim being addressed by the company charged with obligations under its policy issued to its insured.

And, so, I felt that that was evidence that they were doing what they should have been doing on a number of fronts at the time.

Q.    All right.  And your omission of the bodily injury claim, was that intentional?  Or --

A.    It wasn't germane to me, because there is no claim by Elizabeth Deary challenging the actions or claims-handling practices of Progressive, as I understand it, in this case.

Q.    -- right.  But the property damage, that was Elizabeth Deary's claim wasn't it?

A.    Except it was an exposure to Mr. Norman.  That was my concern.

Q.    What were Mr. Norman's property-damage limits?

A.    I don't recall, sitting here, what they were under the policy.

Q.    Okay.  All right.  Did you -- when was the bodily injury claim for Darlene Deary opened by Progressive?

A.    Just give me a minute.  I am looking.

Douglas McIntosh
October 14, 2020                                    32

Q.   Sure.

A.   I think that a letter of representation came in on April 7, 2017.  But I am looking to see if a file was opened before that, and I can't find it right this second.

Q.   Do you have the claim notes in front of you?

A.   I have a chronology that you probably have, that I used, rather than the stack of claim notes.  No. I don't have the claims notes in hard copy in front of me.

Q.   Okay.  I don't remember if I did this on the record or not.

But if at any time you want me to show you, via screensharing, a specific document, like the claim notes, just let me know.

A.   Okay.  Looks like -- do you want me to continue to answer?

Q.   Yes.

A.   Looks like a claim note of April 14, 2017, acknowledged a letter of representation received and opening a PI claim on the file.

Q.   All right.  Did you -- strike that.  In your opinion, when was Progressive's first notice of a bodily- injury claim to Darlene Deary?

A.   I believe that it is reflected by virtue of

the letter of representation that was sent by the Gordon and Donner firm.

Q.   Was there any notice provided to Progressive that a bodily injury claim by Darlene Deary would be forthcoming, prior to that letter of representation?

A.   I don't recall having seen one.  No, ma'am.

Q.   Would a prior notice be -- or influence your opinion, at all?

A.   Depends what type of notice and what information was imparted, and to who.

Q.   Sure.  Now, on March 21, 2017, at 4:13 p.m. -- and I will, actually -- I may as well just screenshare.

That way, you know, we're not in a guessing contest, here.  Let me -- okay.  Can you see that?

A.   Yes.

Q.   The claim notes?  Okay.  So, I am going to go to PGR727.  Okay.  Do you see that there is a note on March 21, 2017, at 4:13 p.m.?

A.   Yes, ma'am.

Q.   Okay.  And do you see where there is a note that the daughter, meaning Darlene Deary, has pancreatic disease and is now in pain?

A.   Yes, ma'am.

Q.   Okay.  Is there a reason why you didn't reference that notice of Ms. Deary's post-accident pain

in your expert report?

A.   There is no reason why I didn't reference it in my report.  In my chronology I have it highlighted, based on my review of the chronology.

Q.   What do you mean you had it highlighted?

A.   I have it highlighted, as you can see, here, on my chronology, with yellow highlight.

Q.   Do you mean in the notes that you produced to us?

A.   They would have been in my file materials. Yes, ma'am.

Q.   Okay.  But not in your expert report; correct?

A.   No.  I did not note it that she was reporting -- I believe this is through her mom?

Q.   Yes.

A.   That the daughter suffers from pancreatic disease and is in pain.

Q.   All right.  Do you think that Progressive should have opened up a bodily injury claim for Darlene Deary prior to April 14th of 2017?

A.   I didn't see any reason to do so.  No, ma'am.

Q.   Okay.  I am going to stop the screensharing. All right.  Let's talk about Paragraph 8 of your expert witness report.

A.   Eight?

Q.    Yes.  Paragraph 8, on Page 5.

A.    Okay.

Q.    You have a note regarding -- on April 17, 2017, a conversation between Ms. Gabay and Dwight Norman.

A.    I see that.

Q.    Is that based, solely, on the claim note of that date?

A.    It is based on what is documented in the claims file.   Yes, ma'am.

Q.    Okay.  You don't know the contents of the conversation between Ms. Gabay and Dwight Norman, other than what's written in the claim note, though; correct?

A.    I'm sorry.  The video got gargled, there. Could you repeat that?

Q.    You don't know the specific detail or content of that conversation, other than what is written in the claim notes; correct?

A.    That is correct.

Q.    Ms. Gabay has no recollection of that conversation?

A.    I would have to look back at her testimony to see if she has testified to that effect.  I don't recall.

Q.    Okay.  And there is no recording; correct?

Douglas McIntosh
October 14, 2020                                    36

A.   Not that I am aware of.  No, ma'am.

Q.   All right.  And in the same paragraph, Paragraph 8, you say that same day Ms. Gabay sends Mr. Norman a letter advising him of the nature of the claim, his potential excess exposure for what his purchased policy limits are of $25,000 per accident.

And his right to associate personal counsel, at his expense, to protect his interest.  Do you see that?

A.   I see it.  Yes, ma'am.

Q.   Okay.  Let me pull up a document.  All right. I am going to screenshare.

A.   Okay.

Q.   All right.  I am showing you PGR309.  It is an April 17, 2017, letter; do you see that?

A.   Yes.

Q.   Is this the letter that you are referring to in Paragraph 8 of your expert report?

A.   I believe so.  Yes, ma'am.

Q.   All right.  Now, your expert report says that the letter advises Mr. Norman of the nature of the claim.  Where, in this letter, is he advised as to the nature of the claim?

A.   Where it says: I have learned that one or more parties have damages from the accident on March 17, 2017.

Unfortunately, the value of those damages may be more than are covered by your policy.

Q. You would agree with me it doesn't say whether that is a property-damage claim or a bodily-injury claim; correct?

A. It doesn't specify PD over BI; no.

Q. So, when you say, in your report, the nature of the claim, what does that mean, nature of the claim?

A. It means that the nature of the claim was that one or more parties have alleged that they had damages from the accident. That is the nature of the claim.

Q. Okay. And you would agree with me that this letter, also, doesn't specify who is bringing any specific claim, whether it is a bodily injury or property damage, or any other type of claim; right?

A. It doesn't specify names or particulars about any of the variety of claims. You are right.

Q. Do you know if Mr. Norman actually received this letter?

A. I don't know. I would have to look back at his deposition if he was asked and answered that.

Q. He actually hasn't been deposed, yet.

A. Okay.

Q. Did you see any indication in the claim notes that Mr. Norman did not receive this letter?

A.    I don't remember.

Q.    I am going to -- you don't have the claim notes in front of you; right?

A.    I think, if you want me to look in my bellows to see if I have them, I can.  But I don't have them out in front of me right now.  No, ma'am.

Q.    I can just pull it up versus -- via screenshare.

A.    Okay.

Q.    Let me actually find the correct page; okay? And, actually, let me go -- let me take you to the claim note of that date, that April 17, 2017, note.  It is on PGR733.

Do you see?  There is a note on April 17, 2017, at 10:45 a.m.?

A.    At 10:25?

Q.    10:45.

A.    Okay.  I'm sorry.  I misunderstood.  Yes.  I see that note.

Q.    Okay.  Is that note what you are referring to in Paragraph 8, where you say Ms. Gabay called and spoke with the insured, Dwight Norman?

A.    Yes.  That is one of the notes, 10:45 a.m.

Q.    Was there any other note regarding what the content of the conversation between Ms. Gabay and

Mr. Norman was?

A.    Relative to her conversation with Mr. Norman?

Q.    Correct.

A.    No.  I don't recall another note.

Q.    Okay.  Now, I am going to take you to the following page, PGR734.  And I asked you whether Mr. Norman actually received the letter that we looked at.

So, I'm going to take you to a note on April 27, 2017, at 10:05 a.m.  Do you see this note?

A.    I see it.  Yes, ma'am.

Q.    Okay.  And it says, received an excess letter to named insured back in the mail in April.

A.    Yes, ma'am.  I see that, now.

Q.    Okay.  Excess letter, is that the April 17, 2017, letter that we're looking at?

A.    I don't know for sure, but I would presume that is the reference.

Q.    Does that affect your opinion contained in Paragraph 8 where you say that Ms. Gabay sent Mr. Norman a letter advising him of the nature of the claim and her excess exposure, etc.?

A.    It doesn't undo the fact that the letter was sent and the claims professional was seeking to discharge her obligations to the insured by sending that

letter; no.

Q.   Okay.  Did you see any indication that after this letter came back returned by mail that the adjuster, Ms. Gabay, took any effort to forward this letter via email?

Or to obtain a new address for Mr. Norman, or anything like that?

A.   I don't see anything right now.  I do seem to recall that a better address was obtained somewhere down the road.  And that was changed in the file.

Q.   Okay.  What about around the time of this letter, the April 17, 2020, letter?

A.   I don't see anything around that timeframe. No, ma'am.

Q.   Okay.  Would you agree with me that an insurance company like Progressive has a duty to advise the insured of the possibility of an excess judgment?

A.   Yes.  That is one of the obligations that it owes.

Q.   Does Progressive also have an obligation to advise Mr. Norman of the probable outcome of the litigation?

A.   As best they can.  Yes, ma'am.

Q.   Okay.  Do you think that the letter -- and I will pull it back up -- the PGR309, which actually, we

Douglas McIntosh
October 14, 2020                                              41

can mark PGR309 as Exhibit 1.

(Thereupon, the document was marked as Defendant's Exhibit No. 1.)

MS. MEILER:  Do you think that this letter advises Mr. Norman of the possibility of an excess judgment?

THE WITNESS:  Yes.

BY MS. MEILER:

Q.   Do you think that it advises him of the probable outcome of litigation?

A.   I don't think it advises of probable outcome because that information couldn't have been known by anyone at that time.

Q.   All right.  Now, as of April 17, 2017, was there a possibility of an excess judgment?

A.   There was the possibility that damages from the accident could exceed the amount of insurance that Mr. Norman chose to purchase from Progressive American Insurance Company, as of March 17, 2017, when the accident happened.

Q.   Would you agree that his bodily-injury limits of $25,000 are relatively low?

A.   I don't know what you mean by relatively low. There are state requirements for insurance.

And there are a variety of coverages that persons

Douglas McIntosh
October 14, 2020                                        42

such as Mr. Norman, or myself, can elect to buy based upon our buying power and ability to pay.

Q.   All right.  Well, Mr. McIntosh, for example, if Mr. Norman had one-million-dollar policy limits, do you think that there would be a possibility of an excess judgment as of April 17, 2017?

A.   It would be pure guesswork and it would be an unknown.  And absent more information, nobody could know that, including Ms. Gabay.

Q.   All right.  So, if the insured company has a duty to advise of the possibility of an excess judgment, when do they have to advise of that and when do they not have to advise of that?

A.   A company is well-advised to keep their insured apprised of claims when they know that claims are being made.

And is well-advised to point out to an insured if they have limits that may not protect the insured from the potential claims that could exist in an accident.

To advise them that they may have an exposure and have the right to hire their own attorney, at their own expense, to help them through that process.

Q.   Now, since we have that note, which confirms that Mr. Norman did not receive this letter, did you see any other evidence of Progressive advising Mr. Norman of

Douglas McIntosh
October 14, 2020                                     43

the possibility of an excess judgment?

    A.    Yes.

    Q.    Okay.  And where is that?

    A.    July 19, 2017, PGR277 to 279.

    Q.    Okay.  And you said July 19, 2017?

    A.    Yes.

    Q.    What about around April of 2017?  Did you see any other evidence of Progressive advising him of the potential excess exposure?

    A.    I don't see anything in that timeframe.  No, ma'am.

    Q.    Okay.  All right.  So, in Paragraph 9 of your report, you conclude that it is your opinion that at this point in time -- and then you specify April 17th of 2017.

    Progressive handled the claim presented against its insured in full compliance with its obligations under the policy and in accord with its good-faith duties imposed upon it.  Do you see that?

    A.    Yes, ma'am.  I see that.

    Q.    And included in those obligations that you enumerate you talk about properly communicating with the insured and the attorney for the Plaintiff.  Do you see that?

    A.    Yes.

Douglas McIntosh
October 14, 2020                                    44

Q.   And undertaking necessary activities to fully analyze the exposure presented to its insured.  Do you see that?

A.   Yes.

Q.   And, then, you say, which may ultimately have damages that exceeded the limits of the coverage purchased by Dwight Norman, which was made known to Mr. Norman.

What do you mean by, which was made known to Mr. Norman?

A.   In the phone call note of 4-17 at 10:45 Ms. Gabay reflects that she called Mr. Norman and advised him of the various items that are listed in that note.

Q.   E process limits and confirmed FOL.

A.   Right.  And confirmed no other insurance, and not working at the time of loss to see if there was other insurance, which would have embraced the discussion about the fact that his only insurance was with Progressive.

Q.   Okay.  Do you know if Progressive said, based on your policy limits of $25,000, the damages may exceed those limits?

A.   If that was stated by Ms. Gabay in that conversation?

Q.   Yes.

A.   I don't know.

Q.   So, based on this April 17, 2017, note, as well as the note stating that Exhibit 1, PGR309, was returned to Progressive, is your opinion as contained in Paragraph 9 affected in any way?

A.   No.  Because my Paragraph 9 said as of 4-17. It wasn't learned until after 4-17 that the letter was not received.  So, no.

As of 4-17 I believed that Progressive did everything that was required of them.

And the claims professional assigned to the claim did everything required of them to assist Mr. Norman with the potential claims that could be coming from this accident.

Q.   What about as of 4-27-2017 when Progressive received the excess letter back as undelivered?

A.   What about it?

Q.   Do you have any opinion as to whether Progressive complied with its good-faith duties at that point?

A.   I believe that Progressive was absolutely executing its good-faith duties.  Because by that point, there was representation.

And Ms. Gabay contacted the firm and, in

particular, Yolanda at the firm, to get as much information as she could.

Q.   All right.  I'm going to show you the April -- sorry -- the June 17, 2017, demand letter.  Let me screenshare.

Okay.  All right.  And you reviewed this, obviously, in performing your expert-witness review in this case; correct?

A.   I think you said June.  But this is July 17th.

Q.   Sorry.  It is July 17, 2017.  I apologize.

A.   Yes.  So, what is your question?

Q.   You reviewed this in forming your opinion in this case?

A.   Yes.

Q.   Okay.  And did you review all of the medical records that were enclosed with this letter?

A.   I reviewed the records that had been provided contemporaneous with that, that were in the claims file.  Yes, ma'am.

Q.   Okay.  So, the accident report, the Delray Medical, as of March 29, 2017.  Dr. Mishi Foutz, DLS (phonetic), April 14, 2017 through June 28, 2017.

Dr. Bugi (phonetic) DLS, April 17 through June 30 and the itemized statements; correct?

A.   I believe that those records were contained

and that I reviewed them.  Yes, ma'am.

Q.    All right.  Now --

A.    There was a question about the completeness of the Delray Medical Center records, as I recall.

Q.    Yes.  So, what was the issue with the completeness?  What was it that you -- because I noticed that you mentioned that in your expert report.

And what is it that you contend was missing from the Delray Medical Center records?

A.    I don't contend anything, ma'am.

Q.    Okay.  Well, you write that -- in Paragraph 13 of your expert report, which is on Page 6, on 7-17-17 demand for Progressive's policy limits of $25,000 is made by Gordon and Donner, to Ms. Gabay at Progressive.

And several incomplete medical records were provided, along with the accident fax report.  So, what is it that you state was incomplete?

A.    As I reviewed the file, it was evident that the complete records of Dr. Shefs (phonetic) were not provided and the records that later revealed surgical candidacy.

But, also, as noted in Paragraph 14 of my report, Ms. Gabay was calling the paralegal at Gordon and Donner, asking for complete medical records.

And was being told by that person that they,

themselves, as counsel for Ms. Deary, were having difficulty themselves.

And as I note in the Paragraph 14, they acknowledged that any demand couldn't be properly or fully evaluated without inclusion of full medical records.

Q.   Okay.  So, when you say incomplete, you mean that somewhere in the world, there might have been more medical records?

A.   Well, I wouldn't say somewhere in the world, ma'am.  But we know that there were more medical records.

Q.   Okay.  So, do you know whether, as of July 17, 2017, the date that this letter was sent from Gordon and Partners, whether Gordon and Partners, Ms. Deary's attorneys, whether they had additional medical records that they did not send?

A.   All I know is that Ms. McGee testified that her later letters in September included records that were not included in the original demand of July 17th.

I, also, know that the firm came into possession of those records sometime in July or early-August of 2017.

Q.   All right.  But as of July 17, 2017, was Gordon and Partners in possession of any records that they did not send to Progressive?

A.    I don't know.

Q.    Would that affect your opinion, one way or the other?

A.    Well, yes, it would.

Q.    Okay.  So, if Gordon and Partners sent Progressive everything that they had, how would that affect your opinion?

A.    If they sent everything that they had, all it does is reveal that the case was too early in its development to be able to assess exposure and whether a settlement should be achieved.

If they withheld records, or by accident had received them somewhere in their processing department of their offices and failed to include them, then it would fortify that there was no reasonable opportunity presented to Progressive to settle this case as of the demand of July 17, 2017.

Q.    When you say there was no reasonable opportunity, what does that mean?

Because if you look at Page 2 of the July 17, 2017, letter, it says: At this time, we, hereby, demand tender of Mr. Norman's policy limits in the amount of $25,000.

A.    Yes.  What is your question?

Q.    So, how was there no opportunity to settle for the policy limits if the letter presents an opportunity

to settle for the policy limits?

MR. MACHADO:  Objection.  Form.

THE WITNESS:  Because -- I'm sorry.  Go ahead.
I didn't mean to --

MS. MEILER:  No.  I didn't say anything else.

THE WITNESS:  There was an objection, I think.
I don't know.

MR. MACHADO:  Yes.

THE WITNESS:  Because on July 24th the author
of this letter, Yolanda McGee, pre-litigation
paralegal, confirmed that she, herself, did not
have all the records.

And recognized that a response to that demand
seven days earlier could not be fairly addressed by
saying that she knew that.

BY MS. MEILER:

Q.  What do you mean by fairly addressed?
Couldn't Progressive just take the records that they had
and evaluate the records that they had?

MR. MACHADO:  Object to form.

THE WITNESS:  Well, I think that is the whole
point of what the law says a carrier is obligated
to do.

In this case, it can take the records that
were provided and make its best adjustment decision

based upon those records, which is what Progressive did.

BY MS. MEILER:

Q.   And if it takes the records that it has and it determines that based on the records it had, injury is valued at $25,000, should Progressive just hold off and wait for more records?

Or, is Progressive obligated to tender the limits at that point?

A.   I can't answer your question.  Because that didn't happen.

Q.   Okay.  But -- all right.  Progressive got the records that it got on July 17th of 2017.  It made an offer; correct?

A.   It did.

Q.   What was that offer?

A.   Something around $8,500 as I recall.

Q.   Okay.  It made an offer for $8,500.  Do you think that Progressive should have made an offer for $8,500?

Or, should Progressive have said, no.  We don't have complete records.

So, we're not making any offer.  What do you think Progressive's obligations were, here?

MR. MACHADO:  Object to form.

Douglas McIntosh
October 14, 2020                          52

THE WITNESS:  I'm sorry.  You are going to have to break that question down.  It is really in two or three parts.

BY MS. WEILER:

Q.   Sure.  Do you think that Progressive should have made an offer for $8,500 in response to this July 17, 2017, letter?

A.   As I think my report reflects and my opinions reflect, it was reasonable for Progressive to attempt settlement of the claim for $8,500 based upon the information that it had in-hand, as provided by counsel for Ms. Deary.

Q.   Would it have been reasonable for Progressive to refuse to make any offer because Ms. McGee said she was having trouble getting some of the records?

A.   It would have been acceptable and reasonable for Progressive to say, we can't respond to your demand because we need more information.  And not make an offer.  Yes.

Q.   What additional information, based on your review of the records enclosed in the July 17, 2017, letter, did Progressive need?

A.   What else did it need?

Q.   Yes.

A.   It needed to hear about the completion of her

care and whether, in fact, surgery was going to be indicated, versus a potential for surgery if no further improvement with non-surgical care was made.

Q.   What is the difference between surgery was indicated versus a potential for surgery?  What are the words that you are looking for?

A.   Well, there is a big difference.  When a medical professional writes the records that you showed me that Dr. Shefs did, that is trying to say there is a potential for surgery if this, this, and this doesn't work.

Versus a report that says, even if you do this, this, and this, it is my opinion you are going to need surgery.

You can make the choice, Mr. or Mrs. Patient, but I think you need surgery.  And I am recommending surgery.  There is a difference.

Q.   All right.  Based just on the fact that Ms. Deary was receiving injections and might need additional injections, do you think that would merit a tender of the $25,000?

A.   No.

Q.   Why not?

A.   Because of Florida no-fault law, number one.  Number two, the medical date-of-service records and

Douglas McIntosh
October 14, 2020                                            54

billing records showed, I believe, a very small sum of money having been incurred in medical expenses that would not have warranted a $25,000 policy limits payment.

Q.   Did you see that there was a permanency rating given by both the chiropractor and the neuron surgeon?

A.   I did.

Q.   Okay.  And what does that indicate to you in terms of what elements of damages prevent them from having an obligation to pay for that?

A.   The permanency rating by the chiropractor, first of all, won't hold much weight.

Because he continued to treat and was treating Ms. Deary, according to her sworn testimony in this case, in August of 2017.

She testified that she was doing, quote, occasional, closed quote, continued care with the chiropractor.

So, how he can give a permanency rating when he is continuing in care is not sound.

Whether he was doing that for PIP purposes, I have no way of knowing.  But often times, chiropractors are being driven by PIP.

Q.   Do you know if he was doing that for pain management purposes?

A.   Doing what?

Q.   Continuing to treat Ms. Deary to manage her pain, temporarily.

A.   I don't have anything that suggests that it was a temporary palliative care, as opposed to potentially curative.  No, ma'am.

Q.   You don't have any indication one way or the other; correct?

A.   Just my knowledge of chiropractic over the 38 and a half years that I have dealt with it in my business, as well as, as a personal patient of chiropractic.

Q.   And what is that opinion or that knowledge that you have?

A.   Chiropractic can and sometimes does cure soft tissue injuries that result from a motor vehicle or other traumatic event.

Q.   Does it ever treat the pain?

A.   Yes.  It is palliative in nature.  Yes, ma'am.

Q.   All right.  I want to show you -- all right. I am going to show you what we can mark as Exhibit 2 to this deposition.

It is Progressive's liability navigator.  It is PGR280 through 283.

(Thereupon, the document was marked as Defendant's

Douglas McIntosh
October 14, 2020                        56

Exhibit No. 2.)

MS. MEILER:  Did you review the liability navigator in this case?

THE WITNESS:  Can I look at the whole document?  Can you go from the title page?

BY MS. MEILER:

Q.  Yes.  So, right now, I am showing you 280.  I will scroll to 281.

A.  And, leave it there for a second, please.

Q.  Yes.

A.  Next page.

Q.  All right.  I am scrolling to 282.

A.  Yes, ma'am.  I see it now.  Okay.

Q.  Okay.  And I will scroll to the last page, 283.

A.  Okay.

Q.  All right.  Did you review this document in your expert review in this case?

A.  I remember seeing it.  Yes, ma'am.

Q.  Did you take this into consideration when rendering your expert opinions?

A.  I believe I did.

Q.  Okay.  Does this liability navigator indicate that Progressive was expecting the cervical thoracic and lumbar spine injuries?

Douglas McIntosh
October 14, 2020                    57

A.   Was -- I couldn't understand -- excepting or accepting?  What are you asking?

Q.   Accepting.

A.   A-C-C-E-P-T?

Q.   A-C-C.

A.   I'm sorry.  I didn't -- the Zoom is tough with sounds sometimes.  I apologize.

Q.   My enunciation doesn't help.

A.   Well, we are all in a different environment these days.  It is different than if we were sitting across from one another, for sure.

So, I apologize if I misunderstand.  So, your question is what, if you don't mind?

Q.   Sure.  Does this indicate, the liability navigator, indicate that Progressive was accepting, A-C-C, the cervical thoracic and lumbar spine injuries complained of?

A.   I don't know if accepting, A-C-C, is the right word, as much as recognizing that there was a sprained strain of the ligaments of those three spinal areas.

Q.   All right.  I am going to take you to Progressive's claim notes on Page PGR735.  Do you see the injury evaluation note dated July 21, 2017, at 5:18 p.m.?

A.   I see Ms. Gabay's note at 5:18.  Yes, ma'am.

Douglas McIntosh
October 14, 2020                                    58

Q.    Okay.  Do you see where she states, not accepting hip and shoulder as no --

Will accept or will accepted -- they made a typo -- CTL and left shoulder, however.  T/L are questionable.  Do you see that?

A.    Okay.  I see it.  Yes.

Q.    Okay.  So, does that indicate that as of July 21, 2017, Progressive was accepting cervical thoracic and lumbar injuries?

A.    It indicates to me that they were causally relinquishing the sprain and strain to the cervical thoracic and lumbar spine, to the MVA that is in question, the Motor Vehicle Accident in question.

Q.    Okay.  So, based on that, I am going to take you back to the liability navigator, which, if you look on PGR280, it is dated August 1, 2017.  Do you see that?

A.    Yes, ma'am.

Q.    All right.  And do you see this plan that has certain dollar figures?

A.    I do.

Q.    Okay.  Do you see any indication that Progressive was including future medical expenses in its evaluation in August of 2017?

A.    I don't know what the category, additional damages, would have encompassed for $7,000.

Q.    Did you review Ms. Gabay's testimony regarding what she included in the additional damages?

A.    I read her deposition.  I don't recall, sitting here, what she said.  You can refresh my memory if you would like.

Q.    Sure.  Do you recall her saying that she included some pain and suffering related to the injections, in the additional damages section?

A.    I do recall the faceted injections being discussed.  Yes, ma'am.

Q.    Okay.  So, do you know, sitting here today, whether Ms. Gabay included future medical expenses in this evaluation?

A.    I don't see a category for future medicals. The medicals that are noted appear to be the actual, incurred through PIP medicals.

Q.    Based on the information received by Progressive enclosed in the July 17, 2017, demand letter, do you think Progressive should have included future medical expenses?

A.    No.  I don't think it had enough information to fairly estimate future medicals, based upon the information that was provided.

Q.    Do you think Progressive was on notice that Ms. Deary would need additional treatment, whether

chiropractic injections, or surgical intervention, based on the records received on July 17th?

MR. MACHADO:  Objection.  Form.

THE WITNESS:  I believe that the records reflected that the chiropractor wanted to complete care through ten or twelve modalities of treatments through May.  Yes.

BY MS. MEILER:

Q.   That would indicate that Ms. Deary would, at a minimum, need additional chiropractic treatment; correct?

A.   Yes.

Q.   And, so, if the records indicate that at a minimum, Ms. Deary would need additional chiropractic treatment, then why wouldn't there be a figure included in Progressive's valuation for future medical expenses?

A.   Well, there is a general damages column of $2,255 to $4,100.  There are additional damages of $7,000.

But, perhaps, more pertinent in answer to your question is, unless there was a threshold demonstration of permanent injury caused by the accident, there wouldn't be a need to contemplate those types of damages.

But in answer to your question, they could have

added, perhaps, another $1,000 for chiropractic.  I don't remember what the gentleman charged for his visits.

Q.   You mentioned that the threshold demonstration would perhaps warrant some additional monies for future medical expenses.  Is that accurate?

A.   In defense of many automobile claims over the course of my career in adjusting and assisting adjusters with claims of this type, one of the considerations has to be whether the no-fault threshold requirement of Florida Law would be met.

If it is not met, then it doesn't matter what future medicals exist.  Because there is no causally-related permanent injury that would require contemplation of those damages.

Q.   Did you, in rendering your expert opinion as to whether Progressive fairly and honestly evaluated this claim, did you disregard the permanency reading that Dr. Shefs had given Ms. Deary in the July 17, 2017, records?

A.   No.  I didn't disregard the rating that Dr. Shefs placed in his records.  No.

Q.   So, where is the valuation that reflects that permanency rating, here in the liability navigator?

A.   By virtue of the fact that they are making an

Douglas McIntosh
October 14, 2020                                              62

offer, demonstrates that they are considering that there may be a recovery allowed because of the threshold.

Q.   Do you see any indication that Progressive was giving or assessing Ms. Deary with future pain and suffering?

A.   I don't see any category that identifies future pain and suffering.

Q.   Do you think they should have assessed future pain and suffering?

A.   I think with their damages' assignment of $11,100 in general damages and additional damages, they were contemplating the pain and suffering component of present state, as well as in the future.

Q.   Did you consider the medical bills, the total amount of medical bills that were enclosed in the July 17, 2017, demand letter?

Did you consider those in reaching your expert witness opinion?

A.   I did.

Q.   Okay.  And did you see that those bills totaled $27,000?

A.   I did.

Q.   Okay.  So, does that influence -- do you still think that based on the $27,000 worth of bills, that this valuation is fair?

Douglas McIntosh
October 14, 2020                                   63

A.   I believe that the provision of $27,000 in bills by the paralegal at Gordon and Donner was disingenuous.

Because she, herself, admitted she knew that that amount of medicals could not be boarded in this case.

And that it was only the PIP reimbursements that could be boarded.  And, therefore, this evaluator at that point and moment in time is completely justified and reasonable.

Q.   When you say it was disingenuous, are you suggesting that Ms. McGee should have withheld those medical bills and not provided them to Progressive?

A.   I think she should have provided them with an acknowledgement that those would not be able to be recovered by her client under the law.

Q.   Why would she provide that acknowledgement? Do you think that she has to take the place of the judge and jury in deciding what would ultimately be boarded and not?

MR. MACHADO:  Object to form.

THE WITNESS:  No.  My assessment of Ms. McGee is she was a 14-year veteran, pre-litigation paralegal who acknowledged and admitted that she knew the law.

That she knew that just because you have

Douglas McIntosh
October 14, 2020                                    64

medical bills, or your client has medical bills,

that those cannot be recovered as a matter of law.

And, yet, she submitted them, in my opinion,

in an obvious attempt to inflate the value of this

claim, as of the date of her authored July 2017

demand letter.

BY MS. MEILER:

Q.    Okay.  But you would agree with me that it was

appropriate for Ms. McGee to give Progressive all of the

medical bills that Gordon and Partners had in their

possession; correct?

A.    Sure.

Q.    That was appropriate; right?

A.    It was appropriate to provide everything she

had in her possession.  Yes, ma'am.

Q.    Right.  So, if she had withheld them, that

would be inappropriate.  That would be hiding something

from Progressive; right?

A.    Say that again.

Q.    If she -- strike that.  If Ms. McGee withheld

medical bills, that would be inappropriate; right?

A.    I mean, I can't even follow your hypothetical.

Because I don't know why a plaintiff advocate would

withhold medical bills.

Q.    Right.  She is supposed to give all of those

bills; right?

A.   Of course.

Q.   And it is the adjuster's job to figure out what those bills mean in terms of the valuation of the injury; right?

A.   Yes.  And the adjuster did that job here. Yes, ma'am.

Q.   Okay.  Now, after the July 17, 2017, demand letter, Ms. McGee provided Progressive with a PIP log; correct?

A.   I believe that is -- yes.  The PIP log was provided.  Yes.

Q.   Does that affect your testimony just now? That Ms. McGee was acting in a disingenuous way?

MR. MACHADO:  Objection.  Form.

THE WITNESS:  I'm sorry.  Did you have --
you're talking about -- my testimony and opinion is
she was not being genuine with her July 2017
demand, attempting to portray recoverability of
$27,000 in medical bills.

When she provided the PIP log, she, at least,
is, now, acknowledging that she is going to be, and
her client is going to be, restricted in what can
be boarded for recoverable medical expenses.

BY MS. MEILER:

Douglas McIntosh
October 14, 2020                                          66

Q.   Okay.  I am going to go back to the July 2017 letter.  I am going to screenshare again.  Do you see this letter?

A.   Yes.  And, when it is convenient, I need to take a break.  Because I got to get something for my throat.  But go ahead.

Q.   Sure.  I'm just going to ask this question. And, then, we can take a break if that works.

A.   Thanks.

Q.   Do you see anywhere in the body of this letter where Ms. McGee says anything about whether the full $27,000 should be boarded or not?

A.   No.

Q.   Okay.

A.   I was talking about her testimony.

Q.   But we are talking about what happened in July 2017; right?  So --

A.   Right.  But she was asked, what did you do to form the basis for your letter, that she, herself, wrote, to make the demand in July.  And she said, the $27,000 in medical bills.

Q.   -- okay.  Do you believe that in July 2017 when Ms. McGee sent this letter that she was doing anything that was, in your words, disingenuous, by providing the itemized medical bills totaling $27,000?

A.    Well, she has a misstatement in her letter.

Q.    Okay.  Where is that misstatement?

A.    That Dr. Shefs opined Ms. Deary is a surgical candidate for a two-level, interior, cervical discectomy fusion.

Q.    Did the records enclosed mention that Ms. Deary may need surgery if her more conservative treatment fails?

A.    That is a different statement than a surgical candidate for a two-level, interior, cervical discectomy fusion.

Q.    Okay.  So, what are the magic words that a doctor needs to use in order for you to opine that the person is a surgical candidate?

A.    That they are a candidate for surgery that is being recommended by the physician to improve their medical condition.

Q.    And it is your opinion that the -- Dr. Shefs' records do not say that.

A.    They did not say that in -- no, ma'am.

Q.    Okay.  So, it is your opinion that as of July, 2017, Ms. Deary was not a surgical candidate?

A.    She was not considered a candidate for surgery by Dr. Shefs, according to his records at that time. Yes.

Q.   Okay.  And are there any specific industry standards and guidelines that you're applying for that interpretation of Dr. Shefs' records?

A.   Well, sure.  In reading records over the course of my entire career, there is a difference when a doctor says, if the treatment that we are going to provide you doesn't work, you may need surgery.

Versus, based upon my findings, MRIs, X-rays, tests, you are a candidate for surgery now and ought to consider it.  There is a difference.

Q.   All right.  Now, if there was a record that said what you just said, that based on the MRIs, etc., you need surgery, would -- do you think in your opinion that Progressive at that point should have valued Ms. Deary's injuries at $25,000?

A.   I will need that break.  Because my throat is giving up on me.

Q.   Sure.

A.   I don't know how to answer that question.  You would have to show me the record for me to be able to answer it.

I know that that information was being asked for and not being provided or gathered by Ms. McGee.

Q.   Okay.  Let's take that break.

A.   Thank you.  I appreciate it.

Q.    You want to do five minutes, or longer than that?

A.    Five is great.  I just want to get a little hot water for my throat.

Q.    Sure.  Okay.  Let's do a five-minute break.

(Thereupon, a break was taken and the proceedings continued as follows:)

BY MS. MEILER:

Q.    All right.  Now, if you will take a look at Paragraph 16 of your report, Mr. McIntosh, on Page 7.

A.    Yes.

Q.    And do you see that you opined that Ms. Gabay promptly analyzed the claim based upon the incomplete medicals provided and PIP log provided?

A.    Yes.

Q.    So, again, when you are referring to the incomplete medicals, was there something specific based on the documents that Progressive did have, that Progressive needed to further value, or fairly evaluate this claim?

A.    Specifically, I believe that the claims handler spoke to Ms. McGee about the Delray Medical Center records being incomplete.

Q.    Did you review the discovery and the underlying trial, like the underlying litigation?

Douglas McIntosh
October 14, 2020                    70

A.   Yes.

Q.   Okay.  And, so, did you have a full, complete copy of the Delray Medical Center records?

A.   I don't remember if that was the case or not. Sitting here now, I don't remember.

Q.   Okay.  And, now, sitting here now, and rendering your expert opinion, was there anything later discovered from the Delray Medical records that would have changed the valuation that Progressive came up with in August of 2017?

A.   Sitting here right now, not that I know of or can recall.  No, ma'am.

Q.   Okay.  And what about when you were writing this report?

Like, in other words, was there something that you were like, oh, see that is what I mean.

If Progressive had that, it could have said that this claim was valued higher. Or if they had it, it would have valued it lower.

A.   Well, when I was writing this report in June of 2020, by that point in time we know that later in August of 2017 there were medical records obtained and provided.

But they weren't produced until formal discovery requests in the litigation -- strike that.

Douglas McIntosh
October 14, 2020                                        71

On September 18th, Ms. McGee, for the first time in closed records, indicated that Ms. Deary would, in fact, be undergoing spinal surgery in September.

And, then, it wasn't until later in the litigation in response to a request to produce filed by Attorney J.R. Richards, that the medical records that had been asked for were provided.

Q.   So, let's go back to August of 2017.

A.   Okay.

Q.   On August 3rd of 2017, what was it specifically that Progressive asked for that had not been provided?

A.   It wasn't anything specific that it asked for, aside from what we have already discussed, the Delray Medical Center complete records that hadn't been provided.

Q.   Okay.  And Ms. McGee had advised Progressive that she was having trouble obtaining those records; correct?

A.   That is what the claim file reflects.  Yes, ma'am.

Q.   All right.  Now, did Progressive request like a HIPPA authorization or a medical authorization form? So that Progressive could attempt, also, to get those records?

A.    I don't recall if they ask for medical authorizations or not.

I do know that Ms. McGee informed them that she was using authorizations from her client to try to get the records.

Q.    Okay.  Do you think that Progressive should have tried to get its own medical authorizations to see whether it would have better luck getting those records?

MR. MACHADO:  Objection.  Form.

THE WITNESS:  You know, at this stage of this claim, I think it was perfectly acceptable for Progressive to rely upon Ms. McGee, as the agent and representative of Ms. Deary, to get the records.

I am not sure that a medical provider is going to pay more or less attention if it comes from a third party.

In fact, to the contrary, I would expect that a medical provider should, in fact, respond with completeness to any inquiry.

But, certainly, to an inquiry from the legal representative of its patient.

BY MS. MEILER:

Q.    Do you think that it is in compliance with the good-faith duties, for Progressive to solely rely on

Douglas McIntosh
October 14, 2020                                          73

Ms. Deary's counsel for the provision of medical

records?  And not to attempt any other method of

obtaining that?

A.   In my opinion, it is perfectly acceptable for

Progressive and its claims professionals to rely upon

the legal representative of the claimant to obtain and

provide complete medical records to substantiate their

claim.

If there comes a time when they get those records

and they believe that something is either missing, or

something that should exist -- perhaps there is a

reference in a record to another care provider giving

treatment.

And they haven't received it, then, they should

either ask for that anew.  Or, get an authorization and

get it themselves.

Q.   All right.  Okay.  In Paragraph 17 you write

that on August 4, 2017, a message was left for Yolanda

McGee, or sorry, by Yolanda McGee to Adjuster Gabay.

A.   Yes.

Q.   All right.  And it says Yolanda also refused a

request made at that time to extend the time to comply

with the limits demand.  Do you see that?

A.   Yes.

Q.   And it says, to allow for more documents to be

Douglas McIntosh
October 14, 2020                          74

obtained relative to Ms. Deary's medical treatments.

Where do you see a request for additional time in order -- specifically, in order to obtain more medical records?

And if you would like, I can show you the claim notes from that day, perhaps, to assist you.

A.   Yes.  I'm looking at my chronology.  But if you want to pull up the -- we're looking at 8-7; right?

Q.   Yes.

A.   Yes.  If you want to pull it up, you can.

Q.   Sure.  All right.  So, I'm showing you the claim notes from August 7th of 2017.

A.   Okay.

Q.   All right.  Now, do you see there is a file review by Angela Comacho-Spivey (phonetic)?

A.   Yes.  It is a file review.  Yes.

Q.   Yes.  And it says, essentially, left message requesting extension.

A.   Yes.

Q.   Do you know -- where does it say that Ms. Comacho-Spivey needed an extension in order to obtain more records?

A.   In the note below that.

Q.   Yes.

A.   It says no additional documents provided.  So,

Douglas McIntosh
October 14, 2020                                    75

that indicates to me that when she spoke with Yolanda --
or the message from Yolanda was that there were no
additional records that were going to be provided.

Q.   Do you know how long of an extension they were
asking for?

A.   I don't know, specifically.  But I would --
no, I don't know, specifically.  No, ma'am.

Q.   Great.  And, now, that request on August 7th
for an extension, that was an extension from the
already-granted extension to August 14th; correct?

A.   That is right.

Q.   Now, Angela Comacho-Spivey, do you know
whether she was filling in for Ms. Gabay, who was out of
the office that week?

A.   I see a note that it says file assist, which
would indicate to me that she was, perhaps, filling in
due to absence.

Q.   Okay.  So, do you know if Ms. Comacho-Spivey
was asking for an extension so that the actual adjuster
could come back and handle this?

Or, if she was asking it, specifically, as she
wrote, to allow for more documents to be obtained?

A.   I believe it was the latter.

Q.   And that is based on this second note that
says, in-bound call from Yolanda that she will not

extend.

And she was just adjusting and demanding the limits, again.  No additional documents provided.

A.   I mean, based on that note and the testimony that I have read as to what Ms. Gabay and her supervisors wanted.

Q.   And what is that testimony about what Ms. Gabay and her supervisors wanted.  What did they want?

A.   Well, they needed to know if the young lady was still treating outside of her chiropractic, with the orthopedist.

And whether the orthopedist had made a decision that surgery was going to be necessary.

And they were not giving any of that information, or relative to whatever continuing care she had, as she testified, quote, occasionally, closed quote, in her deposition.  That is Ms. Deary.

Q.   Do you see a single, written request during this time period for additional medical records, or updates regarding Ms. Deary's treatment?

A.   Do I see any what?  A written request?

Q.   Yes.

A.   I didn't see a letter or email if that is what you are asking.  No.

Q.   Now, the response to the extension of the settlement offer to August 14th, that was actually sent on August 11, 2017; correct?

A.   If you say.  I mean, I will accept your dates. I can look in my chronology.  Yes.  August 11th, they re-reviewed the claim and sent the letter to Mr. Williams.

Q.   Okay.  And that is on PGR328; correct?  That I am showing you on your screen?

A.   Yes.  328.  Yes, ma'am.

Q.   All right.  So, Progressive didn't even wait until the due date of August 14th to respond; right?

A.   That is right.  They were acting three days in advance of the deadline.

Q.   Now, on August 11, 2017, when Progressive reiterated its offer of $8,500, what was the high end of Progressive's internal valuation of Ms. Deary's claim?

A.   I would say on the valuation you showed me, it was roughly $12,000.

Q.   Do you think it was in compliance with Progressive's good-faith duties to stand firm on the $8,500 offer?

And not offer more, within its own internal valuation range?

A.   Yes.

Douglas McIntosh
October 14, 2020                     78

Q.   Why?

A.   Because of the many statements made by Yolanda McGee, a non-lawyer paralegal, that she, quote/unquote, was not going to negotiate this claim, period.

Q.   Because she wanted $25,000; right?

A.   Because she was demanding $25,000 for her client; yes.

Q.   So, why offer $8,500, again, if that is the case?

A.   Because they are trying to discharge their obligations and their good-faith duties to their insured by trying to gain a resolution of the case by directly writing the lawyer in this instance.

And inviting him to contact her to try to possibly come to a fair and amicable resolution of the claim.

That is what is called for, what is expected, and what was done under the good-faith obligations of the company.

And reiterating an $8,500 offer tells the recipient that they offered.  That they still haven't provided sufficient information to warrant an offer above that.

Q.   All right.  So, I'm looking at this letter, which is PGR328.  We can mark that as Exhibit 3.

(Thereupon, the document was marked as Defendant's Exhibit No. 3.)

Douglas McIntosh
October 14, 2020                          79

MS. MEILER:  Where in this letter directed to the attorney, as you pointed out, does it say that Progressive can't offer anymore without more documents?

THE WITNESS:  It doesn't say that in the four corners of this letter.

My testimony was based upon what preceded this date and the nature of the exchanges with Ms. McGee and the documented responses of Ms. McGee.

Specifically, that she refused to obtain and provide any further information.

And expected the company to pay its $25,000 regardless of how it evaluated the claim.

BY MS. MEILER:

Q.   Show me where in the file, the claim notes, a letter, anywhere else, where Ms. McGee specifically, in your words, refused to provide any further documentation.  Where she specifically refused to do so.

A.   I think that it is replete in the exchanges where Ms. McGee did things like, claim the offer was ridiculous and hung up the phone.

That, despite being asked for records, to my knowledge, never made an effort to go get them until litigation commenced.

And they were required to get the records and

produce them.

Q.   I am confused, Mr. McIntosh, we previously discussed the claim note where Ms. McGee advised Progressive that she was trying to get records.  And was having a hard time to do so.

So, I am trying to figure out where in the file it specifically says that Ms. McGee refused to provide additional records.

A.   I don't see anything that says that she refused.  That was my reading on the exchanges that that young lady had with the claims handler, which was basically saying you have the demand.

The demand is not going to be extended to accommodate your request for more information.  Either pay it, or not.  That is the context that I stated that in.

Q.   Oh.  I'm going to go back to the claim notes. Did you see an indication that the demand letter that was forwarded to the insured was returned as undeliverable?

A.   Yes.  I saw a note on August 14th that the certified demand letter to the named insured came back in the mail unclaimed.

Q.   Unclaimed.  Okay.  Did you see any indication that the adjuster reached out to Mr. Norman to try to

get, you know, an additional address?  Or forwarded him the demand letter via email?

A.   All I saw was the fact that she called Mr. Norman on August 15th and advised that there could be a suit forthcoming.

And warning him about the 20-day rule for service of the summons.  And, then, the letter following that on August 15th.

Q.   So, is there any record of Progressive actually conveying to Mr. Norman that there was a $25,000 offer to settle made by Ms. Deary?

And that Progressive was going to respond with an offer of $8,500?

A.   Other than in phone calls that would have taken place, I don't see anything documented to that effect in writing to Mr. Norman.  No, ma'am.

Q.   Do you think that Progressive had an obligation to advise Mr. Norman that there was an offer to settle his claim, made by Ms. Deary for the policy limits?

A.   I believe that there is an obligation in an insurer to advise an insured of opportunities to settle. Yes.

Q.   All right.  Now, after this August 15th note where Ms. Gabay advises Mr. Norman that suit could be

Douglas McIntosh
October 14, 2020                                    82

filed against him, did you see any other settlement

offers made by Progressive to try to resolve this claim,

before suit was actually filed?

    A.   What was the date suit was filed?

    Q.   I believe it was November 21st of 2017.

    A.   Thank you.  There were some phone calls in the

fall of 2017 by Ms. Gabay to Yolanda in follow-up to the

offers and whether suit was going to be filed.

    Q.   Did Ms. Gabay make any settlement offers to

Ms. McGee during those phone calls?

    A.   All I saw were messages being left for

Yolanda, with no return calls.

    Q.   Were there any settlement offers conveyed to

anyone at Ms. Deary's attorney's office during that time

period, the fall of 2017, prior to suit being filed?

    A.   Not to my knowledge.  No, ma'am.

    Q.   All right.  I'm going to show you a September

18, 2017, letter.  And it is PGR31 through 34, from

Ms. McGee to Ms. Gabay.

    A.   I see it.  Yes.

    Q.   I believe you referenced this earlier when you

were saying that this was additional medical information

that was provided; right?

    A.   Yes, ma'am.

    Q.   Okay.  And, now, this letter indicates that

Ms. Deary would be undergoing the interior cervical discectomy on September 21, 2017; correct?

A. Yes.

Q. Okay. And if I could take you to the August 25th of 2017 service record from Dr. Shefs. Do you see that on PGR 34?

A. Okay.

Q. And see where it states that Ms. Deary wants to go ahead with the surgery and will obtain preoperative bloodwork clearance?

A. Yes. I see that.

Q. All right. Do you see any indication that upon receipt of this letter and this record that Progressive updated its valuation of Ms. Deary's injuries?

A. I'm looking. Hang on just a second. I don't see anything in my chronology that indicates an update was performed within the claims records.

Q. Earlier we talked about what the term, surgical candidate, meant. And would you agree that as of this September 18, 2017, letter, Ms. Deary was a surgical candidate?

A. Yes.

Q. So, do you think that based on her being a surgical candidate, Progressive should have placed a

Douglas McIntosh
October 14, 2020                                                84

valuation on future medical expenses for Ms. Deary?

A.   I don't think there was any purpose in doing so at that point in time.  I do know that they eventually did do that.

Q.   Right.  And why do you think there was no purpose at that point in time?

A.   Because the letter that you showed me a moment ago clearly withdrew any potential to settle the case for the $25,000-policy limits.

Q.   Did that mean Progressive no longer had an obligation to try and settle the claims against its insured and to obtain a release?

A.   No.

Q.   Okay.  So, based on the fact that -- you would agree with me Progressive has a continuing obligation to try and settle the claims against its insured?

Why do you think Progressive did not need to update its valuation to include future medical expenses once it received these records?

A.   At this moment in time, August of 2017, there was no opportunity to settle.  Because the offer to settle had been withdrawn in clear language by Ms. McGee.

I have questions in my mind about her authority to do that as a non-lawyer.  But that is beside the point.

Douglas McIntosh
October 14, 2020                                    85

It was written on behalf of her client.

Q.   In your 38 years of practice, have you ever seen a claimant withdraw their offer to settle but, then, still accept the policy limits once they were actually tendered and there was a check in-hand?

A.   Oh, sure.  That has happened in cases.  Sure.

Q.   Do you think that Progressive should have continued to try to settle this claim, even after this letter was received?

A.   They did.

Q.   Okay.  So, upon receiving this September 18, 2017, letter, in your opinion, was Ms. Deary's claim valued at the $25,000-policy limits?

A.   Could you go back to the letter for a moment?

Q.   Yes.  This is the face of the letter.  And if you would like me to scroll down to the medical records enclosed, I am happy to do so.

A.   Well, we were just on those records; right?

Q.   Yes.

A.   Okay.  So, your question is, do I have an opinion as of September 18th whether the case should have been evaluated, or could have been evaluated at having an exposure of $25,000?

Q.   Yes.

A.   Yes.

Q.   Do you think that it would be fair and honest for Progressive to value Ms. Deary's injuries on September 18, 2017, at below the $25,000-policy limits?

A.   I would have to see the evaluation and the basis for doing so.  So, I can't really answer that question without more information.

Q.   Did you see any new evaluation in response to this September 18, 2017, letter?

A.   Just a moment.  I am looking.  I think later in the claims file that occurred.  But in this timeframe, no, ma'am.

Q.   Did you see a reference in the claim notes to a phone call, a conversation between Ms. Gabay and Ms. McGee after this September 18, 2017, letter, to see if Ms. Deary had had cervical surgery?

A.   After September 18th?

Q.   Yes.

A.   I saw a note that on October 4th Ms. Gabay did an injury evaluation.  That would have been after receipt of the letter, which was noted in the file on September 26th.

And that she called Yolanda, who said she was in process of filing suit.  And that her client had not, yet, had surgery because of some bloodwork issue.

Q.   Now, upon receipt of the information that

Douglas McIntosh
October 14, 2020                              87

Ms. Deary wasn't able to have her surgery because she had some bloodwork issues, do you think that Progressive should have continued to try to settle this claim since no surgery had occurred and suit had not been filed, yet?

A.   I think that Progressive should continue to adjust the claim and maintain communication with the legal representatives of the claimant, which they did.

Q.   Okay.  So, after that October 4, 2017, phone call -- and, actually, let me take you to claim notes, because you mentioned it was on October 4th of 2017.

I am taking you to the claim note, that is PGR740; do you see that on your screen?

A.   Yes.  Yes.  It is there.

Q.   So, you're referring to this injury evaluation, October 4, 2017, at 9:49 a.m.?

A.   Yes.

Q.   Where it says, called Yolanda.  She is in the process of filing suit.  DD has not had surgery, yet, due to bloodwork; right?

A.   Yes.

Q.   All right.  Now, if you take a look two notes up, on September 26, 2017, do you see where Ms. Gabay notes that she called Yolanda.

And Yolanda advised that Ms. Deary went for the

surgery.  However, her blood levels were too high and she could not get the surgery.

However, she will go back for the surgery when her blood levels are lower; do you see that?

A.   Yes.  I have that note in my chronology.  Yes.

Q.   All right.  And, that conversation doesn't reference anything about suit being prepared, or that they are going to file suit imminently or anything like that; right?

A.   I believe, didn't the letter reflect that they were going to proceed to file the complaint, when she said it was withdrawn?

Q.   I'm talking about this note, that postdates the letter.

A.   Oh.  Yes.  No, this note doesn't say anything about suit being filed.  But the letter said it was.

Q.   Okay.  But suit had not been filed; right?

A.   No.

Q.   And, now, there is a new circumstance, which is that Ms. Deary wasn't able to get her surgery as scheduled; right?

A.   That is correct.

Q.   And that Ms. Deary still intended to get surgery at some point in the future; right?

A.   Yes, ma'am.

Douglas McIntosh
October 14, 2020                                                89

Q.   Okay.  Now, do you think that at this point, September 26, 2017, Progressive should have offered the $25,000 to see if they could settle this claim against Mr. Norman?

A.   Do I think they should have?

Q.   Yes.

A.   I think they could have.  I'm not sure that they should have.

Q.   Why?

A.   Let me finish.  Let me finish.  But had they done that it would have been fruitless.

Because Ms. McGee already unequivocally stated that her client was never accepting that sum of money.

Q.   You say it would have been fruitless.  Earlier you testified that you have seen instances where claimants say we're withdrawing our offer.  And, then, they still accept the policy limits; right?

A.   I have seen those circumstances; yes.

Q.   Okay.  So, why -- how are you so sure that would have been fruitless?

What testimony or evidence or documentation have you seen that establishes that it would have been fruitless?

A.   Because in the instances where I have seen that occur, you didn't ask under what conditions and

circumstances, that has happened in my career.

It doesn't happen when you have an unequivocal withdrawal of the demand and no further development of information.

Such as performance in a deposition in a lawsuit, additional medical records being obtained during the course of litigation, other discovery being undertaken.

When the claimant's lawyer, who was resolute with not ever going to accept a nickel under a certain sum of money has changed their evaluation because of facts and circumstances that developed over the course of time.

Those are the circumstances where I have seen a non-negotiable, we will not accept a certain, change. And the claimant decides to, in fact, take the money.

Q.   All right.  Let me ask you this.  Prior to this September 18, 2017, letter, do you recall that Ms. McGee sent a letter to Progressive extending the $25,000 offer to August 14th of 2017; right?

A.   I do.  Yes, ma'am.

Q.   Okay.  Now, upon the expiration of that offer, August 14, 2017, you would agree with me that there is no pending offer to settle for $25,000; right?

A.   As a matter of law, you are correct.

Q.   Okay.  Does that mean because the offer expired, that Progressive should no longer try to settle

Douglas McIntosh
October 14, 2020                                   91

because there was an offer and it was expired?

A.   No.

Q.   Okay.  And do you think they should have, then, continued to try to settle?

A.   And they did continue to try to negotiate the claim.  Yes, ma'am.

Q.   Okay.  So, after August 14, 2017, what settlement offers did you see in the file that Progressive made to Ms. Deary?

A.   I didn't see any specific settlement offers. I saw efforts that the claims handler and the claims professional trying to get information that they needed.

But by that point in time, the offer had expired. And it was formally withdrawn.

Q.   Okay.  So, when you say it was formally withdrawn, that means the September 18, 2017, letter. Is that what you mean?

A.   Yes.  I think it is 9-18.  Yes, ma'am.

Q.   Okay.  So, let's look at what that letter says.  It says:  Therefore, Ms. Deary's settlement demand for $25,000 is hereby withdrawn; right?

A.   Yes.

Q.   But you would agree with me that there wasn't actually a settlement offer for $25,000 pending at that time?

A.   Well, as a matter of law, when a time demand goes un-responded to, if somebody tried to accept it after the date that it was timed to expire, the offeror could say, no, that offer expired.

It is no longer available.  However -- let me finish.  However, that doesn't mean that the settlement demand can't be continued.

But when she wrote in bold letters on September 18th, the settlement demand is, hereby, withdrawn -- she didn't say expired with the prior demand.

She didn't say, lapsed without response.  She said, hereby, withdrawn.

Then, she is, unequivocally, stating they are going to file a complaint for damages.  And there is no opportunity to settle anymore for $25,000.

Q.   All right.  So, is it your opinion that under the industry customs and standards, an insurance company no longer has an obligation to offer to settle for within the policy limits when a settlement offer is withdrawn?

A.   No.  I don't have that opinion.

Q.   Now that this letter was received by Progressive, should Progressive have continued to try to settle the claim for within the $25,000-policy limits?

A.   No.  Because on August the 15th they were told

by Yolanda she would not negotiate the claim.

And that is where we have the note that you asked me about earlier, where she advised who in their right mind would have surgery with no UM and only $25,000 in BI.

Q.   Which, obviously, is contradicted by the fact that Ms. Deary is scheduled for surgery; right?

A.   Well, sure.  It is contradicted.  I think it was nonsensical for Yolanda McGee to say something like that.

Q.   Are you assuming that Yolanda McGee did, in fact, say that?

A.   I am not assuming anything.  I am only reading what is written in black and white.  And, obviously, the author of the note heard what she wrote.

Or, thought that is what she heard, and documented her file.  That is all I can go by, is what is in black and white.

Q.   All right.  Now, after that October 4th of 2017 conversation -- and, I'll pull it back up on the claims notes.

Between that phone call on October 4, 2017, and the date that suit was actually filed against Mr. Norman, you would agree that Progressive did not make any other settlement offers?

A.   I agree that it did not make any different settlement offers, but it made efforts to follow up on the offer and try to negotiate the case.

Q.   Okay.  I am going to take you to a claim note by Evin Jarvis (phonetic) on December 4, 2017, which is on PGR741.  Do you see that?

A.   Yes, ma'am.

Q.   Okay.  And that was entered after Progressive learned that suit had been filed against the insured; correct?

A.   Let me get to -- where is it, again?

Q.   Sure.  It is on PGR741.

A.   Okay.

Q.   On December 4, 2017.

A.   Okay.

Q.   And, I'm showing it to you on the screensharing if you need assistance.

A.   Right.

Q.   Okay.  Do you see where Mr. Jarvis wrote, okay to use WPDHC if case does not resolve?

A.   Yes.

Q.   Does that indicate that Progressive was still trying to resolve this claim?

A.   It indicates that if there is a potential to resolve the case, an opportunity to settle, it was open

to doing so.  Yes, ma'am.

Q.   Okay.  Did you see any indication that prior to December 4, 2017, Progressive had tendered the $25,000-policy limits?

A.   No, ma'am.

Q.   Okay.  The first time that Progressive tendered the $25,000-policy limits, was that the proposal for settlement that was filed on June 14, 2018?

A.   I believe so.  Yes, ma'am.

Q.   Do you think that it was in compliance with its good-faith duties to act fairly and honestly, to wait all the way until June 14, 2018, to tender the policy limits?

A.   I think it was within acceptable claims handling procedures to wait until it got the records that it had long been requesting.

To justify the placement of its full policy limits on the case to try to protect its insured.  Yes, ma'am.

Q.   All right.  What is the specific record, in your opinion, placed Ms. Deary's claim at the $25,000-policy limits?

A.   I didn't understand.  I didn't get your question.  Something broke up.  What --

Q.   Sorry.  You said that once Progressive received the records that it had been asking for that at

that point, they should tender the $25,000.

Now, what specific record was it that, in your opinion, made Ms. Deary's claim worth $25,000?

A.   It was the medical-record documentation that was received by Attorney, J.R. Richards, in response to his request to produce.

That documented and verified that this young lady had the need cervical intervention at two levels of her cervical spine.

And that the provider would link that up to the motor vehicle accident.

Q.   All right.  So, the need for surgical intervention, not, necessarily, the fact that she had to go into intervention makes her claim worth $25,000; correct?

A.   Not -- well, the need is, of course, when you say that, it is being recommended by a licensed medical professional; right?

Q.   Yes.

A.   Yes.  Not just that somebody thinks they need surgery.

Q.   Right.

A.   Yes.

Q.   Okay.  Is it fair to say that in reaching your opinions in this case, as it applies to the appliance

with the good-faith duties, as well as the causation, that you essentially applied the facts to the law as you understand it?

A.   Well, I'm having difficulty with your question because I don't apply facts to law.  I mean, ultimately, that is a jury's job, as instructed by the court.

My opinion is based upon the evidence that is compiled, to judge from an expert perspective with the experience that I have in this arena.

As to whether Progressive met its obligations to Mr. Norman under the contract of insurance purchased by him.  And my opinion is they did.

Q.   And that experience is as an attorney in the State of Florida; correct?

A.   As a licensed attorney, who under Florida Statutes, I am able to adjust claims without any type of adjuster's license.  Yes, ma'am.

Q.   Has your opinion ever been limited by a court?

A.   Are you talking about the Ford case a few years ago?  Is that the one?

Q.   Yes.

A.   I think in that case, both my opinion and that of the Plaintiff Expert, Lou Jack (phonetic), were dispensed by the court as not being necessary to its determination of the issues before it.

Douglas McIntosh
October 14, 2020                                    98

Q.   Is it fair to say that the methodology that you used in this case is the same methodology that you employed in your expert review in the Ford case?

A.   I can't answer that.  I don't recall all of the issues in Ford and what my analysis was at that time.

Q.   Okay.  Let me stop the share screen.  Other than the opinions contained in your report and what we have discussed today in your deposition, do you have any other opinions in this matter?

A.   No.  I think there are more depositions and materials.  I think something came in yesterday that I haven't had a chance to review.

But, as of right now, no, ma'am.  I don't have any other opinions.

Q.   If you have any additional opinions, will you provide them to Mr. Machado's firm so that they can provide them to us?

A.   Yes.  Mr. Machado, certainly, if I am asked to do that.  I absolutely would.  Yes, ma'am.

Q.   Okay.  Now, your opinion on causation was, essentially, that nothing Progressive did or didn't do caused the excess exposure against Mr. Norman; correct?

A.   Yes.

Q.   What, in your opinion, did cause the excess

exposure?

A.   Ms. McGee refusing to extend the time, provide medical records, and deciding on her own, apparently without Mr. Williams' input, to withdraw and refuse to negotiate the $25,000 demand.

Q.   Are you familiar with the ethical obligations of attorneys in the State of Florida, to present all settlement offers to their clients?

A.   Yes.

Q.   Okay.  So, if Progressive had extended a settlement offer, Mr. Williams, as the attorney, would be obligated, or, at least, someone from his office would be obligated to present that offer to Ms. Deary; correct?

A.   Just as they would have been obligated to present the $8,500 offer.  Yes, ma'am.

Q.   Okay.  And did you see in Ms. Deary's deposition testimony that she stated that she was hopeful that the claim would have settled for the policy limits prior to suit being filed?

A.   I'm not sure that she used those words.  If you could take me to page and line, I am happy to look at it.

But I don't recall her saying she was hopeful that the $25,000 would have been tendered to her at any point

Douglas McIntosh
October 14, 2020                    100

in time.

Q.   Okay.  I'll do the screensharing, again.

A.   Okay.

Q.   I'm going to show you Ms. Deary's deposition transcripts.  On page 52 through 53, there are some objections in there.

But if you go to Page 53 at the top, do you see the question:  Do you think, do you personally think your claim could have settled prior to you getting the surgery?

And, do you see Ms. Deary's answer:  That is anyone's hope on this, on my side, being the one who had a car.

A.   Well, oh, yes.  I know -- I recall that testimony.  That is not what your question was before.  But, yes, I recall reading that.

Q.   All right.  Did you take that testimony into consideration in rendering your expert opinion?

A.   That it is anyone's hope that her claim could have settled for $25,000?

Q.   Yes.

A.   Yes.  I took that into consideration.

Q.   And that was prior to her getting surgery; right?

A.   Let me look at the temporal exchange, there.

Douglas McIntosh
October 14, 2020                                      101

Yes.  It was settled prior to having surgery was the context of the question.  Yes, ma'am.

Q.   Now, her surgery happened just about two or three days before suit was filed against Mr. Norman; correct?

A.   I think she testified -- she couldn't recall, exactly.  But, yes, she had the surgery in November.

Q.   Okay.  I have no further questions.

MS. MEILER:  Mr. Machado, do you have any follow-ups?

MR. MACHADO:  Yes.  Really, quickly.  I shouldn't take more than 10 minutes.

CROSS-EXAMINATION

BY MR. MACHADO:

Q.   Mr. McIntosh, you were asked about industry customs and practices of insurance companies and how that relates to Florida law.  Do you recall that?

A.   Yes.

Q.   In your experience, is it true and correct that some of these industry customs and practices of insurers are generally of a higher standard than the good-faith claims handling standards imposed under Florida law?

MS. MEILER:  Object to form.

THE WITNESS:  If you are talking about things

Douglas McIntosh
October 14, 2020                                    102

like best practices manuals -- is that what you are talking about?

BY MR. MACHADO:

Q.   Yes, sir.

A.   Yes.  The best practices manuals employed by insurance companies are often times altruistic or striving for the ultimate best.

And that exceeds what is required under the law for meeting good-faith obligations to an insured or can exceed it.

Q.   Okay.  You were also asked about documents Progressive needed to fully evaluate the claim, as of the July 17, 2017, demand by Gordon and Donner; correct?

A.   Yes.

Q.   I'm going to show you PGR735, which is a claim note.  Let me share the screen.  Okay.  735.  Do you see the claim note dated July 21, 2017, at 5:04 p.m.?

A.   Yes.

Q.   And it is a note by Amy Gabay, indicating that she left a message for Yolanda at attorney's office, needing the PIP log, ER bill, and MRI bill.  Do you see that?

A.   Yes.

Q.   What -- why would Progressive require, or need, these additional bills and the PIP log in order to

Douglas McIntosh
October 14, 2020                                    103

render a complete evaluation?

MS. MEILER:  Object to form.

THE WITNESS:  In the practice of evaluating claims, whether you are an insurance adjuster or an attorney trying to assist a client like Mr. Norman, you want to look at the medical bills for the tools that we utilize to try to evaluate what a claim might be worth in terms of both, settlement ranges and verdict ranges.

So, getting the PIP log is useful because there you will see the write-off on medical bills that can't be boarded.  And the actual real medical bills that can be recovered.

And, then, the emergency room bill, which I presume was Delray Medical Center, since it is a trauma surgery center.

And the MRI bill would be important.  Because those could be additional costs that might add to the value of the claim, based upon the tools utilized.

BY MR. MACHADO:

Q.   And do you recall the amounts of those bills?

A.   I don't recall them.  No, sir.

Q.   And, then, very quickly, you were asked about -- you were asked to identify anywhere in the record,

Douglas McIntosh
October 14, 2020                                    104

from your recollection, where Gordon and Donner refused to provide additional medical records.  Do you recall that?

A.   I do.

Q.   And in rendering your opinion, you reviewed the entire claim file in its entirety; correct?

A.   I did.

Q.   Let me show you PGR742.  It is a claim note dated January 3, 2018, at 3:36 p.m.  Do you see that note, there?

A.   Let me look.  January 3rd, 3:36 p.m.  Yes.

Q.   Now, that is a note by Jennifer Pearson (phonetic) who was an adjuster assigned to the case after the litigation commenced.

And she indicates, here, that she received a call from Paralegal, Sara.  And they indicated, here, that they were not going to provide new records, or a new demand at this time; correct?

A.   Yes.  I have that.  I got it in my chronology.

Q.   Right.  And why is this note significant in rendering your opinion?

MS. MEILER:  Object to form.

THE WITNESS:  Because it goes to my opinion that there was no reasonable opportunity presented to settle this case for $25,000 after it was

Douglas McIntosh
October 14, 2020                                    105

   withdrawn formally by the predecessor paralegal.

BY MR. MACHADO:

   Q.   Okay.  And, lastly, I am going to show you PGR744.  It is a note authored by Marion Arums.  You reviewed Marion Arums' deposition testimony; correct?

   A.   Yes.

   Q.   Now, do you see this note dated April 11, 2018, at 7:01 a.m.?

   A.   I do.

   Q.   It says, here, that Marion Arums ran an ISO on Darlene Deary.

   A.   Yes.

   Q.   What is an ISO?

   A.   It is a background check for prior claims that the industry utilizes, or lawyers, also, utilize them to see if there were prior events in the history of the claimant.

   Q.   Do you see in that note that he found two Motor Vehicle Accidents that Ms. Deary had suffered?

   A.   Yes.

   Q.   Do you recall one occurring -- do you see the February 14, 2018, motor vehicle accident?

   A.   Yes.

   Q.   Now, that is after, obviously, the accident that occurred that is the subject of this claim, March

17, 2017?

A.    Yes.

Q.    At this moment when Marion Arums ran this ISO search, Progressive had not tendered, or had not -- scratch that.

Progressive had not confirmed that Ms. Deary had an actual surgery; correct?

A.    I believe that is correct.

Q.    What about this February 14, 2018, accident? How does the discovery of that subsequent accident affect Progressive's claims handling in determining whether or not the surgery relates to the March 17, 2017, accident?

MS. MEILER:  Object to form.

THE WITNESS:  As the claims professional notes in the next note at 7:09 a.m., once you discover that there is a subsequent loss with the same area of the body as this was, you need updated medicals and discovery in the litigation process to be able to fully evaluate the claim.

BY MR. MACHADO:

Q.    And Progressive didn't get those updated medicals until June; correct?

A.    I believe the request for discovery went out in May and the records were received in June.  Yes, sir.

Douglas McIntosh
October 14, 2020                                    107

Q.   And based on those updated medicals, they sent a PFS for the policy; right?

A.   Yes, they did.

Q.   Is that, in your opinion, an evidence of Progressive's good-faith claim handling in this case?

A.   Yes.  I believe that that reflected that once they got the information that warranted the policy limits being offered, despite the fact that they were told many times, there would be no new demands and they would never accept the $25,000, they made an effort in good faith to try to settle the case for the limits that Mr. Norman had purchased.

Q.   Thank you.

MR. MACHADO:  I have no further questions.

MS. MEILER:  I have a quick follow-up.

REDIRECT EXAMINATION

BY MS. MEILER:

Q.   Did you review Progressive's original answer in affirmative defenses filed in this matter, or only their amended answer in affirmative defenses?

A.   If you can hang on a second, I can check to see what is in my pleadings clip.

Q.   Sure.

A.   I have their amended answer in affirmative defenses in my pleadings clip.

Q.   Okay.  You replied a number of times that, in your opinion, Progressive did not have a realistic opportunity to settle; is that accurate?

A.   They did not have a reasonable or realistic opportunity to settle the case once information was in-hand that warranted the payment of the sum purchased by Mr. Norman.  Yes.

Q.   Okay.  I am going to screenshare and show you the original answer in affirmative defenses that was filed in this matter.

All right.  Do you see my screen, Docket Entry 19, Progressive's answers in affirmative defenses in this case?

A.   Yes.

Q.   Okay.  I'm going to scroll down to the affirmative defenses, which is on Page 5.  Do you see that?

A.   I do.

Q.   Okay.  And do you see that Paragraph 41, the fourth affirmative defense?  Progressive states that Progressive did not have a realistic opportunity to settle.

A.   I see that.

Q.   And do you see right above it on the third affirmative defense that Ms. Deary was unwilling to

Douglas McIntosh
October 14, 2020                    109

settle?

A.   I see that.

Q.   Okay.  Now, the amended answer in affirmative defenses that were filed by Progressive -- and I will pull that up -- it is Docket Entry 20.

All right.  Do you see Progressive's amended answers in affirmative defenses in this case?

A.   Yes.

Q.   All right.  I'm going to scroll down to the affirmative defenses.  Do you see that the third and fourth affirmative defenses were withdrawn?

A.   I see that they don't appear here.  Yes.

Q.   Okay.  Does that affect your opinion in any way?

A.   No.

Q.   Okay.

A.   And I could add to that the reason why.

Q.   Sure.

A.   The first affirmative defense assumes those third and fourth affirmative defenses when it is asserted that it fulfilled all of its obligations owed under the policy and Florida law.

MS. MEILER:  I have no further questions.

Would you like to read or waive?

THE WITNESS:  I will read.

Douglas McIntosh
October 14, 2020                                    110

MS. MEILER:  Okay.  Thank you very much.

(Thereupon, the zoom deposition was concluded.)

CERTIFICATE OF OATH

STATE OF FLORIDA :

COUNTY OF BROWARD:

        I, NICHOLAS BRUENS, Florida Professional Reporter, Notary Public, State of Florida, certify that DOUGLAS M. MCINTOSH personally appeared before me on the 14th of October, 2020 and was duly sworn.

        Signed this 27th day of October, 2020.

_____
Nicholas Bruens
Notary Public, State of Florida
Commission No.:  #GG 298095
Commission Expires:  March 11, 2023

Douglas McIntosh
October 14, 2020                                        112

CERTIFICATE OF REPORTER


STATE OF FLORIDA :

COUNTY OF BROWARD:


          I, NICHOLAS BRUENS, Florida Professional

Reporter, certify that I was authorized to and did

report the deposition of DOUGLAS M. MCINTOSH; pages 1

through 109; that a review of the transcript was

requested; and that the transcript is a true record of

my notes.

          I further certify that I am not a relative,

employee, attorney, or counsel of any of the parties,

nor am I a relative or employee of any of the parties'

attorneys or counsel connected with the action, nor am I

financially interested in the action.


          Dated this 27th day of October, 2020.




                              _____
                              NICHOLAS BRUENS
                              Court Reporter

WITNESS NOTIFICATION LETTER


October 27th, 2020




DOUGLAS M. MCINTOSH - DMCINTOSH@SMSM.COM

DARLENE DEARY, individually and as assignee of DWIGHT NORMAN VS. PROGRESSIVE AMERICAN INSURANCE COMPANY

    Deposition taken on October 14, 2020.


The transcript of the above proceeding is now available for your review. Please call to schedule an appointment between the hours of 9:00 a.m. and 4:00 p.m., Monday through Friday, at an office located nearest you. Please complete your review within a reasonable time and return the errata sheet to our office. You need not return the entire transcript.


Sincerely,


_____
Nicholas Bruens



CC via transcript:

MICHAL MEILER, ESQUIRE